# EXHIBIT 1

Fulton County Superior Court
***EFILED***TV
Date: 9/3/2025 6:07 PM
Che Alexander, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

|  |  |
|---|---|
| SHERRI ALLEN, in her capacity as Chair of the FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS, and NADINE WILLIAMS, in her capacity as Executive Director of the FULTON COUNTY DEPARTMENT OF REGISTRATION AND ELECTIONS, |  |
| Petitioners, | Civil Action File No. 24CV014632 |
| v. |  |
| STATE OF GEORGIA, |  |
| Respondent. |  |

## AMENDED PETITION FOR DECLARATORY AND INJUNCTIVE RELIEF REGARDING STATE ELECTION BOARD SUBPOENAS

Petitioners Sherri Allen, in her capacity as Chair of the Fulton County Board of Registration and Elections ("BRE"), and Nadine Williams, in her capacity as Executive Director of the Fulton County Department of Registration and Elections ("DRE"), respectfully submit this Amended Petition seeking declaratory and injunctive relief regarding two identical subpoenas issued by the State Election Board on November 5, 2024 (copies attached as **Exhibits 1** and **2**, respectively).

Petitioners seek declarations that the subpoenas (1) unlawfully seek irrelevant information regarding alleged issues in connection with the 2020 election that have been the subject of numerous closed State Election Board reviews and investigations; (2) unlawfully were issued in retaliation for BRE's refusal to agree to certain monitors for the 2024 election suggested by certain Board members; and (3) should be subject to normal cost-shifting principles for subpoenas under O.C.G.A. § 24-13-23(b).

Petitioners also seek corresponding injunctive relief (1) quashing the subpoenas in their entirety or (2) requiring the State Election Board to pay Petitioners' reasonable expenses for retrieving and copying the documents requested in the subpoenas.

In support of this Amended Petition, Petitioners respectfully show the Court the following:

## I.    FACTUAL BACKGROUND

1.    During the November 2020 general election, BRE agreed to retain Carter Jones of Seven Hills Strategies to serve as an independent election monitor. Mr. Jones issued a report describing his observations at the time (copy attached as **Exhibit 3**).

2.    Despite this contemporaneous monitoring of the 2020 general election, the performance of BRE and DRE in the 2020 general election has been the subject of numerous additional complaints, investigations, and reviews by the State Election Board, all of which have been resolved and closed.

3.    Following passage of SB 202 in August 2021, the State Election Board—presently consisting of Chair John Fervier, Rick Jeffares, Janelle King, Dr. Janice W. Johnston, and Sara Tindall Ghazal—appointed a Performance Review Board—consisting of Ryan Germany (then General Counsel to the Georgia Secretary of State), Ricky Kichens (Coosa County election official), and Steven Day (Gwinnett County election official)—to conduct a thorough review of the performance of BRE and DRE during the 2020 general election and to monitor their performance during the 2021 and 2022 general elections.

4.    The Performance Review Board issued a report in January 2023 (copy without exhibits and attachments attached as **Exhibit 4**), which the State Election Board adopted in June 2023. The Performance Review Board addressed numerous allegations and claimed violations,

including double-scanning ballots during the recount of the votes for the President of the United States in 2020. Based on the recommendations of the Performance Review Board, the State Election Board decided it would neither suspend nor remove BRE as Fulton County election superintendent.

5.    The State Election Board also resolved a complaint (styled as SEB Case Nos. 2021-181 and 2022-025) alleging 36 inconsistencies in the batch tally sheets for the risk-limiting audit conducted by BRE and DRE following the 2020 election.

6.    The Secretary of State investigated the batch tally sheet allegations and found DRE failed to enter all audit batch sheet data accurately because of human error.

7.    The State Election Board issued a Consent Order (copy attached as **Exhibit 5**) in June 2023 directing BRE to implement written policies and procedures for conducting risk-limiting audits and to train staff on these policies and procedures. The Consent Order fully resolved these issues.

8.    The State Election Board also received a complaint (styled as SEB Case No. 2023-025) alleging that DRE double-scanned ballots during the recounts of the 2020 election.

9.    The State Election Board referred the complaint to the Secretary of State, which reported the results of its investigation in a presentation to the State Election Board on May 7, 2024.

10.    The State Election Board sent DRE, as the respondent, notice of the May 7, 2024, meeting on April 2, 2024, providing an opportunity for DRE to be heard on the matter.

11.    At the May 7, 2024, State Election Board meeting, the Secretary of State investigator presented his findings that DRE double-scanned a small number of ballots during the 2020 recount, but the investigator otherwise rejected virtually all the allegations set forth in

SEB 2023-025. Despite finding double-scanning of a small number of ballots, the investigator found no evidence that DRE had counted ballots twice in the final vote counts for the 2020 presidential election.

12.     The Secretary of State investigator also noted that even if these votes had been counted twice, the outcome of the 2020 presidential election in Georgia would not have changed.

13.     Following the investigator's presentation, the State Election Board invited DRE, as respondent, to make a statement, which it did. DRE's representative presented its position regarding the investigation, after which the State Election Board asked questions of the investigator, the DRE representative, and others present at the hearing.

14.     After these statements from both sides and an extensive question-and-answer session, then-State Election Board member Ed Lindsey made a motion for the State Election Board to issue a letter of reprimand to BRE and DRE relating to violations of State Election Board rules as found by the investigation of SEB Case No. 2023-025.

15.     Mr. Lindsey stated that, in lieu of referring the case to the Attorney General, he was "recommending a letter of reprimand with the understanding that," by the next State Election Board meeting in July 2024, "the respective parties [the State Election Board, Secretary of State, and BRE] will reach an agreement as to a . . . mutually agreeable monitor" to observe Fulton County elections during the November 2024 general election. *See* **Exhibit 6** [excerpts of hearing transcript], at 214.

16.     Mr. Lindsey stated that if the parties did not agree on the monitor by the next meeting in July, he would "come back with a motion to reconsider and send it to the Attorney General." *Id.* at 215.

17.    Member Sara Tindall Ghazal seconded Mr. Lindsey's motion to issue a letter of reprimand in SEB Case No. 2023-025 "[f]or the sake of moving things along and having closure." *Id.*

18.    Mr. Lindsey's motion to issue a letter of reprimand passed. The letter of reprimand, dated June 13, 2024 (copy attached as **Exhibit 7**), found that BRE and DRE violated State Election Board rules regarding the double-scanning of ballots during the 2020 General Election Recount "[b]ased on the facts found at the [May 7, 2024] meeting." The letter also "instructed" BRE and DRE "to refrain from further violations" and "admonished" BRE and DRE "to comply with all the State Election Board rules and Georgia law" going forward.

19.    The letter of reprimand also stated that the Secretary of State, the State Election Board, and BRE would enter a Memorandum of Understanding regarding an election monitor by the State Election Board meeting in August 2024. The State Election Board, however, never presented a proposed Memorandum of Understanding to BRE.

20.    After issuance of the letter of reprimand, the Secretary of State accepted a proposal by Ryan Germany, the former General Counsel for the Secretary of State, to serve as the election monitor in Fulton County for the 2024 general election.

21.    BRE received election monitor proposals from Mr. Germany and from State Election Board Member Dr. Janice Johnston. After considering the two proposals, BRE voted to accept Mr. Germany's proposal at its July 11, 2024, meeting and to reject the proposal from Member Johnston.

22.    At its July 2024 meeting, the State Election Board did not accept Mr. Germany's proposal or seek reconsideration or rehearing of the decision to close SEB Case No. 2023-025,

but instead voted to defer consideration of "further research into the allegations made concerning the 2020 election" in Case No. 2023-025 to its August meeting.

23.     At the State Election Board's meeting on August 7, 2024, Board Member Johnston asserted that SEB Case No. 2023-025 had not been closed because the State Election Board had not agreed to a monitor proposal for the 2024 election in Fulton County. *See* **Exhibit 9** (excerpts of August 7, 2024, meeting), at 608-11.

24.     In response, Board Chair John Fervier stated the case cannot be "reopened . . . because action's already been taken," and there is "a principle in law . . . called res judicata," which says "you can't be tried twice for the same thing." *Id.* at 613. Because Fulton County had "been heard by this board," Chair Fervier stated "that case has been adjudicated" and is "over"— warning that an "attempt to reopen" the 2023-025 case would set "a horrible precedent for this board" and put the State Election Board "in legal jeopardy." *Id.* at 613-15, 622.

25.     Also at the State Election Board's August 2024 meeting, both Mr. Germany and Ms. Christina Propst, another potential monitor, made proposals regarding election monitors in Fulton County, but the State Election Board did not vote to accept either proposal.

26.     Chair Fervier met with Petitioner Allen and an attorney for BRE to discuss the monitoring issues on August 21, 2024. Chair Fervier did not provide a list of potential monitors or an executable Memorandum of Understanding for Petitioner Allen to present to BRE.

27.     BRE held a meeting on August 29, 2024, to hear additional monitoring proposals. Although the State Election Board had been invited to the meeting, no one from the State Election Board appeared, nor did anyone that represented the group in the monitor proposal advanced by Member Johnston. BRE reaffirmed its vote to accept Mr. Germany's monitoring proposal at that meeting.

28.     After the State Election Board's next meeting on September 20 and 23, 2024, Chair Fervier and Member Johnston met with Petitioner Allen regarding the monitoring issues on September 30, 2024.

29.     During that meeting, Member Johnston suggested that additional monitors could be compensated out of the budget for Mr. Germany's monitoring team. When Petitioner Allen asked for the State Election Board's legal authority to require that BRE utilize particular monitors, Member Johnston acknowledged there was none.

30.     Member Johnston stated that if BRE did not agree to the additional monitors, the State Election Board would have no choice but to "disavow" BRE as Fulton County's election superintendent.

31.     At the State Election Board's October 8, 2024, meeting, certain Board members claimed that BRE had rejected Member Johnston's proposed additional monitors. After discussion regarding Petitioners' rejection of Member Johnston's proposed election monitoring team and in apparent retaliation for this rejection, Member Johnston moved to issue the subpoenas Petitioners now seek to quash. *See* **Exhibit 10** (excerpts of October 8, 2024, meeting), at 145-48.

32.     Board Member Sara Tindall Ghazal explained that SEB Case No. 2023-025 "is a closed case under the law," and that "[i]t's been made very clear by the Attorney General's Office that they consider that the case is adjudicated. We have no legal standing to force this, force a monitoring team." *Id.* at 149-50. Board Chair Fervier reiterated the Attorney General's "guidance" on "whether this case should be closed or not." *Id.* at 159-60.

33.     In response to Board Chair Fervier's comments, Board Member King did not dispute that the subpoenas had been issued because of BRE's refusal to agree to the monitors

suggested by Board Member Johnson: "This is in reference to them not fulfilling their end of the bargain. We gave them ample opportunities to work with us. And we've given them, we provided them with an additional list, and they refuse to do it. They put themselves in this position. They need to produce the documents." *Id.* at 160.

34.     Board Chair Fervier reiterated that BRE's alleged refusal to accept additional monitors for the 2024 election had nothing to do with the subpoenas for 2020 election documents: "Dr. Johnson's motion is requesting documents related to the 2020 election and the [2023-025] case. It has nothing to do with the monitoring necessarily. It's requesting documents from back then, which has nothing to do with the fulfillment of the monitoring." *Id.* Board Member King responded that "it has to do with the same case. It's just all the same." *Id.*

35.     The Board then voted 3-2 to issue the subpoenas. *Id.* at 161-62.

36.     The State Election Board later confirmed that the subpoenas address the same issues covered by the previous closed investigations. In a legal hold letter issued to BRE and DRE on November 7, 2024 (copy attached as **Exhibit 8**), the State Election Board described the subpoenas as part of the State Election Board's investigation into "certain unexplained anomalies in vote tabulation and storage related to the 2020 elections and the recounts of those election results (the initial count, the hand recount, any risk-limiting or other audits, and the machine recount), including the reasons for the variances noted by the audits and recounts and the investigations related to those events (collectively the 'Events')." These "Events" had already been the subject of multiple completed and closed State Election Board complaints and investigations.

37.    Despite voting to issue the subpoenas on October 8, the State Election Board did not serve the subpoenas for almost a month, ultimately doing so on November 5, 2024 (election day).

38.    The subpoenas ordered Petitioners to provide 18 broad categories of documents regarding the 2020 election by November 18, 2024, despite Petitioners' extensive election-related obligations between November 5 and November 18, 2024.

39.    Although election records usually must only be retained for two years under O.C.G.A. § 21-2-73, voluminous records from the 2020 election have been retained because of litigation and State Election Board investigations.

40.    Petitioners have investigated the time and expense that would be necessary to comply with the subpoenas.

41.    To locate the documents requested in the subpoenas, over 700 boxes of 2020 election materials must be opened, searched, and sorted. *See* Affidavit of Nadine Williams (attached as **Exhibit 11**) ¶ 3. To conduct this search and make copies of the requested documents, Petitioners estimate they will need to hire 15 temporary staff members to work full time (40 hours a week), at approximately $26/hour, as well as a supervisor, paid at $45/hour, for a period of approximately 15 weeks. *Id.* ¶¶ 4-5. Petitioners also estimate they will need to hire four temporary staff members to work full time, at approximately $26/hour, for a period of four weeks to perform redactions of personal information from documents requested in the subpoenas. *Id.* ¶ 6.

42.    Based on those estimates, the total cost of the staffing necessary to respond to the subpoenas would be approximately $281,800. *Id.* ¶ 7. Petitioners also estimate $95,000 in costs to make copies, at 15 cents per page, of the approximately 300,000 ballot oath envelopes and

other documents requested by the subpoenas, which are estimated to be 333,333 pages. *Id.* ¶ 8. Altogether, Petitioners' estimated cost to comply with the subpoenas, including labor and copying costs, is $376,800. *Id.* ¶ 9.

43.    Petitioners do not currently possess the funding or resources necessary to comply with the subpoenas. To hire the necessary temporary staff, DRE would need to obtain funding from the Fulton County Board of Commissioners; engage in a full procurement process relative to these temporary services; and enter a contract with the successful offeror. The successful offeror would then retain temporary staff who would require training to comply with the subpoena. *Id.* ¶ 10.

## II.    WAIVER OF SOVEREIGN IMMUNITY

44.    In accordance with the Georgia Constitution's waiver of sovereign immunity in Article I, Section II, Paragraph V(b)(1), Petitioners sue the State for declaratory and injunctive relief regarding the State Election Board's subpoenas. *See Republican Nat'l Comm. v. Eternal Vigilance Action, Inc.*, 917 S.E.2d 125, 137 (Ga. 2025) (explaining that waiver of sovereign immunity encompasses actions seeking declaratory relief as to allegedly unlawful actions of any "board" of "this state" as well as authorizing a court to "enjoin such acts upon granting declaratory relief" (quoting Ga. Const. Art. I, § II, ¶ V(b)(1))); *Warbler Invs., LLC v. City of Social Circle*, 321 Ga. 125, 128 (2025) (noting sovereign immunity waiver includes declaratory relief as well as related "injunctive relief").

45.    In support of its argument that Petitioners had named the incorrect defendant in this action, the State's Response to Petitioners' initial Petition cited *Burton v. Glynn County*, 297 Ga. 544, 549 (2015), which addressed the different issue of whether a declaratory judgment that did not include injunctive relief could support a contempt order (holding it could not).

46.    Here, Petitioners seek declarations that the subpoenas (1) unlawfully seek irrelevant information regarding 2020 election issues that already have been addressed multiple times; (2) unlawfully were issued in retaliation for BRE's refusal to accept certain monitors for the 2024 election suggested by certain State Election Board members; and (3) trigger ordinary cost-shifting burdens from the responding party to the requesting party.

47.    Petitioners additionally seek corresponding injunctive relief (1) quashing the subpoenas in their entirety; or (2) requiring the State Election Board to pay all reasonable costs and expenses incurred in retrieving and producing the information sought in the subpoenas.

## III.    STANDARD OF REVIEW

48.    This Court has the power "to declare rights and other legal relations" of interested parties both "[i]n cases of actual controversy" and "in any civil case in which it appears to the court that the ends of justice require that the declaration should be made." O.C.G.A. § 9-4-2. Because the State Election Board's subpoenas seek irrelevant information regarding 2020 election issues that have been examined multiple times and resolved, and because the State Election Board issued the subpoenas in retaliation for BRE's refusal to utilize certain monitors for the 2024 election, Petitioners seek a declaration that service of the subpoenas constitutes unlawful action by the State Election Board.

49.    Moreover, because Petitioners timely petitioned to quash the subpoenas, this Court has the power to grant corresponding injunctive relief by quashing or modifying the "unreasonable and oppressive" subpoenas. O.C.G.A. § 24-13-23(b)(1); *accord* O.C.G.A. § 9-11-45(a)(1)(C). This discretion should be exercised based on the "peculiar facts arising from the subpoena itself and other proper sources." *Walker v. Bruhn*, 281 Ga. App. 149, 151 (2006); *see*

*also id.* (affirming order quashing subpoena and noting that "[i]tems that are neither pertinent nor relevant need not be produced" (citation omitted)).

## IV.   REQUEST FOR DECLARATION THAT THE STATE ELECTION BOARD'S SUBPOENAS UNLAWFULLY SEEK IRRELEVANT INFORMATION AND CORRESPONDING INJUNCTIVE RELIEF QUASHING THE SUBPOENAS

50.    Petitioners incorporate paragraphs 1-49 as if fully alleged herein.

51.    Matters concerning the 2020 general election have been resolved by the State Election Board through at least three closed matters.

52.    First, the State Election Board appointed the Performance Review Board to conduct a thorough investigation of the 2020 election. The Performance Review Board did not recommend suspension or removal, and the State Election Board voted to adopt the Performance Review Board's recommendation in June 2023.

53.    Second, also in June 2023, the State Election Board issued a Consent Order to resolve the allegations in SEB Case Nos. 2021-181 and 2022-025 concerning the risk-limiting audit conducted by DRE after the 2020 general election. These complaints have been fully resolved.

54.    Third, an investigation, review, and hearing in SEB Case No. 2023-025, which involved allegations of double-counting of ballots, resulted in the issuance of a letter of reprimand in June 2024.

55.    The State Election Board's proceedings in Case No. 2023-025 preceding its issuance of the letter of reprimand were thorough and quasi-judicial in nature. The Board investigated the underlying facts; held a hearing at which the investigator and the respondent (DRE) were entitled to and did make presentations and statements; and questioned witnesses at the hearing. *See Lilly v. Heard*, 295 Ga. 399, 403 (2014) (explaining that, where board of elections is "resolving a factual dispute through procedures that are sufficiently similar to those

of courts," "both sides to the controversy had the right to be heard and present evidence," and "the challenger was given a full and fair opportunity to contest [the underlying factual issues]," that board is "acting as a 'court of competent jurisdiction' for purposes of res judicata").

56.    The State Election Board's letter of reprimand in SEB 2023-025 was final and binding on the parties. While then-Member Lindsey claimed he could "mo[ve] to reconsider" the State Election Board's decision to issue a letter of reprimand in Case No. 2023-025 if the parties did not agree upon a monitor by the July 2024 meeting, no State Election Board member ever formally moved or voted to reopen the case (if such a reopening were even permitted), and no person timely appealed the letter of reprimand resolving SEB Case No. 2023-025 within the mandatory 30-day period for any such appeals. O.C.G.A. § 50-13-19(b); *see also Bd. of Regents of Univ. Sys. of Georgia v. Drake*, 372 Ga. App. 202, 205-06 (2024) (rejecting Board of Regents' argument that its decision "was not a final, quasi-judicial decision," noting that "the possibility of an appeal did not render the [Board]'s decision non-final").

57.    The State Election Board's decision at the July 2024 meeting "to defer further research into the allegations made concerning the 2020 election" also did not and could not "re-open" the matters already investigated and resolved via a letter of reprimand in Case No. 2023-025. Nor did the parties' failure to enter a Memorandum of Understanding regarding 2024 election monitors undermine the finality of the determinations made in the letter of reprimand regarding the 2020 election.

58.    Thus, the State Election Board's decision to resolve SEB 2023-025 through a letter of reprimand was final and entitled to *res judicata* for the matters addressed therein. *See also, e.g., Riverdale Land Grp., LLC v. Clayton County*, 354 Ga. App. 1, 6 (2020) (where a

"decision . . . required the Board to determine 'the facts and apply the ordinance's legal standards to them,'" it was a "decision making process akin to a judicial act").

59.     "Georgia courts have repeatedly held that questions of fact ruled upon by an administrative body are thereafter precluded from re-litigation in civil suits by the doctrines of res judicata and collateral estoppel." *Lilly*, 295 Ga. at 402 (quoting *Malloy v. State,* 293 Ga. 350, 354-55 (2013)). In *Lilly*, the Supreme Court held that a local election superintendent's determination of a candidate's ineligibility to run for local office was binding on the trial court in subsequent litigation brought by the candidate to re-litigate eligibility.

60.     Here, as in *Lilly*, the State Election Board lacks the authority to re-litigate matters it already has resolved. Each of the State Election Board's multiple investigations into the 2020 election has been completed and closed. These include the Performance Review Board recommendation in 2023, the Consent Order in 2023, and the letter of reprimand in 2024.

61.     Having fully adjudicated and closed investigations regarding specific alleged issues with the 2020 general election, the State Election Board lacks the authority to reinvestigate and re-adjudicate those same issues. *See, e.g.*, *Jordan v. Bd. of Pub. Safety*, 253 Ga. App. 339, 342 (2002) ("[Q]uestions of fact once ruled upon by an administrative body . . . are thereafter precluded from re-litigation by the doctrines of res judicata and estoppel by judgment." (citation omitted)).

62.     Moreover, the discussion regarding issuance of the subpoenas at the State Election Board's October 8, 2024, meeting shows that the State Election Board issued the subpoenas not as a proper exercise of its powers, but instead as a retaliatory act because BRE had refused to accept additional election monitors proposed by certain State Election Board members.

63.     The State Election Board's issuance of unreasonable and oppressive subpoenas as punishment for BRE's refusal to agree to certain monitors for the 2024 election should be rejected as "[a]rbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." O.C.G.A. § 50-13-19(h)(6); *see also*, *e.g.*, *Northeast Ga. Med. Ctr., Inc. v. Winder HMA, Inc.*, 303 Ga. App. 50, 58 (2010) (defining arbitrary as "done capriciously or at pleasure; without adequate determining principle; not founded in the nature of things; non-rational; not done or acting according to reason or judgment; depending on the will alone; absolutely in power; capriciously; tyrannical; despotic" (citation omitted)).

64.     Based on the foregoing allegations, Petitioners seek a declaration that the State Election Board may not issue subpoenas seeking additional information related to cases that have been investigated and closed.

65.     Petitioners further seek a declaration that the State Election Board unlawfully issued the subpoenas in retaliation for BRE's refusal to agree to utilize certain monitors for the 2024 election that had been suggested by certain State Election Board members.

66.     Petitioners additionally seek corresponding injunctive relief in the form of an order quashing the November 4, 2024, subpoenas issued by the State Election Board as unreasonable, oppressive, arbitrary, and capricious.

**V.      REQUEST FOR DECLARATION THAT STATE ELECTION BOARD'S SUBPOENAS IMPOSE UNREASONABLE AND OPPRESSIVE BURDENS ON PETITIONERS, BRE, AND DRE, AS WELL AS CORRESPONDING INJUNCTIVE RELIEF QUASHING OR MODIFYING SUBPOENAS**

67.     Petitioners incorporate paragraphs 1-49 as if fully alleged herein.

68.     Independent from their unlawfulness based on res judicata, arbitrariness, and capriciousness, the subpoenas impose an unreasonable and oppressive substantive burden on Petitioners, BRE, and DRE.

69.     The substantive requests in the subpoenas would require review of all materials retained from the 2020 election, which have been archived in more than 700 boxes.

70.     To search for and make copies of the requested documents from these 700 boxes, Petitioners estimate they will need to hire 15 temporary staff members to work full time (40 hours a week), at approximately $26/hour, as well as a supervisor, paid at $45/hour, for a period of approximately 15 weeks. Williams Aff. (**Ex. 11**) ¶¶ 4-5.

71.     Petitioners also estimate they will need to hire four temporary staff members to work full time, at approximately $26/hour, for a period of four weeks to perform redactions of personal information from documents requested in the subpoenas. *Id.* ¶ 6.

72.      Petitioners estimate the total cost of the staffing necessary to respond to the subpoenas would be approximately $281,800. *Id.* ¶ 7. Petitioners also estimate $95,000 in costs to make copies, at 15 cents per page, of the approximately 300,000 ballot oath envelopes and other documents requested by the subpoenas, which are estimated to be 333,333 pages. *Id.* ¶ 8.

73.     Altogether, Petitioners' estimated cost to comply with the subpoenas, including labor and copying costs, is $376,800. *Id.* ¶ 9.

74.     O.C.G.A. § 24-13-23(b) authorizes the Court upon timely motion not only to "[q]uash or modify [a] subpoena if it is unreasonable and oppressive," but also to "[c]ondition denial of the motion upon the advancement by the person in whose behalf the subpoena is issued of the reasonable cost of producing the books, papers, documents, or tangible things."

75.     This Court has broad discretion to quash the subpoenas based on their unreasonableness or oppressiveness, and it should exercise its discretion to do so here. *See Walker*, 281 Ga. App. at 151.

76.     At a minimum, the Court should shift the costs of any production required under the subpoenas to the State. *See, e.g.*, *Norfolk S. Ry. Co. v. Hartry*, 316 Ga. App. 532, 534 n.6 (2012) ("[W]here the requesting party has filed a subpoena requesting the production of documents, the court has the discretion to 'quash or modify the subpoena if it is unreasonable and oppressive, or to condition denial of the motion upon the advancement . . . of the reasonable cost of producing the . . . documents[.]'" (quoting § 9–11–45(a)(1)(C) and citing *Ga. Emission Testing Co. v. Reheis,* 268 Ga. App. 560, 564 (2004))).

77.     Moreover, because at least some requests in the "subpoenas seek materials that would generally be considered public records subject to production under Georgia's Open Records Act (O.C.G.A. § 50-18-70 *et seq.*)," State's Response to Petition, at 7, the State Election Board should be required to pay "a reasonable charge for the search, retrieval, redaction, and production or copying costs for the production of records" sought by their subpoenas, as with any requesting party under the Open Records Act. O.C.G.A. § 50-18-71(c).

78.     Petitioners request a declaration that these normal cost-shifting principles also apply to subpoenas issued by the State Election Board.

79.     Petitioners also seek corresponding injunctive relief regarding the subpoenas. If the Court does not quash the State Election Board's subpoenas, Petitioners request that the Court enter an order requiring the State Election Board to pay reasonable expenses for retrieving and copying the documents.

## VI.    CONCLUSION

80.     Petitioners seek declarations regarding the unlawfulness of the subpoenas issued by the State Election Board and the applicability of normal cost-shifting principles to the subpoenas, as well as corresponding injunctive relief. The subpoenas concern the 2020 election

and issues that have been the subject of multiple closed State Election Board matters, and the State Election Board improperly issued the subpoenas in response to BRE's refusal to accept election monitors proposed by some members of the State Election Board. The subpoenas also seek 18 different categories of documents and would require review of the entire set of archived materials from the 2020 election, which Petitioners estimate will take at least 15 weeks and hundreds of thousands of dollars to conduct.

      **WHEREFORE**, Petitioners seek the following relief:

      1.    A declaration that the State Election Board may not subpoena materials relevant only to closed reviews and investigations;

      2.    A declaration that the State Election Board unlawfully issued the subpoenas in retaliation for BRE's refusal to accept certain monitors for the 2024 election proposed by certain State Election Board members;

      3.    Injunctive relief quashing the subpoenas as unreasonable, oppressive, and seeking irrelevant information;

      4.    A declaration that normal cost-shifting principles for subpoenas apply to subpoenas issued by the State Election Board;

      5.    If and to the extent Petitioners must produce materials in response to the subpoenas, an order requiring the State Election Board to pay reasonable expenses for retrieving and copying the documents; and

      6.    Such other and further relief as the Court deems just and proper.

Respectfully submitted this 3rd day of September, 2025.

/s/ Michael W. Tyler
Michael W. Tyler (Ga. Bar 721152)
C. Allen Garrett, Jr. (Ga. Bar 286335)
Jennifer Cotton (Ga. Bar 520708)
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309
(404) 815-6500
(404) 815-6555 (facsimile)
mtyler@ktslaw.com
agarrett@ktslaw.com
jcotton@ktslaw.com

*Counsel for Petitioners*

**CERTIFICATE OF SERVICE**

This certifies that I have this 3rd day of September, 2025, electronically filed the

foregoing AMENDED PETITION FOR DECLARATORY AND INJUNCTIVE RELIEF

REGARDING STATE ELECTION BOARD SUBPOENAS with the Clerk of Court using the

Odyssey eFileGA system, which will automatically send email notification, service and

documentation of such filing to all attorneys of record, including the following counsel for

Respondent:

Elizabeth T. Young
eyoung@law.ga.gov

Danna Yu
dyu@law.ga.gov

*/s/ Michael W. Tyler*
Michael W. Tyler (Ga. Bar 721152)
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309
(404) 815-6500
(404) 815-6555 (facsimile)

*Counsel for Petitioners*

EXHIBIT 1

# BEFORE THE STATE ELECTION BOARD
## STATE OF GEORGIA

IN THE MATTER OF:

**Fulton County Board of Elections**

**Respondents**

### *SUBPEONA DUCES TECUM*

TO: Fulton County Board of Registration and Elections

    Sherri Allen, Chair of the Board of Registration and Elections

    5600 Campbellton Fairburn Road

    Union City, GA 30213

    Sherri.allen@fultoncountyga.gov

**YOU ARE HEREBY COMMANDED AND DIRECTED** that, laying all other business aside, you shall produce, pursuant to this subpoena issued by the State Election Board pursuant to O.C.G.A. 21-2-33, by hand delivery or email to **Vice Chairperson Janice Johnston (jjohnstonmd.seb@gmail.com).** Production pursuant to this subpoena shall be made on or before **November 18, 2024,** and shall include all of the Information (as that term is described Abelow), described in paragraphs 1-12 below, pertaining to the 2020 General Election and the supporting documentation that is retained after such elections:

A. Election Day

1. Copies of the Consolidated Return Sheets required to be delivered under O.C.G.A. § 21-2-497. See also Ga.Rule 183-1-12-.12(b).

2. Copies of the opening and closing scanner tapes (the "zero" tapes and the "tabulation tapes"), as executed and required for each ballot scanner by O.C.G.A. § 21-2-374(b), 450(a)(2) ("zero tapes") and O.C.G.A. § 21-2-455(b) (tabulation tapes, as executed). See also Ga.Rule 183-1-12-.10 and Ga.Rule 183-1-12-.12(a)(1).

3. The poll pad recap sheets for each precinct prepared as required by Ga.Rule 183-1-12-.12(a)(2).

4. The absentee ballot recap sheets prepared under O.C.G.A. § 21-2-483(d) and 484.  See also Ga.Rule 183-1-12-.12(a)(2).

5. The numbered list of voters and "return sheets" required by O.C.G.A. §§ 21-2-436; 21-2-454(b); and 21-2-500(a).  See also O.C.G.A. § 21-2-2(16) and Ga.Rule 183-1-12-12)(a).

6. All information related to and including the chain of custody forms and related reconciliation report required by O.C.G.A. §§ 21-2-374; 21-2-456; 21-2-382(c)(3); Ga.Rule 183-1-.05 & .06; Ga.Rule 183-1-12-.12(e).

7. The electronic files required to be delivered by O.C.G.A. § 21-2-500 (including ballot images, tabulation, and log files).  See Ga.Rule 183-1-12-.13(a)(b).

8. All documents reflecting the security seals required for the storage and transportation of equipment and election records and all related security verification forms.  See Ga.Rules 1-12-.10(2); 1-12-.12(a)(5)

B. Advance In-Person Voting

1. The daily recap sheet prepared at the end of each day for advance in-person-polling place scanners, as required by Ga.Rule 183-1-14-.02(9).

2. Copies of the opening and closing scanner tapes (the "zero" tapes and the "tabulation tapes"), as executed and required for each ballot scanner by Ga.Rule 183-1-14-.02(7) ("zero tapes") and Ga.Rule 183-1-14-.02(15) (tabulation tapes, as executed).

3. Copies of the daily recap forms for each in-person polling place scanners. Ga.Rule 183-1-14-.02(9)

4. The electronic files required to be delivered by O.C.G.A. § 21-2-500 (including ballot images, tabulation, and log files).  See Ga.Rule 183-1-12-.13(a)(b).

5. All documents reflecting the security seals required for the storage and transportation of election records and all related security verification forms.  See Ga.Rules 1-12-.10(2); 1-12-.12(a)(5)

C. Mail-In Voting

1. The absentee numbered list of voters.O.C.G.A. § 21-2-411; Ga.Rule 183-1-12-.19

2. Digitized copies of the absentee ballot oath envelopes required by O.C.G.A. § 21-2-390.

3. The electronic files required to be delivered by O.C.G.A. § 21-2-500 (including ballot images, tabulation, and log files).  See Ga.Rule 183-1-12-.13(a)(b).

4. All documents reflecting the security seals required for the storage and transportation of election records and all related security verification forms. See Ga.Rules 1-12-.10(2); 1-12-.12(a)(5)

5. All information related to and including the Chain of custody forms-Poll manager and technician purposes.

"Information" as used in the subpoena means documents, in hard copy, electronic, photographic or any other form or format.

Because of the sensitive nature of this inquiry, you are hereby requested not to discuss this subpoena outside of disclosure that is necessary to comply with this subpoena. Should you have any questions, please contact **Vice Chairperson Johnston at 404-558-2711 or by email jjohnstonmd.seb@gmail.com.**

**HEREIN FAIL NOT UNDER PENALTY OF LAW, this 5th day of November, 2024**

Michael T. Coan

Executive Director, State Election Board

EXHIBIT 2

**BEFORE THE STATE ELECTION BOARD**

**STATE OF GEORGIA**

**IN THE MATTER OF:**

**Fulton County Board of Elections**                    **SEB Inquiry**

**Nadine Williams, Director of Elections**

**5600 Campbellton Fairburn Road**

**Union City, GA 30213**

**Respondents**

## *SUBPOENA DUCES TECUM*

    **YOU ARE HEREBY COMMANDED AND DIRECTED** that, laying all other business aside, you shall produce, pursuant to this subpoena issued by the State Election Board pursuant to O.C.G.A. 21-2-33, by hand delivery or email to **Vice Chairperson Janice Johnston** (**jjohnstonmd.seb@gmail.com**). Production pursuant to this subpoena shall be made on or before **November 18, 2024,** and shall include all of the Information (as that term is described Abelow), described in paragraphs 1-12 below, pertaining to the 2020 General Election and the supporting documentation that is retained after such elections:

A. Election Day

1. Copies of the Consolidated Return Sheets required to be delivered under O.C.G.A. § 21-2-497. See also Ga.Rule 183-1-12-.12(b).

2. Copies of the opening and closing scanner tapes (the "zero" tapes and the "tabulation tapes"), as executed and required for each ballot scanner by O.C.G.A. § 21-2-374(b), 450(a)(2) ("zero tapes") and O.C.G.A. § 21-2-455(b) (tabulation tapes, as executed). See also Ga.Rule 183-1-12-.10 and Ga.Rule 183-1-12-.12(a)(1).

3. The poll pad recap sheets for each precinct prepared as required by Ga.Rule 183-1-12-.12(a)(2).

4. The absentee ballot recap sheets prepared under O.C.G.A. § 21-2-483(d) and 484. See also Ga.Rule 183-1-12-.12(a)(2).

5. The numbered list of voters and "return sheets" required by O.C.G.A. §§ 21-2-436; 21-2-454(b); and 21-2-500(a). See also O.C.G.A. § 21-2-2(16) and Ga.Rule 183-1-12-12)(a).

6. All information related to and including the chain of custody forms and related reconciliation report required by O.C.G.A. §§ 21-2-374; 21-2-456; 21-2-382(c)(3); Ga.Rule 183-1-.05 & .06; Ga.Rule 183-1-12-.12(e).

7. The electronic files required to be delivered by O.C.G.A. § 21-2-500 (including ballot images, tabulation, and log files). See Ga.Rule 183-1-12-.13(a)(b).

8. All documents reflecting the security seals required for the storage and transportation of equipment and election records and all related security verification forms. See Ga.Rules 1-12-.10(2); 1-12-.12(a)(5)

B. Advance In-Person Voting

1. The daily recap sheet prepared at the end of each day for advance in-person-polling place scanners, as required by Ga.Rule 183-1-14-.02(9).

2. Copies of the opening and closing scanner tapes (the "zero" tapes and the "tabulation tapes"), as executed and required for each ballot scanner by Ga.Rule 183-1-14-.02(7) ("zero tapes") and Ga.Rule 183-1-14-.02(15) (tabulation tapes, as executed).

3. Copies of the daily recap forms for each in-person polling place scanners. Ga.Rule 183-1-14-.02(9)

4. The electronic files required to be delivered by O.C.G.A. § 21-2-500 (including ballot images, tabulation, and log files). See Ga.Rule 183-1-12-.13(a)(b).

5. All documents reflecting the security seals required for the storage and transportation of election records and all related security verification forms. See Ga.Rules 1-12-.10(2); 1-12-.12(a)(5)

C. Mail-In Voting

1. The absentee numbered list of voters.O.C.G.A. § 21-2-411; Ga.Rule 183-1-12-.19

2. Digitized copies of the absentee ballot oath envelopes required by O.C.G.A. § 21-2-390.

3. The electronic files required to be delivered by O.C.G.A. § 21-2-500 (including ballot images, tabulation, and log files). See Ga.Rule 183-1-12-.13(a)(b).

4. All documents reflecting the security seals required for the storage and transportation of election records and all related security verification forms. See Ga.Rules 1-12-.10(2); 1-12-.12(a)(5)

5. All information related to and including the Chain of custody forms-Poll manager and technician purposes.

"Information" as used in the subpoena means documents, in hard copy, electronic, photographic or any other form or format.

Because of the sensitive nature of this inquiry, you are hereby requested not to discuss this subpoena outside of disclosure that is necessary to comply with this subpoena. Should you have any questions, please contact **Vice Chairperson Johnston at 404-558-2711 or by email jjohnstonmd.seb@gmail.com.**

**HEREIN FAIL NOT UNDER PENALTY OF LAW, this 5th day of November, 2024**

Michael T. Coan

Executive Director, State Election Board

EXHIBIT 3



# State Election Board Report – Post-Election Executive Summary
# Updated February 16, 2021

## Introduction

Seven Hills Strategies, LLC (SHS) has been contracted by the State Election Board (SEB) to serve as an independent, non-partisan monitor for the pre-electoral processes in Fulton County leading up to the November 3, 2020 general election and for any subsequent runoffs. SHS will observe absentee ballot request processing procedures, absentee ballot processing/scanning, early voting procedures, and actual ballot counting on Election Day and beyond. The goal of SHS is to identify areas of improvement and generate suggestions to ensure that Fulton County is adequately prepared to implement effective, efficient, credible, and code-compliant elections moving forward.

## Fulton County's Compliance with the Terms of Sec. 12 of the Consent Order[1]

In addition to this report on compliance with the terms of Consent Order, SHS believes that is necessary to share this observation: From October to January, I spent nearly 270 hours at various locations observing every aspect of Fulton County's election processes. At no time did I ever observe any conduct by Fulton County election officials that involved dishonesty, fraud, or intentional malfeasance. During my weeks of monitoring, I witnessed neither "ballot stuffing" nor "double-counting" nor any other fraudulent conduct that would undermine the validity, fairness, and accuracy of the results published and certified by Fulton County.

### A)  Absentee Ballot Procedures:

1) Leading up to the Nov. 3 election, SHS had the opportunity to observe the signature matching processes for absentee ballot applications being processed both at Darnell Senior Center and at Fulton County headquarters. During the runoff, I was stationed at Georgia World Congress Center (GWCC) and was able to monitor the vast majority of signature matching for the weeks leading into the runoff.

SHS determined the signature matching processes to be in-line with the terms outlined in the Consent Order, and generally erred on the side of "give it further research" when there was any doubt about a signature's authenticity.

However, although most applications were being processed within 48 hours of being received, SHS found one ballot application at Darnell Senior Center that had been in Fulton County's custody for more than two weeks. Given the massive influx of applications and

---

[1] Throughout this report, the term "Consent Order" is used to refer to the Consolidated Consent Order for SEB Cases 2020-016 and 2020-027 that created the role of State Election Board Monitor.



ballots, it is not surprising that a few ballots might be left behind, but Fulton County must re-double their efforts in future elections to speed up processing times.

Additionally, SHS received multiple reports of absentee ballots being sent to the wrong addresses, which seems to be the fault of sloppy data entry by staff. Future staff trainings should underscore the importance of correctly entering the temporary/preferred addresses of all ballot applicants.

2) Although Fulton County allocated ample resources for absentee ballot processing leading into the Nov. 3 election, the processes themselves were extremely sloppy and replete with chain of custody issues as the massive tide of ballots bounced around the Fulton County Gov't HQ building.

The system, created by Ralph Jones, Registration Chief for Fulton County, seemed to function, but there were many processes that seemed to be *ad hoc* solutions to problems caused by a lack of organization or permanent staff with the expertise to manage the system in place. For example, the room which housed the team doing additional voter verification was also a temporary housing location for ballots between the mail room (which receives, opens, and records the numbers of ballots) and the ENET processing room. Staff in this room seemed to not understand the process, and Jones had to intervene to stop a temporary staffer from moving a pile of recently-accepted but unverified absentee ballots into the stack to go straight to State Farm Arena for scanning/counting. Had Jones not been there with me to catch this mistake, it is safe to assume that those ballots would've been counted as if they had been verified.

I observed an additional security issue here, as one staff member told me that people had not been signing out batches of ballots as they moved around the building in trays between processing rooms, which is a clear failure in the chain of custody mandated by the O.C.G.A.

Given the inefficiencies of this system and the volume of absentee ballots received, there was no way that Fulton County could possibly comply with the mandate to "process all absentee ballots by the close of business on the next business day after the ballot is received."

Despite the aforementioned deficiencies during the Nov. 3 election, Jones and his team were able to both streamline and improve processes for the Jan. 5 runoff. The Fulton County team migrated the entire signature verification process to the facility established at GWCC and for several days even attempted to do the voter credit step on-site before resolving to handle that at Pryor St. before bringing credited ballots to GWCC. Performing the entire process[2] linearly and in full view of the public was a tremendous improvement on the labyrinthine

---

[2] Voter credit → 1st pass signature verification with ENET → 2nd pass signature verification with RocketFile → Return RocketFile rejects to Pryor St for curing

SEVEN HILLS
STRATEGIES

system concocted for the Nov. 3 election. In my opinion, Fulton County clearly made available sufficient resources to handle the influx of ballots for the runoff.

3) SHS has not yet been able to conduct an audit to graphically represent the rate at which absentee ballots were scanned for the Nov. 3 election; however, my research indicates that the staff was able to scan fewer than 80,000 ballots in the period leading up to Nov. 3. Judging by final absentee/UOCAVA numbers (approx. 147k), in the 72 hours from 11/3 to 11/5, the staff were able to scan nearly 80 percent (approx. 67k) of that which they had scanned in the previous two weeks. Regardless of whether the bottleneck was in receiving the ballots, verifying the signatures, opening the ballots or scanning them, this rapid acceleration in scanning rate indicates that Fulton County failed to adequately utilize the pre-scanning period allowed by SEB Emergency Rule 183-1-14-0.9-.15.

The Jan. 5 runoff, however, was a stark dichotomy and a comparative great success. With the eyes of the world watching, Fulton County was able to report 106,117 absentee votes (the vast majority) on Election Day itself due to the diligent pre-scanning work by Fulton County staff. By the time that the operation was closed at 2 a.m., Fulton County had fewer than 5,000 absentee ballots left to process. This small remainder – all received from ballot drop boxes on the evening of Jan. 5 – is a testament to how hard the Fulton County team worked to comply with this item in the Consent Order.

4) Based upon a conversation with Captain M. McHugh, Fulton County Police Department, regarding the security protocols installed to ensure the protection of ballot drop boxes, I am confident that Fulton County's robust security architecture made it impossible to tamper with votes at ballot drop boxes.

Given the daily influx of new ballots to the GWCC facility, I believe that ballots were, in fact, collected each day as required by SEB Emergency Rule 183-1-14-0.8-.14. On Jan. 5, multiple shipments of drop box ballots were received at GWCC (one at 4:38 p.m. and another at 11:30 p.m.) after first being checked-in at the Pryor St. mail room. As far as I witnessed, Fulton County fully complied with this item of the Consent Order.

**B) Poll Workers and Poll Worker Training:**

1) Fulton County greatly exceeded the target number (2,200) of poll workers required for both the Nov. 3 general and January 5 runoff elections. Fulton County enlisted so many poll workers to account for any potential emergencies, attrition, or no-shows on Election Day.[3]

---

[3] N.B. This point also covers Section 12.B.4 of the Consent Order



| Indicator | Target | Poll Workers Assigned (11/3) | Poll Workers Assigned (1/5) |
|---|---|---|---|
| Dual Manager | | 81 | 81 |
| Manager | | 174 | 174 |
| Assistant Manager | | 510 | 510 |
| Line Manager | | 558 | 525 |
| Clerk | | 2,420 | 1,495 |
| Deputy Registrar Clerk | | 255 | 155 |
| Provisional | | 30 | 17 |
| **Total** | **2,200 + 560 alts.** | **4,028** | **2,957** |

2) On October 28, 2020, SHS attended the four-hour Fulton County poll worker training at the North Annex Service Center. This training accurately and concisely reviewed all voting implementation procedures, how to use Poll Pads and other hardware, and the test at the end ensured that workers had actually learned the content.

A particular importance was placed on securing election materials and ensuring that all zip ties and numbered seal stickers are appropriately installed and recorded at the beginning and end of each day. In accordance with O.C.G.A Code, verifying the zero-count in the morning and recording the final count at the end of the day were also underscored, though there was no emphasis placed on the need to dually-sign these count receipts. Additionally, the trainer underscored processes for keeping voting open despite technological issues, stating that, "you can open the polls with one poll pad, one BMD, and one scanner; if you are not able to open at 7a.m., immediately contact Fulton County and see if you need to fall back to provisional ballots." The trainer also frequently repeated that "we do not turn voters away" to encourage poll workers to find a workable solution to any problems that may arise.

The sole training deficit that I recognized was regarding the Senate District 39 Special Election. While it was somewhat odd that a primary election would be taking place during a general election, this lack of knowledge was a failure to adequately train the trainers regarding this special election. This lack of knowledge was passed on to poll workers, which resulted in numerous complaints to SHS about a failure to offer voters the opportunity to participate in this special election.

3) Fulton County was to provide the SEB with weekly updates on total poll officers and alternates, training, and allocation plan of poll officers to polling places, including contingency plan for alternate poll officers for the Nov. 3 election, as well as any runoff election in this election cycle. As these reports did not come to SHS, I cannot comment on this item.

**C) Advance Voting Locations:**



SEVEN HILLS
STRATEGIES

1) Fulton County was required to have 24 early voting locations, but greatly exceeded this
requirement in both the Nov. 3 general and Jan. 5 runoff elections.

| Indicator | Target | Nov. 3 | Jan. 5 |
|---|---|---|---|
| Early Voting Locations | 24 | 30 + 2 mobile + 7 outreach sites | 30 + 2 mobile + 2 outreach sites |

Both Fulton County staff and poll workers could have done a better job ensuring that ENET
records were kept up to date. Failure to keep accurate records of whether a voter had voted
yet led to a great deal of confusion at the polls during both the Nov. 3 general and the Jan. 5
runoff as well as concerns of widespread voter fraud. Some human error is to be expected,
but Fulton County must strive to reduce the number of these instances.

**D) Election Day Logistics and Polling Locations:**

1&2) Fulton County was required to have 255 voting locations for Election Day, and met this
requirement in both the Nov. 3 general and Jan. 5 runoff elections. It is also worth noting
that Fulton County established 91 new polling locations for this election cycle to meet
this goal.

| Indicator | Target | Nov. 3 | Jan. 5 |
|---|---|---|---|
| Election Day Voting Locations | 255 | 255 | 254 |

3) Fulton County was to provide the SOS with their plan for Election Day distribution of
election equipment and poll officers no later than October 2, 2020. As these plans did not
come to SHS, I cannot comment on this item.

4) On October 29, Rick Barron shared early voting turnout data with the Gabriel Sterling, Chris
Harvey, and Blake Evans from the SOS' office. Sterling ran the modeling through MIT's
Election Data Lab allocation tool, and shared the results with Barron. Complying with this
term of the Consent Order, Barron then re-programmed Poll Pads and redirected election
materials to buttress any weaknesses revealed by the data model.

5) At no point during either the Nov. 3 election or Jan. 5 runoff election did any polling unit run
out of emergency/provisional paper ballots, paper backup pollbooks, or required forms. In
January, three polling units (all served as both early voting and Election Day locations)
received re-supply from headquarters but never ran out of materials.

6) During the Nov. 3 election, Barron negotiated with the ACLU to provide 255 deputy
registrars to use ENET to cancel absentee ballots. During the runoff, this task was performed
mainly by a smaller number of non-ACLU deputy registrars. SHS received no complaints



during the runoff about unnecessary wait times related to not having additional dedicated deputy registrars.

7)  Fulton County established three call centers with a combined staff of more than 100 people to answer questions from poll managers during Nov. 3 and Jan. 5. My poll worker training encouraged me to call the hotline if any problems arose while voters were casting their ballots.

8)  After 9:30 a.m. on Nov. 3, no polling precincts in Fulton County had a wait time greater than 30 minutes. The same was true for the entirety of voting on Jan. 5. Both of these should be seen as tremendous victories for the Fulton County team, as they had allocated sufficient staff, resources, and procedures to ensure that all voters were able to cast their ballots quickly regardless of where they lived in the county.

**E)  Technical Support:**

1)  Fulton County trained 255 technicians for the Nov. 3 election, and additionally ensured that each early voting site also had a dedicated tech aside from State Farm Arena, which had five techs on-hand to manage their large number of BMDs. For the Jan. 5 runoff, Fulton County trained 254 technical support experts, but 22 did not report for work on Election Day for one reason or another.

**F)  Audit Preparation:**

1)  Fulton County's document retention processes at State Farm were adequate for protecting ballots from tampering and the system of marking boxes with scanner number, batch number, and date made it much easier to process during the forthcoming audit and recount.

2)  Risk-Limiting Audit (RLA)

▪   The scale to which Fulton County prepared for the RLA was staggering. With a maximum of 174 teams of two processing ballots by-hand, Fulton County completed the RLA more quickly and accurately than anyone had anticipated. It is a testament to the team's leadership that they were able to keep feeding the processors while keeping accurate records.

3)  Recount

▪   As with the RLA, Fulton County aggressively tackled the Recount and initially seemed as if they would complete their recount more quickly than estimated. However, failure to comply with approved technological procedures led to a server crash and significant, costly delays that required the Fulton County team to completely rescan all ballots once



again. Additionally, during the fourth count (the second lap of the recount), sloppy document storage procedures led to confusion as box labels no longer had precinct names and batch numbers on them but instead all said "ELECTION DAY." This mistake therefore made it difficult to ascertain which ballots had been missed while trying to solve the second technical issue that resulted from accidentally naming two scanners "ICC 16" during the fourth count. Until this point, proper ballot handling, storage, and manifest procedures had been observed.

## Appendices

- Appendix A – Challenges and Recommendations from the Entire 2020 Election Cycle

EXHIBIT 4

# PERFORMANCE REVIEW BOARD REPORT ON FULTON COUNTY ELECTIONS

January 13, 2022

Performance Review Board Members:
Ryan Germany
Stephen Day
Rickey Kittle

## SUMMARY

- In prior years, disorganization and a lack of a sense of urgency in resolving issues plagued Fulton County elections. However, Fulton County has shown improvement in administering elections from 2020 to 2022. This improvement is due to a multitude of factors. Prior staff that oversaw elections, voter registration, redistricting, and absentee ballots are no longer with the office, and new staff can bring new energy and renewed commitment. Training, processes and procedures, and overall organization have all been improved as well, but those things need further improvement to ensure readiness and success in the 2024 election cycle.

- The Fulton County Board of Elections and Registration is engaged and helping to drive those improvements. Replacing the board would not be helpful and would in fact hinder the ongoing improvements to Fulton County elections.

- The County Manager's Office in Fulton County has continued to be involved in planning, strategizing, and preparing for upcoming elections, which has positively contributed to improved execution of elections.

- Like election officials across the state, Fulton County elections staff show daily dedication and effort in carrying out and seeking to improve the administration of elections in Fulton County. Director level staff and the Fulton County Board of Elections need to ensure that staff has the necessary tools and guidance to ensure best practices and compliance.

- The Performance Review Board members individually donated hundreds of hours to this project and The Carter Center donated almost 4000 people hours. Both observations (which were conducted independently) noted significant improvement from the 2020 election, but both also noticed things that could use additional improvement, including further improvements to training and processes.

- The existence of the Performance Review helped incentivize Fulton County to make improvements to their elections, but it took an enormous amount of donated work, and it is difficult to see how it is a sustainable process that can continue to positively influence election administration in Georgia without some reforms. A positive, proactive, and periodic review process, appropriately funded, designed to support and assist all counties with election process improvements could be more effective than the performance review process in its current iteration.

- While the Performance Review Process has seen improvement in Fulton County elections since the 2020 election, further improvement is still needed to ensure readiness for the 2024 presidential election cycle. Presidential election cycles see more voters than midterms and take even more planning and preparation to ensure successful execution. Georgia will be a competitive state in next year's elections, so election preparation needs to recognize that

2

Fulton County's actions (and all counties in Georgia, for that matter) will be heavily scrutinized by political parties, campaigns, candidates, and activist groups. To ensure successful execution of the 2024 election, Fulton County should continue the improvements it has already embarked on and prioritize the areas for improvement noted in this report. Those areas are:

- o  More contextualized poll worker training
- o  Environment of order, organization, and control
- o  Compliance with State Election Board Regulation regarding ballot review
- o  Planning and Preparation based on capacity and execution
- o  Review polling place layout
- o  Compliance with Georgia law regarding sequestration during early tabulation

## BACKGROUND ON FULTON COUNTY ELECTIONS

Fulton County has a long and well-documented history of issues administering elections.[1] The 2012 Presidential Election in Fulton County resulted in the largest fine ever issued by the State Election Board and required remedial training.[2] In that election failures in timely processing voter registration applications snowballed into significant issues for voters on Election Day.[3] This "snowball" effect, where problems on Election Day are generally indicative of earlier failures in the election administration process, was also very present in the June 2020 primary in Fulton County.

The June 2020 Primary Election was marked by long lines and confusion in Fulton County. That election, which occurred during the brunt of the COVID-19 pandemic, was uniquely difficult from an election administration perspective. Massive increases in absentee ballots were difficult for all election officials to keep up with. Pandemic fears increased the already difficult task of recruiting and training poll workers and finding adequate polling locations. Georgia election officials faced the added difficulty of having to implement a new paper-ballot voting system during the 2020 Election Cycle. Implementing a new system always increases logistical and training issues, and issues due to the COVID-19 pandemic stretched election officials to their breaking point. But while every county in Georgia faced those issues, many Fulton County voters had a uniquely bad experience.

Some of the reasons for the issues in the June 2020 primary, in addition to the exigencies mentioned in the above paragraph, were outside Fulton County's control. In addition to certain polling locations electing not to make themselves available due to the COVID-19 pandemic, other locations were not available due to previously existing remodeling schedules. This led to combining many precincts into one voting location and to utilizing locations that were not typically polling locations, such as Park Tavern in Midtown Atlanta. Fulton's Chief Registrar at the time was hospitalized due to COVID-19 and another long-time employee passed away due to the virus. However, Fulton's response to these circumstances added to the Election Day difficulties, specifically the hiring of poll workers on the weekend before Election Day and not ensuring adequate training of those poll workers.

Following the June 2020 Primary Election, the State Election Board considered multiple complaints regarding the election in Fulton County, including accusations that absentee ballot applications were not processed, that polling places did not open on time and did not have all required forms (such as recap sheets), and that poll workers were not adequately trained. The State Election Board found probable cause to send the complaints to the Attorney General's office for

---

[1] "Fulton to Retool Absentee Vote System" *Atlanta Journal-Constitution* (1993); "Touch and No-Go in Fulton? Unreadiness for New Voting System Raises Florida Effect Fears" *Atlanta Journal-Constitution* (2002); "Fulton Needs 'Wake-Up Call'" *The Macon Telegraph* (2008); "Claim: The 'Error Rates' for Fulton County Elections Department are 'Well Below the Average, Rating: False" *Politifact* (2012); "Fulton County Tries to Recover from Election Problems" *Athens Banner-Herald* (2014).
[2] "State Approves Fulton Election Settlement." *Atlanta Journal-Constitution* (August 13, 2015).
[3] "Fulton Elections Investigation Sent to Attorney General." *Atlanta Journal-Constitution* (December 17, 2013).

further prosecution, but instructed the Attorney General's office, Secretary of State's office, and Fulton County to try to resolve these issues with an eye toward improving the issues prior to the November 2020 General Election.

In October 2020, Fulton County and the State Election Board agreed to a Consent Order to resolve the complaints stemming from the June 2020 Primary Election.[4] That order included certain remedial measures that Fulton County agreed to implement prior to the November 2020 General Election as well as the appointment of an independent, non-partisan monitor. The consulting firm Seven Hills Strategies was appointed by the State Election Board as the independent monitor. Carter Jones, of Seven Hills Strategies, spent more than 270 hours observing all aspects of Fulton County's election processes and was granted full access by Fulton County.[5] Seven Hills Strategies' report noted that it saw no instances of dishonesty, fraud, or intentional malfeasance, but that it did see areas of disorganization, sloppiness, and mismanagement.[6]

### REQUEST FROM GENERAL ASSEMBLY FOR PERFORMANCE REVIEW

On July 15, 2021, Senate President Pro Tempore Butch Miller and twenty-two of his Republican colleagues in the Georgia Senate sent a letter to Rick Barron, then-Director of the Fulton County Board of Elections and Registration, requesting answers to questions regarding the double-scanning of nearly 200 ballots and Fulton County's audit tally sheets. Senator Miller requested a response by July 22, 2021. On July 21, 2021, Mr. Barron responded that he wanted to provide answers to the inquiries but that he needed approval from the Fulton County Board of Elections prior to sending responses, that the next board meeting was scheduled for August 12, 2021, and that he would not be able to meet the requested deadline.

On July 27, 2021, Senators Matt Brass, Kay Kirkpatrick, and John Albers (Republican members of the Senate Fulton County delegation), along with twenty-two other members of the Senate Republican caucus, sent a letter to the State Election Board invoking O.C.G.A. § 21-2-106 and requesting a performance review of Fulton County based on their failure to respond to Senator Miller's questions.

On July 30, 2021, Speaker Pro Tempore Jan Jones of the Georgia House of Representatives, joined by four other Republican members of the Fulton County delegation in the House of Representatives, joined their Senate colleagues' request for a performance review of Fulton County elections, mentioning the same issues as their Senate colleagues in addition to "persistent sloppiness in election processes over multiple election cycles."

---

[4] "Consent Order." State Election Board Cases 2020-016 and 2020-027, attached hereto as Exhibit A.
[5] "State Election Board Report- Post Election Executive Summary" *Seven Hills Strategies* (February 16, 2021), attached hereto as Exhibit B.
[6] "Report Shows No Fraud But Many Problems with Fulton Voting Process." Georgia Public Broadcasting. (February 17, 2021).

## PERFORMANCE REVIEW PROCESS

On August 18, 2021, pursuant to the request from the requisite members of the General Assembly, the State Election Board appointed a Performance Review Board consisting of Stephen Day, member and former Chair of the Gwinnett County Board of Elections; Ryan Germany, General Counsel for the Office of the Secretary of State; and Rickey Kittle, Chair of the Catoosa County Board of Elections.

O.C.G.A. § 21-2-106 states that the duty of the performance review board is "to make a thorough and complete investigation of the local election official with respect to all actions of the local election official regarding the technical competency in the maintenance and operation of election equipment, proper administration and oversight of registration and elections, and compliance with state law and regulations." "Local election official" is defined in relevant part to this performance review by O.C.G.A. § 21-2-105 as "a county board of elections or a county board of elections and registration."

After completing that thorough and complete investigation, the performance review board is to "issue a written report of its findings to the Secretary of State, the State Election Board, and the local governing authority which shall include such evaluations, judgments, and recommendations as it deems appropriate." O.C.G.A. § 21-2-106(b).

The Performance Review Board utilized a multi-faceted approach to accomplish the required "thorough and complete investigation," which spanned across the municipal elections in 2021, the redistricting process, and the 2022 election cycle. We reviewed existing documentation regarding Fulton County elections, particularly the report of independent-monitor Seven Hills Strategies. We conducted an interview with Carter Jones, the author of that report, to get his insights into the performance review process and into Fulton County elections generally. The Performance Review Board itself observed pre-election, Election Day, and post-election processes at Fulton County in both the 2021 municipal elections and the 2022 general and runoff elections. This observation included at least four separate visits to the Fulton County Election Processing Center during the 2021 and 2022 elections to observe absentee by mail processes, equipment and paperwork return, vote tabulation and uploading, and other operations. It also included visits to at least nine different election day polling places and seven separate advance voting locations.

In addition to the observation of the Performance Review Board, The Carter Center, which has observed more than 100 elections in 39 countries since 1989, was invited by the Performance Review Board and the Fulton County Board of Elections to observe the November 2022 General Election in Fulton County. The thorough investigation that the Performance Review Board conducted would not have been possible without the independent observation efforts of The Carter Center. The Carter Center greatly expanded the reach of the three-person Performance Review Board, who each had other election-related duties to attend to during the 2022 election cycle. The Carter Center contributed almost 4000 people hours to observation, as well as recruiting, managing, and training their observers and then analyzing and reporting the data they gathered. Their assistance was invaluable, and their work was of the highest quality. The Performance Review Board is exceedingly grateful to The Carter Center for their time and effort.[7]

---

[7] "2022 General Election Observation: Fulton County, Georgia." *The Carter Center*. Attached hereto as Exhibit C.

The Performance Review Board conducted formal interviews of key current and former staff members at Fulton County elections, reviewed Standard Operating Procedures, compared those Standard Operating Procedures to procedures in other counties, and interviewed members of the Fulton County Board of Elections.[8] We also were in close contact with the Secretary of State's Investigations Division and Elections Division as they looked into issues that were relevant to the ongoing review, including redistricting following the 2021 Census and processing of absentee ballot and absentee ballot applications.

## OBSERVATIONS

### 2020 Election Cycle

Before moving to the observations of the Performance Review Board, this section will discuss the 2020 elections in Fulton County based on our review of Seven Hills Strategies' report, interview with Carter Jones, discussions with Secretary of State Elections Divisions, and review of Secretary of State investigations. We will then move to the current status of Fulton County's elections process with the intent of showing the marked improvement in both preparation and performance from 2020 to 2022.

Regarding the 2020 elections that occurred prior to the outset of the performance review process, our interviews and review of materials confirmed much of what has already been written about those elections in Fulton County. In our interview with Carter Jones, the author of the Seven Hills Strategies report, we found him to be knowledgeable, fair, and well-informed regarding Fulton County operations. We concur in his finding that we did not see any indications of fraud, dishonesty, or intentional malfeasance in the 2020 election results in Fulton County, but we did see how a lack of careful planning and precision in ensuring that processes were strictly followed led to errors and to an overall environment that appeared unorganized. In an election with as much interest from voters, media, and others around the country and world, the organizational deficiencies identified in Seven Hills Strategies' report were apparent to voters, observers, and media.

For example, in a pattern that echoed the issues from the 2012 General Election (where a failure to timely process voter registration applications led to difficulties on Election Day), the June 2020 Primary Election saw a failure to timely process absentee ballot applications "snowball" into voter frustration, a high number of absentee ballot requests being cancelled, and long lines on Election Day. In June 2020, these issues were exacerbated due to policies that Fulton County put in place to respond to the COVID-19 pandemic and by issues outside the control of Fulton County (long-time polling places choosing not to make themselves available due to COVID-19, other polling places being closed for previously scheduled remodels, etc.).

---

[8] The two Republican Party-appointed members of the Fulton County Board of Elections did not respond to requests for interviews.

While the November 2020 General Election and January 2021 Runoff Election were smoother than the June 2020 Primary (in large part thanks to the remedial measures from the October 2020 Consent Order) Seven Hills Strategies still observed areas where a lack of precision and strict adherence to policies and rules made post-election activities more difficult. Again, many of these difficulties were exacerbated due to policies the Fulton County Board of Elections and Registration chose to put in place in response to the COVID-19 pandemic and by a post-2020 election environment filled with misinformation and false allegations that increased the difficulty of performing all election-related tasks.

Secretary of State Investigators who investigated complaints regarding the November 2020 General Election in Fulton County elections had similar findings to the Seven Hills Strategies' report—no evidence of fraud, dishonesty, or intentional misconduct, but persistent disorganization that made it difficult to get to the bottom of certain claims. Our review reaches a similar conclusion—we do not see any evidence of fraud, intentional misconduct, or large systematic issues that would have affected the result of the November 2020 election. The fact that three separate counts of the 2020 presidential race in Fulton County (initial count, hand-audit count, and machine recount) all showed very similar results supports this conclusion.

*Hand-Count Audit of 2020 Presidential Race*

One example of Fulton County's disorganization leading to errors and those errors being used to make claims of fraud are the allegations regarding the hand-count audit of the November 2020 Presidential contest that were investigated by Secretary of State Investigators in Case No. SEB 2021-181. In that case, citizen-activists brought to light errors made on tally sheets and in data entry. In a presentation to the State Election Board on March 18, 2022, Secretary of State Investigators confirmed data-entry errors in Fulton County but found that the citizen-activists conclusions (that such errors obviated the usefulness of the hand-count) were not substantiated.

Independent audit experts confirmed to Secretary of State Investigators that some amount of human error is expected in large hand-counts and that the types of errors seen in the Fulton County audit are the typical types of errors that are seen in hand tabulations. As part of that investigation, Fulton County stated that one reason for the errors was that the Arlo system used for the audit did not have required naming conventions for batches and allowed counties to utilize their own naming conventions. However, the fact that Fulton County did not use standardized naming conventions in their hand audit of the 2020 presidential race indicates a failure of planning and execution to avoid a predictable issue, not something that should be blamed on the Arlo system. The State Election Board referred Case No. SEB 2021-181 to the Attorney General's office, and it remains there for final resolution.

Additional contributing factors to the challenges that occurred in Fulton County's hand-audit that were outside of the county's control include that this was the first election with paper ballots in more than twenty years, so this was the first time the county had put in place and executed paper ballot batch management procedures for such a large number of ballots. Due to its status as the largest county with the greatest number of votes to count, Fulton also ran up against the deadline to complete the hand-count audit and was not able to do reconciliation checks of its data entry.

Other counties, including large counties, did have time to check their data entry and caught and corrected errors prior to submission. A full hand-count audit was not something that was planned for or expected in any county. It came about due to the state's new audit requirement and the fact that the margin of the race for president (the contest selected for the audit) was incredibly small, so counties were not allowed much time to plan and train prior to execution of the audit. The environment post-election in Fulton County in 2020 was also extremely difficult to operate in given an influx of poll-watchers and public from around the country that made even regular operations difficult. Of course, policies put in place to respond to the COVID-19 pandemic also contributed to these difficulties.

In conclusion, Secretary of State Investigators did confirm the existence of errors in the Fulton County audit, but independent audit experts confirmed that the existence of those errors was not surprising given the expected error rates in hand counts, the fact that Fulton did not have time to double check data entry, and the other circumstances surrounding the audit. Those same experts confirmed that some level of data entry errors are expected in a full hand-count, and they do not alter the overall conclusion of the audit, which confirmed that Joe Biden won the 2020 presidential race in Georgia.

*Double-Scanning of Ballots*

One of the allegations leading to the General Assembly's request for this review was that ballots were double scanned. As has already been reported, Secretary Investigators substantiated the allegations that two batches totaling almost 200 ballots were double scanned during the initial count of the November 2020 election.[9] As one election expert said, and the Performance Review Board concurs, double-scanning of ballots is "something that should never happen."[10] Contributing factors in this case likely include poor batch management and storage practices (also a contributing factor in errors in the hand-count audit and the recount), a time crunch created by the failure to utilize the early scanning period, and significantly heavier usage of central scanners due to the massive increase in absentee ballots resulting from the COVID-19 pandemic and a corresponding increase in paper jams.

*The January 2021 U.S. Senate Runoff*

The January 2021 U.S. Senate Runoff Election showed improvements from the November 2020 General Election, most notably in that Fulton County took advantage of the early scanning period for absentee ballots, which decreases the time crunch and rush to scan the ballots (increasing accuracy) and leads to faster posting of results on Election Day. Other reasons for these improvements include the fact that election officials and poll workers had more experience running elections with the new equipment, a decrease in the number of absentee ballots to issue and process, and greater familiarity with COVID-19 protocols.

---

[9] "Some Ballots Initially Double-Counted in Fulton Before Recount." *Atlanta Journal-Constitution*. (July 13, 2021).
[10] Id.

**2021 Municipal Elections**

After being appointed in August 2021, the first elections that the Performance Review Board observed in Fulton County were the 2021 municipal elections administered by Fulton County. These elections are orders of magnitude smaller than a presidential or midterm General Election, but they are still valuable to see how a county performs essential election functions. The 2021 municipal elections were significantly smoother than the 2020 elections in Fulton. On Election Night, one performance review board member was present at the Election Processing Center and spoke with Mr. Foris Webb, III, the Atlanta Municipal Clerk. Mr. Webb has observed elections in Fulton County (municipal elections, but also county, state, and federal elections) for 24 years, and he stated that the 2021 municipal election in Fulton was the smoothest one he had observed to date.

The Performance Review Board observation similarly showed smooth operations and significant improvement from the 2020 election. Some of this improvement is undoubtedly due to the fact that a municipal election is much smaller than a presidential election, but it also seemed that Fulton had improved some of their processes since 2020.

One area that contributed to the improvement in operations was staffing. Fulton County created and filled several key and new management positions. These new positions include a Deputy Director, an Absentee Ballot Manager, and a Manager for the Ballot Marking Equipment. The additional managers had staff focused on their areas, allowing for responsibilities to be more spread out and better executed.

*Absentee Ballot Process*

One example of improvement was identified during our observation of absentee ballot procedures. Following the 2020 election cycle, Fulton County split responsibility for managing the absentee ballot process and the registration process, which had been under one manager. Fulton County created and filled a new position of the Absentee Ballot Manager who supervised staff dedicated to absentee ballots. The Absentee Ballot Manager was new to her role in 2021 and had not been in charge of absentee ballots in 2020. This change seems to have resulted in significant process improvements. Our observation was that the processes put in place by the Absentee Ballot Manager were effective and compliant with Georgia law. The location where absentee ballot processing occurred was set up to ensure a good flow of the process while ensuring ballot security and allowing required transparency to poll watchers. The Absentee Ballot Manager stated that part of the training conducted for staff executing those processes is making sure they are aware of how important the task is to the success of the overall election and focuses on quality control.

*Equipment Handling*

Another issue Fulton County addressed following the 2020 election was to split responsibilities for managing ballot marking devices and other election site supplies. Fulton County hired a new manager responsible for ballot marking devices and assigned technicians to specific polling sites to address issues with the equipment. Fulton County also implemented a supply scanning system

that allowed more accurate and timely tracking of supplies and equipment. While this supply scanning system does not appear fully implemented, it is a positive step.

*Advance Voting*

We also observed several advance voting sites, including Sandy Springs Library and Metropolitan Library. At both locations, voting was proceeding smoothly with almost no wait time. Fulton had added a person to advance voting locations to ensure that voter credit was promptly and properly given in the ENET voter registration system and reconciled ENET voter credit with paper Advance Voting Ballot Applications filled out at the time of check-in. This reconciliation check is a noted improvement and shows increased attention to these important processes.

The Performance Review Board also observed advance voting at Buckhead Library and C.T. Martin Natatorium. The observation of those two locations occurred on the last day of early voting so traffic was heavier. Buckhead Library had some poll workers who did not show up that day and was experiencing long lines to vote. The check-in process was going smoothly, but we observed that some check-in stations were not being utilized due to the lack of staff. Buckhead Library is a popular voting location, but the setup is a bit cramped due to space that's available. On that same day, C.T. Martin Natatorium had a full complement of poll workers and kept a short line to vote. The facility at C.T. Martin Natatorium is bigger and allowed for more ease of movement.[11] We also noticed that the poll manager at C.T. Martin would jump-in to staff a check-in station when the line got long, which seemed to really set a good tone for all poll workers at that location.

*Election Day*

On Election Day for the municipal elections in November 2021, the Performance Review Board had a presence at Fulton County Election Headquarters, at the Election Processing Center, and at polling places around the county. At headquarters, Fulton County has an impressive system of logging issues that are reported at different polling places. But the overall atmosphere still seemed disorganized and reported issues did not seem to result in a sense of urgency to resolve. The Performance Review Board was able to visit locations that had specific issues reported such as North Springs High School in Sandy Springs and Independence High School in Roswell. Overall, voter experience on Election Day seemed to be smooth. Typical turnout during municipal elections is significantly lower than in a presidential or midterm election, so issues are able to be resolved without leading to major backups in voting. The two issues discussed below are indicative of the types of issues that can occur when administering an election.

---

[11] Finding good, centrally located polling locations that have sufficient space, parking, accessibility, security, etc. is a difficulty for election officials across the country, especially in urban environments and even more so since schools have understandably stepped back from being polling locations. We conclude that Fulton County does a good job managing this difficulty. Fulton County election seems to have a very good relationship with the Fulton County library system, and while the available space in libraries is not always large, libraries provide good accessibility, availability, and are under county control. We also understand that library staff has also been trained to assist in some election tasks, which could be a huge benefit. The Performance Review Board recognizes the vital assistance the Fulton County Library System plays in ensuring that Fulton County can continue improving administration of elections.

At North Springs High School, the poll manager noticed she was missing the key to the cabinets that store the ballot marking devices and scanners. Even though she reported this issue the Saturday before the election, the key to the cabinets was not delivered until 10:00 a.m. on Election Day. To the poll manager's credit, she utilized available backup procedures (i.e., emergency paper ballots) to ensure that voting was able to occur beginning at 7:00 a.m. on Election Day.

At Independence High School in Roswell, the equipment was delivered to the location much later in the day before the election than was scheduled (schedule for 2:00 p.m. but did not arrive until 8:30-9:30 p.m.). The equipment was incorrectly delivered to a cafeteria downstairs, but the poll manager was told by school officials that was not the proper place. The poll manager alerted Fulton County on Monday night that the equipment needed to be moved to a different location. She was told that a logistics team would be present at 5:00 a.m. on Election Day to move the equipment, but that team did not show up until 1:00 p.m. on Election Day. Fortunately, the poll officials (all female), took the initiative to manually move the necessary equipment themselves up a steep incline. They were up and running by the time the polls opened at 7:00 a.m. and had no delays to opening.

These examples both show poll managers utilizing their training and showing initiative to successfully resolve issues. The fact that backup procedures were utilized to ensure that voters were still able to vote without delay shows a massive improvement from the June 2020 Primary. However, the issues at both of those locations were ones that could have been avoided by better control and execution of the equipment delivery process.[12] These issues were also both noticed by poll managers well in advance of opening of the polls, and a quicker response from Fulton County would have mitigated the need for the extra steps that had to be taken by poll officials.

At the Election Processing Center on Election Night, we observed that the system for tracking memory cards that had already been uploaded was disorganized. Fulton County actually had to re-certify their election results after the Secretary of State's office pointed out to them that certain checks did not add up. Fulton County found memory cards that had not been uploaded. This is something that should never happen, would not happen with better organization, and would be caught with better checks and balances.

**Redistricting**

After the 2021 municipal elections and prior to the 2022 elections, all counties in Georgia had to redistrict voters following the new district maps passed by the General Assembly following the decennial census. Just like voter registration and the absentee ballot process, redistricting is an essential election process where errors can "snowball" into voters being in the wrong location, long lines, and confusion on Election Day. The Secretary of State's Elections Division, particularly Deputy State Elections Director Dr. Jesse Harris, communicated frequently with Fulton about their redistricting. Utilizing a mapping tool, the Secretary of State's office checked all counties state and federal redistricting work to identify voters that may have been placed in the wrong district

---

[12] One of the improvements observed in the 2022 election cycle by both the Performance Review Board and The Carter Center was improved organization in the warehouse. This improvement, if it is kept up, should help to minimize issues with equipment delivery moving forward.

and flagged those records for counties to review. In one of the initial checks, the mapping software identified approximately 30,000 records for counties to review. Approximately 20,000 of those records were in Fulton County.

Fulton County had new staff in charge of redistricting. Once the information regarding potential errors was brought to their attention, they worked diligently to resolve any issues. Fulton County also separately contracted with a mapping service to help them check their work for county level districts. Due to the delay in the census caused by COVID-19, which caused maps to be passed by the General Assembly later than in previous cycles, the corrections that Fulton County was making were occurring closer to the May primary than is ideal. It also became clear that Fulton had not prioritized monthly and annual "street maintenance" (the process that ensures that street names and numbers in the voter registration database are updated to account for new development).

In other large counties, street maintenance is a monthly process regardless of whether redistricting is occurring. As a result of neglecting the street maintenance process, the new staff in Fulton had to spend significant time "catching up" on tasks that ideally would have been completed prior to redistricting. However, at the end of the process, one expert at the Secretary of State's office said that he thought Fulton's voter database was in better shape than it had been in a long time. This was due to dedicated effort by Fulton County elections staff, support from others in Fulton County, (including the County Manager) to ensure that elections had the resources they needed, and assistance from the Secretary of State's office.

### 2022 Election Cycle

In an effort to expand the reach of the three-member Performance Review Board and to further inform the review, the Performance Review Board and the Fulton County Board of Elections and Registration entered into an agreement with The Carter Center to provide independent, non-partisan observation[13] of Fulton County's election. In addition to The Carter Center's observation, the Performance Review Board also conducted some limited observations of advance voting and processes at Fulton's Election Preparation Center when advance voting equipment and ballots were being returned.[14]

During advance voting in the November General Election, The Carter Center deployed 64 observers to all 36 early voting locations and the four "outreach" advance voting locations, collecting over 330 observation reports on advance voting. On Election Day, the Center deployed 104 observers to 217 of the 249 polling places in Fulton County. The Carter Center also observed absentee ballot processing, election night drop-off, and tabulation. Their analysis is based on direct

---

[13] "Nonpartisan election observation is an impartial process where observers systematically gather data determine whether an election was fair, peaceful, and credible… [N]onpartisan observers have no stake in the election outcome. They do not interfere in the election day process, even if they see something take place that should not happen. They are trained to understand the election process as specified by law and report on whether election day procedures are being correctly followed." The Carter Center Report on Observation of Fulton County Election, pg. 5.

[14] Due to the fact that the Performance Review Board members have election-related duties that they must also attend to, the members were limited in what observations they could perform in the November 2022 election. The Carter Center observation was vital to the ability to complete the review in a timely fashion.

observation, desk analysis of documents provided by Fulton County, and conversations with Fulton County staff.

The Carter Center's observation and the Performance Review Board's observations were conducted independently from each other, but both reached similar conclusions. The Performance Review Board observed dedicated poll workers working efficiently to process voters. Voter check-in was proceeding smoothly at the locations we observed (Buckhead Library and Chastain Park), averaging between 55 seconds and 2 minutes and 55 seconds per voter. The overall process was more organized than 2021, which was more organized than 2020. This conclusion was echoed by the poll manager at Chastain Park and by Fulton County elections staff. We also observed that the Elections Preparation Center looked cleaner and more organized than it had in 2021. Fulton County had also implemented a new inventory tracking system that aimed to help with equipment delivery and return. The inventory tracking system is not perfectly implemented yet, but the fact that they have added it shows a recognition of the importance of organization and preparation to the overall election process.

The Carter Center observed that both advance voting and Election Day were calm and peaceful. During advance voting, lines were generally short, ranging from no line to a maximum of 25 minutes. The last day of advance voting saw longer lines (also noted by the Performance Review Board observation). On Election Day, lines generally stayed under 15 minutes throughout the day. Most voters waited far less than 15 minutes, with 57% of observed polling places having no line at all and 38% had lines of 5 minutes or less. Lines at opening were manageable at all observed locations. The longest line at opening at an observed location was 43 people and observers reported that it was cleared quickly. The Carter Center also noted that the presence of compliance officer during advance voting, tasked with ensuring reconciliation of voter credit and voter check-in throughout the day, and a technical specialist, tasked with troubleshooting equipment issues, helped streamline processes.

The Carter Center also noted that election workers were generally friendly, enthusiastic, and helpful to voters, and that there was a strong emphasis on customer service. This is no small task given that workdays could be up to 14 hours.

The Carter Center observed good processes for tracking and processing absentee ballot applications and absentee ballots, similar to what the Performance Review Board observed in 2021. They noted that absentee ballot applications were received by the mailroom, timestamped, opened, and batched in groups of 50 for processing, with batch cover sheets used to track each group of 50 through the process, recording the total accepted or rejected. Applications were processed and reconciled to the voter registration database each night.

In another big improvement from the November 2020 election, Fulton County fully utilized the early scanning period to scan verified and accepted absentee ballots prior to Election Day. Utilizing this time period (codified in Georgia law by S.B. 202 following the 2020 election) allows absentee ballot scanning to be less of a rush, provides more time for quality control checks, and still allows the county to get results posted quickly after the polls close. Observers witnessed absentee ballot processing from initial receipt through verification and tabulation. Best practices were observed at

each step of the process, including using small batches, tracking each batch via a cover sheet that logged any ballots that were removed (e.g., ballots rejected during verification), and reconciling counts of ballots at various stages throughout the process. Following processes like this in an organized fashion is what ensures that the double-scanning of ballots that occurred in 2020 is not something that happens again. One other improvement noted by the Performance Review Board from 2021 to 2022 was a more organized system for storing memory cards when they are returned to the Election Processing Center for tabulation.

## AREAS FOR IMPROVEMENT

Both The Carter Center and Performance Review Board observed significant improvements since 2020, but observers also noted things that could use further improvement.

While poll workers generally seemed better-trained in 2022 than 2020 given that essential functions were successfully performed with relative uniformity, poll worker training can still be improved. The Carter Center observers noted that more contextualized training that helped poll officials understand the big picture "why" of certain administrative steps would be beneficial. For example, the processes of checking seals and properly filling out recap sheets were completed by poll officials, but there did not seem to always be an understanding of why and how these processes were undertaken. Both of those processes are important for overall system security and for public confidence in elections, and both are also ways to potentially find any issues at the point where they can still be easily resolved.

General organization can continue to improve as well. While the reality is that there is no such thing as a mistake-free election, a tightly organized environment lessens the opportunity for mistakes and increases the probability of catching mistakes. For example, in the May 2022 Primary Election, just like in the November 2021 Municipal Election, the Secretary of State's office noticed that Fulton County did not upload all memory cards that contained votes. The issue was resolved prior to certification, but it's something that should not have happened and, at the very least, should have been caught with basic reconciliation checks.

Another observation that can be resolved through better training is compliance with the State Election Board regulation that requires the poll official stationed at the ballot scanner to "offer each voter specific verbal instruction to review their printed ballot prior to scanning it."[15]

The Carter Center also noted that the "outreach" locations opened on college campuses for advance voting had the most significant staffing challenges, with poll managers having to give inexperienced staff on-the-job training. These locations were not initially planned to be advance voting locations, but they were added at the request of activist groups.[16] Preparation and planning is vital to successful election administration. In determining plans for polling locations, we assume the Fulton County Board of Elections and Registration is already taking into account what can

---

[15] Georgia Rules and Regulations 183-1-12-.11(8).

[16] "Following ACLU Complaint, Fulton to Host Voting on College Campuses." *Atlanta Journal-Constitution*. (August 11, 2022).

feasibly be accomplished by available resources and staff. Altering plans at the request of activist groups, who may be driven by motivations other than Fulton County executing a smooth election, can lead to the significant staffing challenges that The Carter Center observed.

We have already mentioned that finding suitable polling places is a difficulty for all, and especially urban, election officials. But one thing Fulton can pay more attention to is the layout of equipment at polling places. Voter privacy, voter flow, and appropriate transparency for certified partisan monitors should all be considered when determining setup and layout. Of course, given that available space will not always be perfect, it is not always possible to maximize each of those considerations, but polling place setup should be intentional and thought through.

One area noted by The Carter Center where significant improvement is needed is in following the sequestration requirements of O.C.G.A. § 21-2-386(a)(6) during early tabulation.[17] Fulton County should be applauded for taking advantage of both the early processing and early tabulating opportunities offered by Georgia law. Early processing and early tabulation ensure that sufficient time and care can be offered to those vital processes, which increases accuracy, while still allowing timely reporting of results. But the rules in place that allow for those processes to be done securely must be followed to ensure fairness and confidence.

Fulton County also has relatively new staff managing certain process since the 2020 election. The Performance Review Board's observation is that staff is dedicated and open to improvements when the necessary tools and guidance are provided. As The Carter Center stated well:

> Election processes are complex logistical exercises. As such, there are always opportunities for continuous improvement of processes to bolster efficiency and maximize appropriate and contextualized transparency. This process of continuous improvement relies on the observation of systems and processes and the creation of monitored feedback loops so that lessons from one election can be integrated into systems to improve future elections.

We hope that Fulton County will continue to build on the significant improvements that our review has noted since the 2020 election cycle.

**Fulton County's Future Plans**

In addition to the improvements that the Performance Review Board and The Carter Center were able to observe, Fulton County has also taken other steps that we believe can lead to even further improvements in future elections.

---

[17] Georgia law, clarified by S.B. 202, allows for both an early processing period where absentee ballots can be scanned but not tabulated (i.e. election officials can essentially do everything to prepare absentee ballots for tabulation but not yet tabulate) and a period beginning at 7:00 a.m. on Election Day where absentee ballots can be tabulated as long as all participants are sequestered so that results cannot be know by anyone outside that room until the polls close.

*Elections Central Location*

Many of the issues in 2020 were caused by or at least exacerbated by the fact that tasks and personnel were spread across many different locations. This was even more so the case in 2020 due to processes put in place to respond to the COVID-19 pandemic, but even outside of pandemic circumstances, Fulton County election operations are spread across multiple locations.

In Spring 2023, Fulton County plans to move to one central location ("Elections Central") where they will be able to conduct all election operations. Elections Central should reduce miscommunication and allow more visibility to managerial staff. Elections Central also shows the commitment of the Fulton County Commission to ensuring that Fulton County Elections has the resources they need to be successful.

*Budget Priority*

Along the same lines as the move to Elections Central, it became clear through our interviews that the Fulton County Commission now takes the budget needs of Fulton County Elections more seriously. One benefit of all the challenges from the 2020 election is that it showed people other than just election officials that election administration is a difficult and complicated logistical operation. Executing elections with the precision, integrity, and voter convenience that Georgia voters deserve and election officials want takes adequate resources.

We did not review the Fulton County Elections budget as part of this review, so we cannot speak to specifically to that issue. We have heard some rumblings that Fulton County Elections is over-funded. We are not able to speak specifically to that allegation, but it is the opinion of the Performance Review Board that elections in Georgia have generally been underfunded, not overfunded.

*Improvements to Poll Worker Training*

Even before The Carter Center's observation noted that some improvements to training would be beneficial, members of the Fulton County Board of Elections had already identified improvements to poll worker training. This came across in our interviews with Cathy Woolard, Chair of the Board, and Teri Crawford, one of the members. Apparently, certain poll managers noticed some weaknesses in training and approached the board about reworking the training manual. We understand that project is in progress. It is also encouraging that the poll managers themselves sought out to improve the training.

## CONCLUSIONS AND RECOMMENDATIONS

- In prior years, disorganization and a lack of a sense of urgency in resolving issues plagued Fulton County elections. However, Fulton County has shown improvement in administering elections from 2020 to 2022. This improvement is due to a multitude of factors. Prior staff that oversaw elections, voter registration, redistricting, and absentee ballots are no longer with the office, and new staff can bring new energy and renewed commitment. Training, processes and procedures, and overall organization have all been improved as well, but those things need further improvement to ensure readiness and success in the 2024 election cycle.

- The Fulton County Board of Elections and Registration is engaged and helping to drive those improvements. Replacing the board would not be helpful and would in fact hinder the ongoing improvements to Fulton County elections.

- The County Manager's Office in Fulton County has continued to be involved in planning, strategizing, and preparing for upcoming elections, which has positively contributed to improved execution of elections.

- Like election officials across the state, Fulton County elections staff show daily dedication and effort in carrying out and seeking to improve the administration of elections in Fulton County. Director level staff and the Fulton County Board of Elections need to ensure that staff has the necessary tools and guidance to ensure best practices and compliance.

- The Performance Review Board members individually donated hundreds of hours to this project and The Carter Center donated almost 4000 people hours. Both observations (which were conducted independently) noted significant improvement from the 2020 election, but both also noticed things that could use additional improvement, including further improvements to training and processes.

- The existence of the Performance Review helped incentivize Fulton County to make improvements to their elections, but it took an enormous amount of donated work, and it is difficult to see how it is a sustainable process that can continue to positively influence election administration in Georgia without some reforms. A positive, proactive, and periodic review process, appropriately funded, designed to support and assist all counties with election process improvements could be more effective than the performance review process in its current iteration.

- While the Performance Review Board has seen improvement in Fulton County elections since the 2020 election, further improvement is still needed to ensure readiness for the 2024 presidential election cycle. Presidential election cycles see more voters than midterms and take even more planning and preparation to ensure successful execution. Georgia will be a competitive state in next year's elections, so election preparation needs to recognize that

Fulton County's actions (and all counties in Georgia, for that matter) will be heavily scrutinized by political parties, campaigns, candidates, and activist groups. To ensure successful execution of the 2024 election, Fulton County should continue the improvements it has already embarked on and prioritize the areas for improvement noted in this report. Those areas are:

- o More contextualized poll worker training
- o Environment of order, organization, and control
- o Compliance with State Election Board Regulation regarding ballot review
- o Planning and Preparation based on capacity and execution
- o Review polling place layout
- o Compliance with Georgia law regarding sequestration during early tabulation

EXHIBIT 5

BEFORE THE STATE ELECTION BOARD
STATE OF GEORGIA

In the matter of:

**FULTON COUNTY BOARD OF
REGISTRATION AND
ELECTIONS,**

**SEB Case 2021-181
2022-025
Fulton County**

Respondent.

<u>**CONSENT ORDER**</u>

The State Election Board, by and through counsel, and the Fulton County Board of Registration and Elections ("Respondent"), hereby enter into the following Consent Order for use in SEB Case Nos. 2021-181 and 2022-025 before the State Election Board in lieu of an evidentiary hearing.

**FINDINGS OF FACT and CONCLUSIONS OF LAW**

The findings of fact and conclusions of law set forth in the following Paragraphs 1 through 5 have been asserted against Respondent.[1] Respondent denies any willful misconduct but desire that the above-captioned case be resolved in its entirety in order to avoid further litigation. Respondent acknowledges that there is evidence of a *prima facie* case supporting the following assertions and enters into this negotiated Consent Order to resolve the issues that arose related to the 2020 General Election in Fulton County, Georgia.

1.

A complaint was submitted to the State Election Board and the Secretary of State's office regarding the risk-limiting audit conducted by Fulton County elections officials for the General

---

[1] SEB Case 2021-181 also names Richard Barron as an additional Respondent. Mr. Barron is no longer the Elections Director for Fulton County, and he is hereby dismissed.

Election held on November 3, 2020.[2]

2.

The complainant alleged that there were 36 inconsistencies discovered in the batch tally sheets for the risk-limiting audit conducted following the 2020 General Election, which were included in the data uploaded to the Secretary of State's website.

3.

A thorough investigation into the complaints was conducted by the Secretary of State's investigations division. Investigators met with the complainant, reviewed all of the data and documentation submitted by the complainant, and interviewed other relevant witnesses with knowledge. The results of the investigation showed that Fulton County elections staff misidentified and duplicated audit batch sheet data when entering the data into the Arlo software used by the Secretary of State's office to manage the risk-limiting audit.

4.

By failing to enter all of the audit batch sheet data accurately, Respondent violated SEB Rule 183-1-15-.04 regarding audits. The investigators further concluded that the reported inconsistencies were the result of human error in entering the data, which were not discovered in time to make corrections due to time limitations in completing the risk-limiting audit and the sheer amount of ballots, and not due to intentional misconduct by Fulton County elections staff.

5.

The discovered errors were a fractional number of the total votes counted and did not

---

[2] The State Election Board heard the recommendation of the investigators regarding SEB Case No. 2021-181 at the March 16, 2022 Board meeting and voted to bind the case over to the Attorney General's office. On March 31, 2022, an additional complaint was received and designated as SEB Case No. 2022-025. The Secretary of State's investigators determined that SEB Case No. 2022-025 is the same complaint that is at issue in SEB Case No. 2021-181. This Consent Order resolves the allegations against Respondent in both SEB Case Nos. 2021-181 and 2022-025.

affect the result of the 2020 General Election Fulton County, which were confirmed as accurate by the risk-limiting audit. The purpose of the risk-limiting audit was to confirm whether the results of the original tabulation of ballots were accurate, which the audit confirmed.

ORDER

1.

This Consent Order addresses and resolves all matters regarding Respondent in connection with SEB Case Nos. 2021-181 and 2022-025.

2.

The State Election Board, having considered the particular facts and circumstances of this case, inclusive of the within and foregoing Findings of Fact and Conclusions of Law, hereby ORDERS that Respondent cease and desist from further violations of the Election Code.

3.

Respondent hereby agrees to implement written policies and procedures for risk-limiting audits for all elections for which risk-limiting audits are required under SEB Rule 183-1-15-.04, which are attached as **Exhibit A**. Respondent hereby certifies to the State Election Board that it has already implemented these policies and procedures and did so for the 2022 General Election.

4.

Respondent agrees to adequately train all of its elections staff involved in conducting the risk-limiting audit on the policies and procedures in advance of each election.

5.

Members of the Fulton County Board of Registration and Elections have been provided with a copy of this Consent Order and have acknowledged that they understand the contents. Respondent understands that it has a right to a hearing in this matter. Respondent knowingly and voluntarily waives such right to a hearing, as well as any other rights under the Georgia

- 3 -

Administrative Procedure Act pertaining to notice and hearing for contested cases, by entering into this Consent Order.

6.

This Consent Order is entered in settlement of disputed matters, and the Consent Order entered herein is not to be construed as an admission of guilt or liability on the part of Respondent but is entered herein to resolve this State Election Board case. This Consent Order is a civil settlement and has no criminal ramifications.

7.

This Consent Order, inclusive of its Stipulations and Order, shall not become effective unless and until approved by the State Election Board at its June 8, 2023, meeting, and the State Board of Elections. If not approved by and executed on behalf of either board, , neither the stipulations nor any other part of this agreement shall have any binding legal effect whatsoever and shall not constitute an admission against interest or prejudice the ability of either the State Election Board or Respondents to adjudicate this matter.

This ___8___ day of ___June_____, 2023.

Consented to:

> FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS

> BY: _____

Sworn to and subscribed
before me this __8__ day
of ___June____, 2023.

_____
NOTARY PUBLIC

My commission expires: _March 22, 2027_

- 4 -

Approved by the State Election Board this 21ˢᵗ day of June , 2023.

STATE ELECTION BOARD

BY: _____

WILLIAM S. DUFFEY, JR.
CHAIRPERSON

Exhibit A intentionally omitted

Exhibit 6 intentionally omitted

EXHIBIT 7



# State Election Board
6/13/2024

**VIA EMAIL AND USPS MAIL**

Fulton County Board of Elections and Registration
141 Pryor St. SW #4075
Atlanta, GA 30303

Nadine Williams, Director of Registration and Elections
5600 Campbellton Fairburn Road
Union City, Georgia 30213
nadine.williams@fultoncountyga.gov

Ann S. Brumbaugh LLC
309 Sycamore Street
Decatur, GA 30030
Annbrumbaughlaw.com

     Re:    <u>SEB Case No. SEB2023-025</u>

Dear Fulton County Board of Elections and Registration and Nadine Williams:

    On May 7, 2024, the State Election Board considered the complaint listed above. As a respondent, you were sent a notice of the meeting on April 2, 2024.

    At the meeting, the State Election Board reviewed the facts developed in the investigation of this matter. The State Election Board found that a series of BMD-printed ballots and hand-marked ballots repeated in the same order in a separate scanned batch from the first batch. A review of the 1,163 hand-marked ballot images appeared to be duplicate ballot images based on the unique markings on the ballot; however, regarding the BMD generated machine ballots, the selections were the same but there were no distinct markings on these ballot images to positively identify them as duplicate ballot images. The Board also found that you did not follow proper batch management procedures for the 2020 General Election Recount.

    State Election Board Rule 183-1-15-.03(1)(e) provides: "The tabulation of ballots must be completed through a precise, controlled process that ensures, for each ballot scanner used in the recount, no more than one ballot container is unsealed at any given time."

    State Election Board Rule 183-1-15-.03(1)(f) provides, in part: "A clear audit trail must be maintained at all times during the recount…"

Based on the facts found at the meeting, the State Election Board determined that you violated SEB Rule 183-1-15-.03(1)(e) and SEB Rule 183-1-15-.03(1)(f) by failing to ensure the 2020 General Election Recount was completed through a precise, controlled process that ensured, for each ballot scanner used in the recount, no more than one ballot container was unsealed at any given time, and failed to ensure a clear audit trail was maintained at all times during the 2020 General Election Recount.

Having found these violations, the State Election Board directed that this letter of findings and reprimand be sent to you. Further, the Board has directed that a memorandum of understanding between the Fulton County Board of Elections and Registration, the Office of the Secretary of State, and the State Election Board be entered. This memorandum should outline a mutually agreeable monitor for the 2024 General Election by the August meeting of the State Election Board.

You are hereby instructed to refrain from further violations of SEB Rule 183-1-15-.03(1)(e) and SEB Rule 183-1-15-.03(1)(f) and are admonished to comply with all the State Election Board rules and Georgia law relating to elections conducted in the State of Georgia.

Sincerely,

John Fervier
Chair, State Election Board

EXHIBIT 8

VIA EMAIL

<u>**Hold Letter for Continuing Investigation**</u>

**Fulton County Board of Elections**

**Nadine Williams, Director of Elections**

**5600 Campbellton Fairburn Road**

**Union City, GA 30213**

RE:     **SEB Continuing Investigation into SEB 2025-023 and self-initiated**

        <u>**Investigation into Issues Surrounding the 2020 Election**</u>

To the Georgia Secretary of State and the Fulton County Board of Registration and Elections and all other persons to whom this letter is addressed:

The State Election Board (SEB) has been investigating certain unexplained anomalies in vote tabulation and storage related to the 2020 election and the recounts of those election results (he initial count, the hand recount, any risk-limiting or other audits, and the machine recount), including the reasons for the variances noted by the audits and recounts and the investigations related to those event (collectively, the "Events").  On October 8, 2024, the SEB voted to continue that investigation.

You are hereby notified that you must retain all documents and information in your possession in any format related to the Events, including paper-based information and electronically stored information, are important and irreplaceable sources of information for the completion of that investigation.  **You are hereby directed to keep all information intact and available for inspection under any court-ordered proceeding or other proceeding authorized by law, including subpoenas issued by the State Election Board.**  The investigations require preservation of all information from all computer systems, removable electronic media, and other locations, including electronic communications, word processing documents, spreadsheets, databases, calendars, telephone logs, contact manager information, internet usage files, and network access information.

Any addressee should also preserve the following platforms in the possession of any addressee or a third party under the control of the addressee (such as an employee or outside vendor under

contract, including Dominion Voting Systems and its affiliates) (collectively, "affiliates"): databases, networks, computer systems, including legacy systems (hardware and software), servers, archives, backup or disaster recovery systems, tapes, discs, drives, cartridges and other storage media, laptops, personal computers, internet data, personal digital assistants, handheld wireless devices, mobile telephones, paging devices, and audio systems (including voicemail).

Failure to preserve and retain the documents and electronic data identified in the following sections of this notice may constitute spoliation of evidence under Georgia law and/or result in the failure to produce evidence under O.C.G.A. § 24-14-22 and could subject addressees or any persons under control of addressees as described above to claims for damages, as well as evidentiary and monetary sanctions.

All of the information contained in the letter should be preserved from January 1, 2020 until the date we announce the completion of the investigation by the State Election Board. Further instructions will be forthcoming.

**Compliance with these preservation obligations includes forwarding a copy of this letter to all individuals or organizations that are responsible for any of the items referred to in this letter, such as offsite servers or companies managing computer systems of your organization. If this correspondence is in any respect unclear, please contact me immediately at 678-665-8480 or mcoan@sos.ga.gov.**

On behalf of the

Georgia State Election Board

_____Michael Coan_____     Date: November 7, 2024

Michael Coan

Executive Director

**VIA EMAIL**

**Hold Letter for Continuing Investigation**

Fulton County Board of Registration and Elections

    Sherri Allen, Chair of the Board of Registration and Elections

    5600 Campbellton Fairburn Road

    Union City, GA 30213

    Sherri.allen@fultoncountyga.gov

RE:    **SEB Continuing Investigation into SEB 2025-023 and self-initiated**

        **Investigation into Issues Surrounding the 2020 Election**

To the Georgia Secretary of State and the Fulton County Board of Registration and Elections and all other persons to whom this letter is addressed:

The State Election Board (SEB) has been investigating certain unexplained anomalies in vote tabulation and storage related to the 2020 election and the recounts of those election results (he initial count, the hand recount, any risk-limiting or other audits, and the machine recount), including the reasons for the variances noted by the audits and recounts and the investigations related to those event (collectively, the "Events").  On October 8, 2024, the SEB voted to continue that investigation.

You are hereby notified that you must retain all documents and information in your possession in any format related to the Events, including paper-based information and electronically stored information, are important and irreplaceable sources of information for the completion of that investigation.  **You are hereby directed to keep all information intact and available for inspection under any court-ordered proceeding or other proceeding authorized by law, including subpoenas issued by the State Election Board.**  The investigations require preservation of all information from all computer systems, removable electronic media, and other locations, including electronic communications, word processing documents, spreadsheets, databases, calendars, telephone logs, contact manager information, internet usage files, and network access information.

Any addressee should also preserve the following platforms in the possession of any addressee or a third party under the control of the addressee (such as an employee or outside vendor under contract, including Dominion Voting Systems and its affiliates) (collectively, "affiliates"): databases, networks, computer systems, including legacy systems (hardware and software), servers, archives, backup or disaster recovery systems, tapes, discs, drives, cartridges and other storage media, laptops, personal computers, internet data, personal digital assistants, handheld wireless devices, mobile telephones, paging devices, and audio systems (including voicemail).

Failure to preserve and retain the documents and electronic data identified in the following sections of this notice may constitute spoliation of evidence under Georgia law and/or result in the failure to produce evidence under O.C.G.A. § 24-14-22 and could subject addressees or any persons under control of addressees as described above to claims for damages, as well as evidentiary and monetary sanctions.

All of the information contained in the letter should be preserved from January 1, 2020 until the date we announce the completion of the investigation by the State Election Board.  Further instructions will be forthcoming.

**Compliance with these preservation obligations includes forwarding a copy of this letter to all individuals or organizations that are responsible for any of the items referred to in this letter, such as offsite servers or companies managing computer systems of your organization.  If this correspondence is in any respect unclear, please contact me immediately at 678-665-8480 or mcoan@sos.ga.gov.**

On behalf of the

Georgia State Election Board

___Michael Coan_____    Date: November 7, 2024

Michael Coan

Executive Director

Exhibit 9 intentionally omitted

Exhibit 10 intentionally omitted

EXHIBIT 11

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

SHERRI ALLEN, in her capacity as Chair of
the FULTON COUNTY BOARD OF
REGISTRATION AND ELECTIONS, and
NADINE WILLIAMS, in her capacity as
Executive Director of the FULTON COUNTY
DEPARTMENT OF REGISTRATION AND
ELECTIONS,

               Petitioners,

v.

STATE OF GEORGIA,

               Respondent.

Civil Action File No. 24CV014632

**AFFIDAVIT OF NADINE WILLIAMS**

Personally appeared before me, the undersigned attesting officer duly authorized to administer oaths, NADINE WILLIAMS, who, after being duly sworn, stated under oath as follows:

1.     My name is Nadine Williams. I am over the age of 21 years, suffering from no known disabilities, and am otherwise competent to testify. The facts set forth herein are based upon my personal knowledge. I submit this affidavit in support of the Petition and Amended Petition to Quash State Election Board Subpoenas.

2.     I am Director of the Fulton County Department of Registration and Elections ("DRE"). I have investigated the estimated time and expense that would be necessary for the DRE to comply with the subpoenas issued on November 4, 2024, by the State Election Board, all of which seek documents related to the 2020 election in Fulton County.

3.       Fulton County's 2020 election materials are stored in over 700 boxes, each of which must be opened, searched, and sorted systematically to locate the majority of the documents requested in the subpoenas.

4.       The DRE does not have sufficient staff to conduct this search and make copies of the documents requested. I estimate that we would need to hire 15 temporary staff members to work full time (40 hours a week), at approximately $26/hour, for a period of approximately 15 weeks to conduct the searching and copying necessary to comply with the subpoena.

5.       To avoid risk of contamination, manipulation, or allegations thereof, we require that searches of materials from the 2020 election be conducted under strict supervision. Thus, a supervisor, paid at $45/hour, would need to be present for the entire 15-week-long search of the 700+ boxes of 2020 election materials.

6.       I also estimate that we will need to hire 4 temporary staff members to work full time, at approximately $26/hour, for a period of 4 weeks to perform redactions of personal information from documents requested in the subpoenas.

7.       Based on the foregoing estimates, the total cost of the staffing necessary to respond to the subpoenas would be approximately $281,800.

8.       I also estimate $95,000 in costs to make copies, at 15 cents per page, of the approximately 300,000 ballot oath envelopes and the other documents requested by the subpoenas, which I estimate to be 333,333 pages.

9.       Altogether, the estimated cost to comply with the subpoenas, including labor and copying costs, would be $376,800.

10.      To hire the necessary temporary staff to respond to these subpoenas, we would need to obtain funding from the Fulton County Board of Commissioners, engage in a

procurement process relative to the temporary services, and enter a contract with the successful offeror. The successful offeror would then retain temporary staff whom we would then train to assist with complying with the subpoenas.

FURTHER AFFIANT SAYETH NAUGHT.

This 24 day of February, 2025.

Nadine Williams

Sworn to and subscribed before me
this 24 day of February, 2025.

NOTARY PUBLIC

My commission expires
March 22, 2029.

- 3 -