Case No. 1:25-cv-07084-TWT

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

FEB 02 2026

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

UNITED STATES OF AMERICA

*Plaintiffs.*

v.

CHÉ ALEXANDER, Clerk of Court
for Fulton County,

*Defendants.*

---

# EMERGENCY MOTION AND MEMORANDUM OF LAW TO RECOGNIZE CRIME AND FRAUD UPON THE COURT AND ONGOING SEIZURE OF GOVERNMENTAL CONTROL OUTSIDE THE ARTICLE 1 CONSTITUTIONAL PRESCRIPTIONS

---

Sarah E. Thompson, Pro se
150 Timber Cove
Statesboro, GA 30461
(856) 866-6881
freedomwinsusa@protonmail.com

Edward T. Metz
6231 Dodgen Rd SW
Mableton, GA 30126
(404) 831-9288
TedMetz@protonmail.com

**INTRODUCTION**

Courts must interpret statutes in light of the prior law, the mischief to be remedied, and the remedy **Congress** adopted. *Heydon's Case* (1584).

This Emergency Motion and Memorandum filed by Movants Sarah E. Thompson and Edward T. Metz, Georgia electors and U.S. Veterans, seeks immediate judicial recognition that the demand (and now seizure)[1] of purported "election materials" by the Department of Justice Civil Rights Division ("DOJ-CRD"), acting on behalf of the United States and claiming jurisdiction under 52 U.S.C. §§ 20701 to 20706, rests on a **sweeping constitutional falsehood that totally avoids federal constitutional preemption.** Courts have long found that the legitimate holding of Federal Elections depends entirely on compliance with Congress's Article I prescriptions found in Chapter 1 of 2 U.S. Code. These are powers delegated to the United States by the constitution under Article 10 of the amendments to the Constitution and are laws which shall be necessary and proper to carry into execution the foregoing Article I powers. *U.S. v. Harris,* 106 U.S. 629, 636 (1883). When Georgia officials receive or record votes contrary to Congressional prescriptions, as they did in 2020 and ongoing, they are acting *without statutory power* and, therefore, open to immediate prosecution using herein facts and evidence.

---

[1] Search Warrant, *In re Search Warrant,* No. 1:26-MC-0177 (N.D. Ga. Jan. 28, 2026) (Salinas, U.S. Mag. J.).

As concrete legal facts demonstrate, Georgia has not executed the Chapter 1 prescriptions of Congress since November 5, 2002, less than a week after the passage of the Help America Vote Act ("HAVA") which funded $3.9 billion in largely mandatory payments to States for establishing federally certified electronic systems in election districts.[2] Consistent with this fact, on January 30, 2026, Michele Nichols, Director of the GA Department of Audits and Accounts stated, referencing elections: "Our office does not have any public records outlining federal preemptions." (Ex. E). Administrative reliance on such systems cannot cure a constitutional defect at the point of creation. *INS v. Chadha,* 462 U.S. 919, 951 (1983). Electronics produce **<u>no certain</u>** election property, data, or information.

As the Founders foresaw, within the **old laws** are clear remedies to the tempting **new evils.** The Elections Clause of the U.S. CONST art 1, § 4, cl 1 vests Congress with exclusive and preemptive authority to make or alter state prescriptions for the Time, Place, and Manner of holding elections for Representatives and Senators. Providentially, Congress used its powers after the American Civil War to enact preemptive federal law, long before subordinate modern "civil rights" welfare and safety statutes asserted by DOJ-CRD. Congress exercised authority to prescribe the Time of electing Representatives and Senators in 2 U.S.C. § 1 (1914) and § 7 (1875). The Place is established within

---

[2] *Help America Vote Act of 2002*, Pub. L. No. 107-252, 116 Stat. 1666 (Oct. 29, 2002).

single-member federal election districts "prescribed by the laws of such state" per 2 U.S.C. § 2a and § 2c (1929, 1967). Congress fixed the prescription for the Manner (Method) of holding elections in 2 U.S.C. § 9 (1899). Congress spoke in specific terms:

> **All votes** for Representatives in Congress must be by written or printed ballot, or voting machine the use of which has been duly authorized by the State law; and all votes received or recorded contrary to this section **shall be of no effect.** (R.S. § 27; Feb. 14, 1899, ch. 154, 30 Stat. 836. R.S. § 27 derived from acts Feb. 28, 1871, ch. 99, § 19, 16 Stat. 440, and May 30, 1872, ch. 239, 17 Stat. 192.)

This clear mandate operates with sweeping force: it limits not only the lawful Manner of voting, but establishes the grounds for the *effectiveness* of individual votes, which in turn concludes *whether a federal election legally occurs.* As such, State fidelity and compliance with execution of the Manner at the prescribed Time and Place determines *whether any constitutionally lawful federal election records are created.* The conditioned REMEDY of Congress imposed on the states is clear. Absent compliance, votes shall be of no effect.

Non-compliance with these prescriptions is clearly catastrophic to fundamental voting rights and unconstitutional. Deprivation of the effective right to vote [vote effectiveness] is patently incompatible with the republican form of government guaranteed by Article IV. *Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 176 (1875). As such, no legal rights, duties, or records can arise from such a

nullity. 2 U.S.C. § 9; *U.S. v. Gradwell,* 243 U.S. 476, 485 (1917); *Johnson v. Clark,* 25 F. Supp. 285, 287–89 (N.D. Tex. 1938); *Ex parte Siebold,* 100 U.S. 371, 384–85 (1879) (the authority of the national government is paramount in federal elections). Accordingly, the federal government cannot make jurisdictional demands where Article 1 and Chapter 1 preemptions are so clearly breached.

Movants submit, based on firsthand experience as recent poll officers, poll watchers, and/or candidates, including and since 2020, supported by public admissions by state officials, that no Georgia polling place of any election district operated using either of the only two constitutionally permitted methods. The claimed "elections" were ***neither*** by written or printed ballots nor voting machines. The terms are simple and their applied meaning was publicly understood at the time of enactment. Written or printed ballots are paper forms, presented by poll officers for manual marking and accounting. The term "voting machine" is consistent with the U.S. Patents of J.H. Myers,[3] and O.C.G.A. § 21-2-2(40).

Preceding the event titled "Presidential Preference Primary of March 2020" and again at the event titled "Presidential General Election of November 3, 2020"

---

[3] U.S. Patent No. 415,548 & 415,549, *Voting Machine* (Issued Nov. 19, 1889), available at
https://patentimages.storage.googleapis.com/92/b3/32/1073a5444b67af/US415549.pdf. U.S. Patent No. 424,332, *Voting Machine* (Issued Mar 25, 1890),
https://patentimages.storage.googleapis.com/25/c0/9c/f24fec8b2d2d38/US424332.pdf.

instead of ensuring a constitutional voting Method through proper execution of state laws and oversight, Georgia state election officials coerced the next generation of electronic systems upon all county jurisdictions by means of a contractual arrangement for corporations to perform both services and state functions for and on behalf of the Georgia Secretary of State.[4] Dominion Voting Systems, Inc. and KnowInk, LLC implemented their systems with the full government support and taxpayer funding. All systems and peripheral devices were fully deployed in all Georgia polling locations to generate [counterfeit] "election results" on November 3, 2020.[5]

The State of Georgia has ***exploited*** The People by totally depriving our rights in a textbook effort consistent with the federal definitions of collaborated sedition. The national drama pivots around the legal fact that Georgia officials, along with those of nearly every other state, ***eliminated*** constitutional means to

---

[4] *Master Solution Purchase Agreement by and Between Dominion Voting Systems, Inc. as Contractor, and Secretary of the State of Georgia,* July 29, 2019, pg. 54, https://gaverifiedvoting.org/pdf/20190729-GA-Dominion-Contract.pdf.

[5] *Security-Focused Tech Company, Dominion Voting to Implement New Verified Paper Ballot System*, Georgia Secretary of State (July 29, 2019), https://sos.ga.gov/news/security-focused-tech-company-dominion-voting-impleme nt-new-verified-paper-ballot-system. *State Election Board Invites Dominion Voting Systems to Discuss 2020 Statewide Voting System*, Georgia Secretary of State (Feb. 23, 2021), https://sos.ga.gov/news/state-election-board-invites-dominion-voting-systems-disc uss-2020-statewide-voting-system. *Secretary of State's Office Releases Additional RFP Documents*, Georgia Secretary of State (Aug. 8, 2019), https://sos.ga.gov/news/secretary-states-office-releases-additional-rfp-documents.

effective voting by replacing constitutional Manners of holding Elections. Where **votes are of no effect** by a scheme used outside of the Congressional Provision of the Elections Clause, a Federal Election **does not occur.**

This case falls apart for lack of concrete facts. Mainly, no party has produced, or can produce, evidence that a constitutional federal election consistent with Article I and 2 U.S.C. § 9 occurred in Fulton County or anywhere in the State of Georgia on or about November 3, 2020. Upon discovery, Movants notified Clerk Che Alexander on January 2, 2025 by email and UPS (See Ex. A),[6] explaining that the DOJ-CRD is unlawfully protecting executives by pursuing only state public records and materials constituting counterfeit substitutes. Sealing as such is outside her official duties and exposes custodians to personal liability. Electronic outputs are only state public records of private entities acting for or on behalf of government agencies per O.C.G.A. § 50-18-70(b)(2). State law mandates their transparency to the public, and, in this case, as **evidence for indictments**.

Parties assert civil rights laws that do not add to government election powers. In fact, the guarantee of the Fourteenth Amendment to the Federal Constitution is a guarantee against exertion of arbitrary and tyrannical power on the part of the government and legislature of a State. *U.S. v. Harris*, 106 U.S. at

---

[6] UPS, Track by Tracking Number: *1Z10412R0305850045,*
https://www.ups.com/track?tracknum=1Z10412R0305850045 (last visited Jan. 9, 2026).

633. Civil rights legislation enforces constitutional prohibitions but confers no new federal power and cannot enlarge, substitute for, or override the Constitution's original allocation of election authority. *The Civil Rights Cases*, 109 U.S. 3, 11–13 (1883); *U.S. v. Harris*, 106 U.S. at 629, 639–40. Cloaked acts of 42 U.S.C. "Welfare," such as HAVA, do not preempt, nor supersede Article 1 prescriptions. Furthermore, it presents as a conspiracy against the rights of Georgians that the DOJ-CRD asserts Title III of the Civil Rights Act of 1960 in place of the *absent* Article 1 preemptive mandates for holding federal elections.

The government-led scheme in this case constitutes fraud upon the Court that requires remedy by the full power of judicial responsibility, as all Fulton County citizens, and, by implication, **all Georgians are egregiously injured.** By HAVA, officials used federal and state tax dollars to establish an unconstitutional electronic infrastructure to replace the constitutional lever voting machines and propagandize the removal of the constitutional paper ballot method as sub-modern.

Negligent judicial handling of this case and connected cases has the potential to be terminally catastrophic to the general government of the United States, and the Republic itself, because of its fabricated and conjectural basis. As the Court is aware, the states have *no power*, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted

by congress to carry into effect the powers vested in the national government. *M'Culloch v. State,* 17 U.S. 316, 317, 4 L. Ed. 579 (1819). This includes the right to have one's vote at an election for a member of Congress counted, which is as open to protection by Congress as is the right to vote itself. *U.S. v. Mosley,* 238 U.S. 383, 35 S. Ct. 904, 59 L. Ed. 1355 (1915). The DOJ-CRD, in this case, attempts to represent the interest of the entire federal government, including Congress, but appears to be enjoined with Georgia political actors to actually, and by means of judicial powers, to further deprive the fundamental right to vote.

The demanded and now seized materials are not federal election records. They are substitutionary outputs generated under an executive-vendor regime, not the materials of a constitutional election. Under Georgia law, lawful election records arise only from mandatory paper ballot prescriptions codified at O.C.G.A. §§ 21-2-280 to 21-2-294 and 21-2-430 to 21-2-440, which the Georgia Supreme Court has affirmed as the controlling statutory prescription. *Rhoden v. Athens-Clarke County Board of Elections*, 310 Ga. 266 (2020). Though the parties lacked standing, similar to the matter herein, the Court still held (1) on October 19, 2020 that elections are "subject to statutory provisions governing use of paper ballots." Then, just days later, officials prohibited the Article 1 Manner statewide. Neither precinct poll officers nor county superintendents duly certified returns per O.C.G.A. §§ 21-2-437 and 21-2-493(c)(e) and (g) statutory provisions governing

use of paper ballots (nor voting machines) were executed per federal mandate.

By suppressing Congress's election prescription, invoking Title 42 enforcement mechanisms in a constitutional vacuum, and seeking judicial compulsion based on the false predicate that a lawful federal election occurred, the DOJ-CRD asks this Court to enforce what Congress has expressly declared to be "of no effect." Such use of judicial process constitutes fraud upon the court, and worse, because it advances a claim the Court lacks constitutional authority to grant and that compels custodians to mischaracterize records that are void as a matter of law. *Chambers v. NASCO, Inc.,* 501 U.S. at 32, 44–46.

Standing to bring or adjudicate election-related claims presupposes the concrete existence of a lawful constitutional election. Before adjudicating such rights or injuries, a court must first determine whether the election was conducted pursuant to the governing constitutional and statutory prescription. *Johnson v. Clark,* 25 F. Supp. at 285, 287–88; *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992) (Party invoking federal jurisdiction bears the burden of establishing elements of standing, Fed. R. Civ. P. 170A). Congress's Article 1 prescriptions define the legal existence of federal elections, and deviations render resulting acts legally ineffective. *U.S. v. Gradwell,* 243 U.S. at 476, 485; *Ex parte Siebold,* 100 U.S. at 371, 384–85; *U.S. v. Classic,* at 313 U.S. 299, 315–16.

In 2020, state and county officials administered a next generation of proprietary electronic voting systems in all Georgia polling places through expansive administrative action that was neither authorized by Congress nor consistent with Georgia's mandatory paper-ballot statutes; they imposed it upon the electorate without lawful alternatives. These actions operated to substitute an executive-vendor regime for Congress's prescribed Manner of holding federal elections and thereby to manufacture the appearance of a federal election where none lawfully occurred. Where no constitutionally valid election occurs, alleged injuries predicated on election outcome are conjectural and insufficient to confer standing. *Lance v. Coffman*, 549 U.S. 437, 442 (2007). The injury here is the wholesale deprivation of the right to cast an effective vote and to participate in a republican form of government caused by the absence of any lawful federal election at all. *U.S. v. Classic*, 313 U.S. at 299, 315; *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Where public officials act without honest and actual antagonistic assertion of lawful authority and place the public interest at hazard, courts have a duty to set aside the resulting adjudications. *U.S. v. Johnson*, 319 U.S. 302 (1943). See also *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–46 (1991); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944).

The abusive blight to deny representation will reoccur absent a lawful status quo. The electronic scheme "assisted" by the U.S.A. is fatal to the Republic itself.[7]

## ARGUMENT

### I. Scope of Congressional Authority Over Federal Elections

Congress's authority to regulate federal elections and to protect the right to vote is plenary when exercised pursuant to express constitutional grants. U.S. CONST. art. I, § 4, cl. 1 states:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but **the Congress may at any time by Law <u>make</u> or alter such Regulations**, except as to the Places of chusing Senators.

The Necessary and Proper Clause empowers plain execution by law. U.S. CONST. art. I, § 8, cl. 18; *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819).

Article I, Section 2 vests the choice of Representatives in the People of the several States. Where Congress has exercised authority under the Elections Clause to prescribe the Manner of holding federal elections, such regulations are paramount and supersede all contrary state law, and neither states nor executive officials may alter that prescription. *Ex parte Siebold*, 100 U.S. at 371, 384–85;

---

[7] *Supra* Note 2 (An Act … to establish a program to provide funds to States to replace punch card voting systems and lever voting machines… to establish the Election *Assistance* Commission …).

*Smiley v. Holm*, 285 U.S. at 355, 366–67; *U.S. v. Classic*, 313 U.S. 299 at 315–16; *Arizona v. Inter Tribal,* 570 U.S. at 1, 14.

Congress's powers under the Fourteenth and Fifteenth Amendments are coextensive with the Necessary and Proper Clause itself to enforce civil rights. *Ex parte Virginia*, 100 U.S. 339, 345–46 (1879). These provisions authorize Congress to enact "appropriate legislation" to secure equal protection and to prevent abridgment of the right to vote, but those powers presuppose the existence of constitutionally valid elections with deference to Article 1 preemptions.

Federal courts consistently reject claims of exclusive state sovereignty over election processes where Congress acts within its scope. *U.S. v. Darby*, 312 U.S. 100, 124 (1941). The federal prescription to all of the states for "Manner of Holding Elections" to properly effectuate votes in 2 U.S. Code § 9 was ***made by Congress.*** In *U.S. v. Manning*, the court upheld the registration provisions of the Civil Rights Act of 1960 as proper ***alterations*** of state prescriptions holding that "[n]othing in the language or history of the Tenth Amendment gives the State exclusive sovereignty over the election processes against the Federal government's otherwise constitutional exercise of a power…" 215 F. Supp. 272, 277 (W.D. La. 1963) (citing *McCulloch v. MD* at 263). See also *U.S. v. Classic*, 313 U.S. at 314; *Ex parte Yarbrough,* 110 U.S. 651, 663 (1884). The epitome of state tyranny is herein total denial and deprivation of voting rights.

As summarized in *U. S. v. State of Louisiana*, Congress enacted the Civil

Rights Act of 1960 to secure more effective protection of voting rights in

***constitutionally compliant*** elections. 225 F. Supp. 353, 360–61 (E.D. La. 1963),

aff'd, 380 U.S. 145 (1965); see also *State of Ala. ex rel. Gallion v. Rogers*, 187 F.

Supp. 848 (M.D. Ala. 1960), aff'd sub nom. *Dinkens v. Att'y Gen. of U.S.*, 285

F.2d 430 (5th Cir. 1961). Absent Art. 1 prescriptions, enforcement authority is null.

Where a state conducts elections in direct and total abrogation of Congress's

controlling prescription and its own mandatory implementing statutes — and

denies the citizens of its own constitutional state provisions — no acts "requisite to

voting" occur and, therefore, no lawful federal-election records are created.

## II. Supremacy Clause Requirement: Article I Election Prescriptions Preempt Contrary Law

Under the Supremacy Clause, U.S. CONST. art. VI, cl. 2, the Constitution

and laws made in pursuance thereof are the supreme law of the land, binding

judges in every state notwithstanding any contrary state law, executive practice,

administrative regulation, or funding condition. When Congress legislates pursuant

to an express constitutional delegation, its enactments carry ***structural preemptive***

***force.*** The Elections Clause renders Congress's authority over the Time, Place, and

Manner of holding federal elections paramount, and once Congress has exercised

that authority, its regulations supersede all conflicting state law. *Ex parte Siebold*,

100 U.S. 371, 384–85 (1879); *Smiley v. Holm*, 285 U.S. 355, 366–67 (1932); *U.S. v. Classic*, 313 U.S. at 299, 315–16. Neither states nor executive agencies may substitute methods, redefine terms, or evade Congress's prescriptions through administrative practice, appropriations, or private contracting.

### III. Congress Alone Prescribes the Manner of Federal Elections: 2 U.S.C. § 9

Congress fixed the lawful Manner of voting for U.S. Representatives in 2 U.S.C. § 9 (1899). The prescribed Manner is mandatory. "A mandatory provision in a statute is one the omission to follow which renders the proceeding to which it relates illegal and void. *Territory ex rel. Sulzer v. Canvassing Bd.,* 5 Alaska 602, 615 (D. Alaska 1917).

> A nonofficial ballot is not a ballot at all; it is not simply an illegal ballot; it is a void ballot… If the nonofficial ballots… are to be counted, then why not count all nonofficial ballots? And if this is to be done, what is the necessity of any official ballots?. *Id.*

Because this binding, positive law permits only two methods, official balloting or valid machine tabulation does not occur outside of this. As such, States have no choice, except whether to adopt the use of voting machines and to select a manufacturer, and Congress imposed no obligation on their use.[8] (Ex. E). The method of printed paper ballots is the federal backstop outside of machines.

---

[8] 32 Cong. Rec. 1611-1613 (Feb. 8, 1899).

The final sentence of 2 U.S.C. § 9 operates as a self-executing nullification clause, declaring that votes received or recorded outside Congress's prescribed Manner are a legal nullity and incapable of producing a lawful federal election. Where the prescribed Manner is not used, the election is void for federal purposes and cannot generate lawful records. *U.S. v. Gradwell*, 243 U.S. 476, 485 (1917); *Johnson v. Clark*, 25 F. Supp. at 285, 287–89. Only theater is left.

## IV. The Fixed Meaning of "Written or Printed Ballot" and "Voting Machine"

Statutory meaning is fixed at enactment. *Wisconsin Cent. Ltd. v. U.S.*, 585 U.S. 274, 281 (2018). The handwritten paper ballot gave way to the Australian pre-printed type toward the end of the century. In 1899, a ballot was a paper instrument, presented by poll officers, manually marked, and then cast into a ballot box. Case law amplifies the meaning. For example, Act June 22, 1891, S.H.A. ch. 46, § 16-1 et seq., which mirrors O.C.G.A. § 21-2-435 provides:

> Voting shall be by ballots printed and distributed at public expense, that no other ballots shall be used, and that the voter shall prepare his ballot by making a cross opposite the name of the candidate of his choice, or by writing in the name of the candidate of his choice in a blank space on said ticket, and making a cross opposite thereto. Held, that voters are not confined to the names printed on the official ballot... *Sanner v. Patton,* 155 Ill. 553, 40 N.E. 290 (1895).

Alternately, the definition and meaning of "voting machine" is consistent with the invention of the mechanical lever "voting machine" in USPTO patents of

J.H. Myers (1889, 1890).[9] Electronic, software-driven, optical-scan, or networked systems did not exist and were not contemplated in 1899 and per Congressional Record, only delegated to the states the option and terms of their use.[10] (Ex. E). Georgia law preserves the "voting machine" definition in O.C.G.A. § 21-2-2(40) as a "mechanical device… also known as a lever machine." Fulton County attorneys stated: "In fact, the voting system used by Fulton County… *is __not__ a system of "voting machines,"* a term which is defined in O.C.G.A. § 21-2-2(41)…" See *In re Dec. 6, 2022 Gen. Election Ballot,* 316 Ga. 843, 889 (2023) (filed May 18, 2023). Conclusively, Georgia complies with neither congressional Manner.

## V. Georgia's Implementing Paper-Ballot Statutes Are Mandatory and Exclusive

Georgia's O.C.G.A. §§ 21-2-430 to 21-2-440 supplies a concrete mandate of non-discretionary official ballot form and procedure for lawful election. The Supreme Court of Georgia has affirmed that elections are exclusively subject to these paper-ballot provisions. *Rhoden v. Athens-Clarke,* 310 Ga. at 266, 272–73.

As summarized in the Alexander Letter (Ex. A), Georgia law mandates: an official paper ballot printed and furnished by superintendent through poll officers; a detachable stub/number strip; folded ballot presentation; pen or pencil marking by the elector; and deposit of the folded ballot into the ballot box to effect the

---

[9] *Supra* Note 3.
[10] *Supra* Note 8.

constitutional secret ballot guarantee. These requisite acts are only acts capable of adjudicating voter intent and producing lawful election materials per 2 U.S.C. § 9. Also, use of electronics is prohibited by O.C.G.A. § 21-2-300(a)(2) ("unless otherwise authorized by law"). The federal preemptive law supersedes state law.

Further, the contract between a foreign person, John Poulos, of Dominion Voting Systems, Inc. and officials of the State of Georgia, states:[11] "The printed ballot contains a *written summary of the voter's choices*, as well as a 2D barcode…" This directly contradicts paper ballot form provisions of law found in O.C.G.A. § 21-2-280 to 21-2-294 and §§ 21-2-430 to 21-2-440. (Ex. B).

## VI. Additional Total Failure on Congressionally Prescribed Place and Time

As stated, Congress prescribed the Time and Place of holding Elections in 2 U.S.C. § 1, § 2a, § 2c, § 5, § 7, § 8. Georgia's state legislature enacted consistent definitions: ""Precinct" is synonymous with the term "voting precinct" and means a geographical area, established in accordance with this chapter, from which all electors [assigned to the precinct] vote at one polling place" per O.C.G.A. § 21-2-2(28). "Polling place" means the room provided in each precinct for voting at a primary or election" (27). And, "Poll officers" means the chief manager, assistant managers, [the board] and clerks required to conduct primaries and elections *in any precinct* in accordance with this chapter" (26). These poll officers only have duty

---

[11] *Supra* Note 4.

on Election Day, as state law prescribes, which is the only day polls are open: "All elections and primaries shall be conducted *in each polling place* by a board…" per O.C.G.A. § 21-2-90. They are sworn to work "On the day of a primary or election," and a planned absence drives a need to fill Election Day vacancies per O.C.G.A. §§ 21-2-94 to -99. Georgia elections officials from top to bottom fail.

Furthermore, Congress prescribed no official voting activity to any other day besides Election Day, as there is **no Place** outside of the polling place in every precinct. This upholds the fundamental voting rights of electors respectively assigned to each election district. Since Article 1 Manner is prohibited, the concrete fact materializes that *poll officers are prohibited* by **all of Georgia's election officials from conducting their sworn duties** in compliance with the congressionally prescribed Time and Place of the Polling Place on Election Day.

## VII. Record-Deficiency Rule: Lawful Election Records Are a Mandatory Condition Precedent to Any Federal Demand

Any lawful request or demand for election records by a state or federal official is strictly limited to constitutionally valid election records created through the Manner of voting prescribed by Congress and implemented through Georgia's mandatory paper-ballot statutes. U.S. CONST. art. I, § 4, cl. 1; 2 U.S.C. § 9; O.C.G.A. §§ 21-2-280 to 21-2-294 and §§ 21-2-430 to 21-2-440. Where the paper-ballot method was not used for in-person voting on Election Day, November

3, 2020, mandatory records precedent to any lawful precinct return and county certification were never generated. O.C.G.A. §§ 21-2-437 and 21-2-493(a). Their absence indicates that no lawful precinct returns were duly certified and no lawful county certification could occur as a matter of law. See Exhibits A (Chart III and IV) and C for lists showing total deficiency. Again, there are no certain records.

Nothing can substitute for prescribed official ballots, tally papers, voter certificates, or certified general return sheets. *Johnson v. Clark,* 25 F. Supp. at 285, 287–89. 1. Relabeling electronic artifacts as "election records" cannot cure the constitutional and statutory defect at the point of creation.

Since the votes of Georgians are "of no effect" according to Congress, no federal election occurred, ergo, no records exist. $0 + 0 \neq 1$. Title III inspection and preservation authority presupposes the existence of records generated by lawful acts requisite to voting and cannot operate where that condition precedent is absent. *Kennedy v. Lynd,* 306 F.2d 222, 225–26 (5th Cir. 1962). Any demand compelling production, inspection, or preservation of counterfeit substitutionary artifacts is therefore ultra vires, and would improperly enlist the Court in enforcement upon a false predicate. This constitutes fraud upon the Court under Fed. R. Civ. P. 60(d)(3). *Chambers v. NASCO, Inc.,* 501 U.S. at 32, 44–46.

## VII. Fraud Upon the Court and Violations of the Federal Rules

## A. Fraud Upon the Court

Fraud upon the court occurs where a party or its counsel (1) advances a false legal predicate, (2) conceals controlling law or material facts, and (3) seeks judicial action the court lacks constitutional authority to grant, thereby corrupting the judicial process itself. *Id*; *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, at 322 U.S. 238, 246; Fed. R. Civ. P. 60(d)(3). This case presents each element.

The DOJ-CRD, has sought summary judicial compulsion of purported "federal election records" while **affirmatively omitting** any pleading claim or verifiable evidence of compliance with the federal preemptions herein. By invoking Title III of the Civil Rights Act of 1960 as an independent enforcement mechanism they advance a false constitutional predicate by seeking relief the Court lacks power to grant. Suppression of this condition precedent materially misleads the Court as to its jurisdiction, remedial authority, and the legal character of the records sought.

Courts are required to know and apply the governing election law before issuing orders that enforce federal election statutes. *Johnson v. Clark*, 25 F. Supp. at 285, 287–89. Granting production on a false premise presuming a federal election where Congress has declared the contrary has improperly entangled this Court.

## B. Violations of the Federal Rules of Civil Procedure

The pleadings and litigation posture in this case implicate multiple, independent violations of the Federal Rules of Civil Procedure. Plaintiff fails to state a cognizable claim under Rule 8(a)(2) because it does not plead the constitutional and statutory prerequisites necessary for the legal existence of federal election records, yet presumes entitlement to relief predicated on their existence. Plaintiff further advances legal and factual contentions not warranted by existing law, and for an improper purpose, in violation of Rule 11(b)(1)–(3), by selectively invoking 52 U.S.C. § 20701 while suppressing Congress's controlling Article I election prescription and recasting a dispute over ballots and election materials. Parties cast the issues as concerning "registration," as if separate from Article 1 Elections, which it is not. They also proceed without disclosure of interested governmental and private actors whose statutory duties, custodial authority, and potential liability are directly implicated, contrary to Rule 7.1(a), thereby impairing the Court's ability to assess jurisdiction, impartiality, and the real parties in interest. Plaintiff seeks relief that cannot be accorded among existing parties because the materials demanded are not created or controlled by the named Defendant alone, requiring joinder of county election superintendents and boards of elections under Rule 19(a)(1)(A). Finally, Plaintiff's representations and demands were not formed after a reasonable inquiry, violating Rule 26(g).

### C. Mischaracterization of Custody and Nature of Records

A defect afflicting this case is the mischaracterization of both custody and legal character of the records sought. Plaintiff does not establish the threshold legal fact that Georgia administered a constitutionally compliant Manner of holding Elections to produce federal records in 2020. Nevertheless, they seek compulsion.

Both parties have elevated civil rights enforcement statutes above the constitutional source of election authority. Balloting, return of results, and voter registration are **acts requisite to voting** within the constitutional structure of election Manner of Holding Elections. *U. S. v. Manning,* 215 F. Supp. at 277. Attempts to segregate any records into Title III while divorcing the requirement for Article I and 2 U.S.C. Code, Chapter 1 compliance inverts the constitutional order and falsely suggests that election materials can be insulated from federal election law via an administrative label and limiting "investigative" provisions of the Civil Rights Act. (Def. Mot. to Dism., para 2). One cannot invoke, apply, or enforce Title III in a constitutional vacuum.

### D. Ethical Violations Implicated

Described conduct implicates violations of ABA Model Rule 3.3(a)(1) (false statements of law by omission), ABA Model Rule 4.1(a) (material misrepresentations), and ABA Model Rule 8.4(c) (dishonesty and misrepresentation). Federal courts possess inherent authority to address such misconduct to protect the integrity of proceedings. *Chambers v. NASCO, Inc.*, 501

U.S. at 32, 43–46. These ethical breaches are confirmed by objective evidence that Georgia's auditing authority, as of January 30, 2026, maintains no public records identifying federal congressional preemptions governing Georgia's compliance with Article I election law, despite auditing HAVA-funded election administration for compliance with "applicable federal and state requirements." (Ex. D). Even despite unconstitutional appropriations, it is startling that counsel proceeds. Where counsel knows or should know that Congress has enacted binding election prescriptions, continued litigation premised on the record existence constitutes the basis for stated ABA violations.

### CONCLUSION AND REQUEST FOR IMMEDIATE HEARING

This matter does not present an ordinary discovery dispute. Movants place the Court on notice of credible crime and fraud upon the judicial process arising from Plaintiff's and Defendant's posed battle over election records, while suppressing the need to establish their lawful existence under Article I election law. Plaintiff's theory of relief rests on a fatal constitutional omission: it asks the Court to assume the legal existence of federal-election records without first determining whether a constitutional federal election occurred under Congress's governing prescriptions. Where that condition precedent is absent, no lawful federal-election records can exist as a matter of law.

Accordingly, Movants respectfully request that the Court:

1. Immediately schedule a hearing to address the alleged crime and fraud upon the Court, including the omission of U.S. CONST. art. I, § 4, cl. 1 and 2 U.S.C. § 9 from Plaintiff's pleadings and litigation posture;

2. Order Plaintiff to show cause why its pleadings and conduct do not violate Federal Rules of Civil Procedure 8, 11, 7.1, 19, and 26(g);

3. Stay or reverse any order of compulsion, inspection, or enforcement pending resolution of the threshold constitutional predicate governing the legal existence of federal-election records;

4. Exercise the Court's inherent supervisory authority to protect the integrity of its proceedings; and

5. Grant such other and further relief as justice and the Constitution require.

The federal judiciary bears an independent duty to ensure that its processes are not used to validate ultra vires executive action or to transmute constitutionally void artifacts into lawful election records by judicial decree.

Respectfully submitted this 2nd Day of February, 2026.

Sarah E. Thompson, Pro se
150 Timber Cove
Statesboro, GA 30461
(856) 866-6881
freedomwinsusa@protonmail.com

Edward T. Metz, Pro se
6231 Dodgen Rd SW
Mableton, GA 30126
(404) 831-9288
TedMetz@protonmail.com

# CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1 (D), the undersigned certifies that the foregoing has been prepared in Times New Roman 14pt, a font and type selection approved by the Court in L.R. 5.1 (C), one-inch margins, and 25 pages or less.

Respectfully submitted this 2nd day of February, 2026,

Sarah E. Thompson, Pro se
150 Timber Cove
Statesboro, GA 30461
(856) 866-6881
freedomwinsusa@protonmail.com

Edward T. Metz, Pro se
6231 Dodgen Rd SW
Mableton, GA 30126
(404) 831-9288
TedMetz@protonmail.com

# CERTIFICATE OF SERVICE

We hereby certify that we have this date served a copy of the foregoing "Emergency Motion and Memorandum of Law to Recognize Crime and Fraud Upon the Court and Ongoing Seizure of Governmental Control Outside the Article 1 Constitutional Prescriptions" filed on February 2, 2026 with the Clerk pursuant to Case No.: 1:25-cv-07084-TWT of the U.S. District Court of GA, N.D., Atlanta Division by first class mail to ensure delivery to the following parties:

| | |
|---|---|
| Harmeet K. Dhillon<br>Assistant Attorney General<br>Civil Rights Division<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, D.C. 20530<br><br>Eric V. Neff<br>Acting Chief, Voting Section<br>Civil Rights Division<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, D.C. 20530<br>CA Bar No. 289367<br><br>Brittany Bennett<br>Trial Attorney, Voting Section<br>GA Bar No. 717377<br>U.S. Department of Justice<br>4 Constitution Square | Michael W. Tyler<br>Georgia Bar No. 721152<br>C. Allen Garrett Jr.<br>Georgia Bar No. 286335<br>Jennifer Cotton<br>Georgia Bar No. 520708<br><br>Kilpatrick Townsend & Stockton LLP<br>1100 Peachtree Street, Suite 2800<br>Atlanta, Georgia 30309<br>Phone: (404) 815-6500<br>Fax: (404) 815-6555<br>mtyler@ktslaw.com<br>agarrett@ktslaw.com<br>jcotton@ktslaw.com |

150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 307-2767
Email: Brittany.bennett@usdoj.gov

Christopher J. Gardner
Ga. Bar No. 163932
Trial Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
150 M Street NE, Room 8.141
Washington, D.C. 20002
Phone: (202) 704-5430
Christopher.Gardner@usdoj.gov

This 2nd day of February, 2026,

*Sarah E. Thompson*

Sarah E. Thompson, Pro se
150 Timber Cove
Statesboro, GA  30461
(856) 866-6881
freedomwinsusa@protonmail.com

*Edward T. Metz*

Edward T. Metz, Pro se
6231 Dodgen Rd SW
Mableton, GA  30126
(404) 831-9288
TedMetz@protonmail.com

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Complying with Federal Rule of Civil Procedure 28(a)(1) and LR 3.3(A)(1)-(4), and Rule 7.1, the undersigned non-party Movants submit the following Certificate of Interested Persons and Corporate Disclosure Statement. This disclosure is made for purposes of judicial transparency, conflict screening, and compliance with applicable disclosure rules, and is based on information presently known to Movants. This statement represents a full and complete list of trial judges, attorneys, persons, associations, firms, partnerships, or corporations that have an interest in the outcome of this particular case to the best of their knowledge as Movants.

I. Parties:
Plaintiff: United States of America.
Defendant: Ché Alexander, Clerk of Courts for Fulton County.
Proposed Intervenors: Black Voters Matter Fund, Communication Workers of America Local 3204, and Communication Workers of America Local 3204 Retired Members Council.

II. Counsel of Record:
Plaintiff: Harmeet K. Dhillon, Eric V. Neff, Christopher J. Gardner, and Brittany E. Bennett.
Defendant: Michael W. Tyler, C. Allen Garrett Jr., and Jennifer Cotton.
Proposed Intervenors: Adam M. Sparks, Uzoma N. Nkwonta, Branden D. Lewiston, and Marcos Mocine-McQueen for Black Voters Matter Fund.

III. Other Interested Persons, Associations, Firms, Partnerships, or Corporations

Named because their statutory duties, contracts, records, certifications, or asserted authority are directly implicated by the constitutional and statutory issues raised in Movants' filing, including the characterization, custody, and inspection of materials asserted to be "federal election records."

A. Georgia State Government Actors with Article 1 Responsibility

- Brian P. Kemp, in his personal capacity, for executing acts outside law, constitution, duty, and sworn loyalties in 2020 and ongoing instead of ensuring that the laws were faithfully executed, preserving the peace, and enforcing laws. (Governor 2019 - present).
- Brad P. Raffensperger, in his personal capacity, for executing acts outside law, constitution, duty, and sworn loyalties in 2020 and ongoing instead of performing as the state executive officer charged with administering only constitutional and lawful elections. (Secretary of State 2019 - present).
- C. Ryan Germany, in his personal capacity, for acts outside law, constitution, duty, and sworn loyalties in 2020 to represent only official actions involving constitutional and lawful elections. (General Counsel for Secretary Raffensperger 2019 - 2023).
- David J. Worley, Rebecca N. Sullivan, Matt Mashburn, Anita Sullivan, and Ed Lindsey, in their personal capacities, for executing acts outside of law, constitution and duty instead of performing as the responsible State Election Board responsible for approving and overseeing only lawful election procedures in 2020.
- Christopher M. Carr, to the extent he represents or advises state election officials regarding election administration and record retention. (Attorney General 2016 - present).

These individual entities are disclosed because the relief sought and legal determinations requested concern the scope of lawful election administration under Article I of the United States Constitution and corresponding Georgia statutes, and may substantially affect their asserted authority or practices.

B. Fulton County Election Authorities with Article 1 Responsibility

Fulton County Board of Registration and Elections Members: Ms. Mary Carole Cooney; Ms. Vernetta Keith Nuriddin; Mr. Mark Wingate; Mr. Aaron V. Johnson; Dr. Kathleen Ruth, in their personal capacities, for executing acts outside of law, constitution and duty instead of performing as the responsible Superintendents responsible for approving and overseeing only lawful election procedures in 2020.

C. Contracted Technology and Service Corporations

- Dominion Voting Systems, Inc.
- KnowInk, LLC

These entities are disclosed because they have contributed services and other items of value relating to elections, including equipment, software, warranties and/or services to Georgia state and county election authorities pursuant to contracts and [invalid] election certifications, and because materials generated through such systems do not constitute lawful "election records" under federal and state law. They are counterfeit under law.

Disclosure of these entities is made solely for transparency and conflict-screening purposes, based on their connection to the subject matter of the proceeding, and does not assert liability, wrongdoing, or party status.

IV. Movants (Non-Party)

- Sarah E. Thompson, Georgia elector and U.S. Veteran
- Edward T. Metz, Georgia elector and U.S. Veteran

Movants are non-parties who have filed a notice and motion seeking judicial recognition of constitutional and statutory limitations on the characterization and compelled production of election-related materials. This Certificate is intended to provide the Court with a complete and candid disclosure of entities whose interests could be substantially affected by the Court's rulings on those questions, including determinations concerning:

- The lawful manner of federal elections,
- The definition and existence of federal election records,
- The scope of inspection and preservation authority under federal law, and
- The duties and limits of custodial officials.

V. Certification

We, the undersigned, certify that the foregoing represents a full and complete disclosure of all known interested persons and entities required to be disclosed under the applicable rules.

Respectfully submitted this 2nd day of February, 2026,

Sarah E. Thompson, Pro se
150 Timber Cove
Statesboro, GA 30461
(856) 866-6881
freedomwinsusa@protonmail.com

Edward T. Metz, Pro se
6231 Dodgen Rd SW
Mableton, GA 30126
(404) 831-9288
TedMetz@protonmail.com

# EXHIBITS

A: Metz/Thompson Letter to Clerk Ché Alexander (Jan. 2, 2026).

B: Dominion/Imagecast X Image of Paper with "Summary of Voter's Choices" Fulton County (November 3, 2020). "Official Ballot" label is a false representation.

C: List of Totally Missing Requisite Accounting Records for Elections by Provisions of Georgia Law Governing the Use of Paper Ballots (Printed Ballots).

D: United States Congressional Record of 2 U.S. Code § 9 Debate and Enactment. 32 Cong. Rec. 1611-1613 (Feb. 8, 1899).

E: Georgia Department of Audits and Accounts Records Request Remittance of Michele Nichols, (January 30, 2026). No public records outlining federal preemptions.

**Edward T. Metz**
6231 Dodgen Rd SW
Mableton, GA 30126
tedmetz@gmail.com
404-831-9288

**Sarah E. Thompson**
150 Timber Cove
Statesboro, GA 30461
freedomwinsusa@protonmail.com
856-866-6881

**Date:** January 2, 2025

**Via Certified and Electronic Mail**

**Che Alexander**
Clerk of Superior Court
Justice Center Tower
185 Shirley C. Franklin Blvd., SW
Atlanta, GA 30303
che.alexander@fultoncountyga.gov

**Re: Constitutional Defect in DOJ Demand for "Election Materials" and Absence of Lawfully Prescribed Federal Election Records**

Dear Clerk Alexander,

We write as United States Veterans and fellow Georgia citizens regarding the action brought by the Department of Justice, Civil Rights Division, in the United States District Court for the Northern District of Georgia, Atlanta Division (Case No. 1:25-CV-07084-TWT), in which you have been named as Defendant. We offer you decades of combined experience in detailed monitoring of governmental affairs, including, but not limited to, credentials in law, science, finance, business, and computer technology. Our goal is to provide you the knowledge to courageously stand for the protection of your own rights secured by the Constitution and ours. As a County Constitutional Officer, we ask that your support be regardless of your legal team.

Possibly unbeknownst to you, this case is resulting from a well-concealed, **total deprivation of constitutional voting rights**, not honest DOJ concerns. Because the current and recently past federal administrations have failed to execute constitutional provisions, **you do not have possession of federal election records from 2020.** The DOJ-CRD is unlawfully protecting executives by pursuing *substitutionary public records in your possession*. To put it bluntly, your inclusion is because federal and state executives are simply flaunting illegitimate power.

Congress prescribed the only Election Manners (Methods) under the **Elections Clause U.S. Const. art. I, § 4, cl. 1** ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the **Congress may at any time by Law** make or alter such Regulations…"). The foundational rule of prohibition remains: ***"A law repugnant to the Constitution is void."*** *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177–78 (1803). You will easily see within this letter that the State of Georgia and

its officials are criminally asserting a plethora of laws that are **not** constitutionally prescribed, including irrelevant administrative law used to seat federal officials outside of Article 1. Regardless of their blatant abrogation, your oath and duty require you to **only have custody of lawful election records**. At this time, the materials presently held by you as "2020 election records" constitute *counterfeit substitutes*. And, your decision to maintain a legal seal on these records as "election records" is outside your official duties, exposing you to personal liability.

**The following federal law is central to understanding our mutual and total deprivation as Georgia citizens:** In 1899, Congress amended the effective federal Manners (Methods of Voting) in **2 U.S.C. § 9 to support Article 1**. It added mechanical lever voting machines to the original prescription of paper ballots, originally enacted in 1871 just following the Civil War.[1] Congress's intent was to stabilize the general government and ensure that The People, of every race, *free of slavery*, shall choose their representatives in Congress.[2] Currently, 2 U.S.C. § 9 has neither been amended nor repealed since 1899. As such, corresponding state prescriptions for precincts using paper ballots or precincts using lever voting machines **must** be executed to enforce the federal prescriptions requisite to lawful certifications by poll officers (O.C.G.A. § 21-2-437) and county election officials (O.C.G.A. § 21-2-493). Explicit compliance produces lawful federal election records, with all else **prohibited and re-enslaving.**

We submit this letter to you for three limited and lawful purposes:

(1) to place on the record the controlling federal and state prescriptions for federal elections that are being chronically and repeatedly prohibited;
(2) to identify the **absence** of congressionally prescribed election records that the United States Department of Justice now demands; and
(3) to encourage your office, consistent with your oath and statutory duties, to accurately document, disclose, and report election record deficiencies, rather than to maintain sealed custody or transmit records that do not lawfully exist.

We are very aware of the government narratives you are receiving. Executive and legislative officials claim that O.C.G.A. § 21-2-280 and 21-2-300 authorize elections with use of modern electronics and its subsequent output as election records. However, **this is clearly false** because electronics are outside the federal prescription of only paper ballots or lever voting machines, enacted long before the age of electronics. And, "all votes received or recorded contrary to this section shall be of no effect." (2 U.S.C. § 9). The clause in 21-2-300(a) prohibiting electronics or any other creative invention states that elections "shall be conducted with the use…. unless otherwise authorized by law." The authorizations are limited to paper ballots and mechanical lever voting machines.

---

[1] R.S. § 27 derived from Acts Feb. 28, 1871, c. 99, § 19, 16 Stat. 440, and May 30, 1872, c. 239, 17 Stat. 192.
[2] 55 Cong. Rec. 1611 (Feb. 8, 1899),
https://www.congress.gov/55/crecb/1899/02/08/GPO-CRECB-1899-pt2-v32-12-2.pdf.

Because election officials have totally failed to produce election records **to lawfully transfer to your custody, you have neither official used ballots,** checked off electors lists, nor any other required record from a participatory event named the "Presidential General Election, November 3, 2020." You have public records produced by prohibited devices. *Election officials falsely represented the records both to you and to the public as valid election records.*

At this time, O.C.G.A. § 15-6-61 clearly guides you. You are charged with the **limited** duty (1) To keep the clerk's office and **all things belonging thereto** at the county site and at the courthouse or at such other place or places as authorized by law; and (5) "to keep all the books, papers, dockets, and records **belonging to the office** with care and security" and to maintain those materials in an organized and accessible manner. That custodial duty, however, **does not expand the scope of records** you are authorized or required to maintain, nor does it obligate you to hold, certify, or surrender materials that were not created pursuant to a lawful election within the public jurisdiction of Fulton County, GA under demands of 52 U.S.C.

As additional confirmation of the prescriptive method that must be fully implemented and not "cherry-picked," the Supreme Court of Georgia has held that there is only **one** effective constitutional state prescription, which are "statutory provisions governing use of paper ballots." *Rhoden v. Athens-Clarke Brd. of Elections* 310 Ga. 266, 850 S.E.2d 146 (2020). As such, Georgia law confines your election-record custodial responsibilities to materials generated and delivered by procedure of O.C.G.A. §§ 21-2-430 through 21-2-440 per O.C.G.A. § 21-2-500. Where an election was **not conducted** using the manner prescribed by Congress in 2 U.S.C. § 9, and where the statutory accounting required of poll officers and election officials under O.C.G.A. §§ 21-2-430 through 21-2-440 (polls) and O.C.G.A. § 21-2-493 (county) was not performed, the resulting artifacts are **not lawful election records within your custody mandate.**

The absence of congressionally prescribed official ballots, voter certificates, tally papers, general returns, and sworn poll-officer accounting creates **a record deficiency**, not a clerical failure on your part. Your duty under O.C.G.A. § 15-6-61 is therefore satisfied not by producing false and non-existent records, but by truthfully documenting their absence and transmitting that documentation to federal authorities and the courts, consistent with your oath and with Georgia law. Representing anything less in the federal case would constitute fraud upon the court.

What do you have in your possession? **Public Records. The records in your possession remain public records consistent with O.C.G.A. § 50-18-70(2).** The pertinent legal fact is that you possess documents and papers prepared by an entity (Dominion Voting Systems, Inc.) via the contracted equipment sold to the State of Georgia in 2019 that generates data reports *for or on behalf of an agency* (Secretary of the State of Georgia). The records have been transferred to an agency (Fulton County Superior Court) for storage *or future governmental use.* As such, there is no requirement that the records in your possession be legally sealed or withheld from anyone.

## KEY ISSUES

### I. The DOJ Demand and the Threshold Constitutional Problem

The United States Department of Justice, Civil Rights Division ("DOJ-CRD"), demands that Fulton County produce purported "election materials" under Title III of the Civil Rights Act of 1960, codified at **52 U.S.C. §§ 20701–20703,** and related provisions. *See* DOJ Complaint ¶¶ 1–4 (asserting "sweeping" preservation and inspection authority; only a "summary" proceeding).

That demand rests on an unstated but indispensable premise: that Fulton County conducted a lawful federal election in the manner prescribed by Congress under **Article I, Section 4, Clause 1 of the U.S. Constitution**. It did not. Congress fixed the exclusive manner of voting for Representatives in **2 U.S.C. § 9,** and the Department has neither alleged nor demonstrated compliance with that prescription. Absent a constitutionally authorized manner of election, the materials sought are not federal-election records within the meaning of Title III and cannot be compelled under **52 U.S.C. § 20701** or any related statute.

Section 20701 presupposes the existence of lawful "acts requisite to voting"; it does not create them. Where voters were not issued lawful paper ballots, where poll officers did not perform the mandatory precinct-level accounting and certification required by Georgia law, and where electronic substitutes displaced the material instruments of election, no such acts occurred and no lawful federal-election records came into being. By seeking enforcement without first establishing this constitutional condition precedent, DOJ asks the Court to impose retention and inspection obligations untethered from a cognizable federal election. The Constitution does not permit that result, and the demand must therefore be denied.

### II. Federal Preemption

#### A. Article I Prescription Supersedes All Other Laws and Regulations

Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, a federal statute enacted pursuant to an express constitutional delegation preempts **all** inconsistent federal and state law, in addition to other regulations and policy attempts. Congress's Elections Clause power is such a delegation.

Congress exercised that power in 2 U.S.C. § 9 (1899), which provides, in full:

"All votes for Representatives in Congress must be by **written or printed ballot**, or **voting machine** the use of which has been duly authorized by the State law; and all votes received or recorded contrary to this section **shall be of no effect**." (emphasis)

4

**B. Title 42 of the U.S. Code "Public Health and Welfare" Cannot Supersede 2 U.S.C. § 9**

The statutes invoked by DOJ-CRD and editorially reclassed after the creation of 52 U.S. Code "Voting and Elections" in 2014 and do **not** prescribe the manner of federal elections. "This Act restates certain laws enacted before the date of enactment of this Act… without substantive change." *(Pub. L. 113-107, § 2).* They are as follows:

- 52 U.S.C. §§ 20701–20705 (formerly codified at 42 U.S.C. §§ 1974–1974e (1964 ed.)) — **Title III of the Civil Rights Act of 1960** presumes the existence of a lawful election and authorizes only the **retention and inspection of records relating to acts "requisite to voting."** It does not prescribe how federal elections are to be conducted and cannot create lawful election records where the underlying acts were not performed in a constitutionally prescribed manner.
- 52 U.S.C. §§ 20901–21145 (formerly codified at 42 U.S.C. § 15301 et seq.) — The **Help America Vote Act of 2002 ("HAVA")** was enacted under Congress's **Public Health and Welfare authority**, not pursuant to the **Article I Elections Clause**. HAVA authorizes funding, administrative standards, and the creation of the Election Assistance Commission; it does **not** prescribe the manner of voting for federal elections and expressly did not amend or repeal **2 U.S.C. § 9**.
- 52 U.S.C. §§ 20501–20511 (formerly codified at 42 U.S.C. §§ 1973gg–1973gg-10 (1994 ed.) — The **National Voter Registration Act of 1993 ("NVRA") governs voter registration and list maintenance only.** It regulates how voters are added to or removed from registration rolls and how registration opportunities are provided. The NVRA does **not** prescribe ballot form, voting method, vote tabulation, or precinct-level accounting, and therefore cannot supply constitutional authority for electronic voting systems or generate lawful federal-election records absent compliance with the Article I prescription.

As a matter of federal preemption, **neither Title 52 nor Title 42 can amend, repeal, or override Congress's Article I prescription in 2 U.S.C. § 9, expressly or by implication.** Administrative statutes cannot cure a constitutional defect at the point of creation. Without constitutional elections, the U.S. Attorney General nor the DOJ can claim authority over demanded records as election records per 52 U.S.C. §§§ 20701, 20510, and 21111.

Additionally, the HAVA Act itself only references voting machines consistent with the congressional prescription of 2 U.S. Code Section 9 of 1899 as a "lever voting machine."[3]

This statute has **never been repealed or amended**. Courts are required to know and apply it. *Johnson v. Clark*, 25 F. Supp. 285, 288–89 (N.D. Tex. 1938). Actions outside this federal prescription ineffectuate the votes of electors and elections themselves..

---

[3] Help America Vote Act of 2002, Pub. L. No. 107-252, 116 Stat. 1666 (Oct. 29, 2002), https://www.congress.gov/107/statute/STATUTE-116/STATUTE-116-Pg1666.pdf.

### III. Plain Meaning of 2 U.S.C. § 9

#### A. "Written or Printed Ballot" Means <u>Paper Ballot</u>

At the time of enactment (in 1871 and amended in 1899), a "ballot" was universally understood as a **physical paper instrument,** marked by the voter and **cast into a ballot box.** Courts have repeatedly recognized this history. See *Burdick v. Takushi*, 504 U.S. 428, 446 (1992) (discussing written ballots and write-in rights); *Sanner v. Patton*, 155 Ill. 553, 562–64, 40 N.E. 290 (1895).

Until the late 1880s, it was normal for voters to write their own ballots. The Australian pre-printed paper ballot became common around the turn of the century to present to voters at their polls. There are hundreds of state and federal court cases clearly demonstrating the meaning of the term "printed ballot." Electronic computer code **nor output** constitutes a paper ballot.

#### B. "Voting Machine" Means Mechanical <u>Lever Voting Machine</u>

Fulton County has represented to the **Supreme Court of Georgia** that the current system **is not a lawful system of "voting machines"** as defined by **O.C.G.A. § 21-2-2(40)** (mechanical lever voting machines). Fulton county attorneys stated: "In fact, the voting system used by Fulton County… **is not** a system of **"voting machines,"** a term which is defined in O.C.G.A. § 21-2-2(41)…" See *In re Dec. 6, 2022 Gen. Election Ballot,* 316 Ga. 843, 889 S.E.2d 811, 812 (2023) (filed May 18, 2023). It is clear they intended to cite (40). "Voting machine" is a mechanical device on which an elector may cast a vote and which tabulates those votes by its own devices and is also known as a "lever machine." O.C.G.A. § 21-2-2(40).

This admission forecloses reliance on the alternative method authorized by 2 U.S.C. § 9 in 1899. Neither the State of Georgia nor Fulton County are executing **statutory provisions governing use of paper ballots nor provisions governing the use of "lever" voting machines.** An absence of both of these limited Art. 1 Manners of Holding Elections creates a SWEEPING PROHIBITION on county certification per O.C.G.A. § 21-2-493, which only allows precincts implementing one of these two constitutional Manners.

### IV. Georgia is Currently Subject to the Corresponding Paper-Ballot Mandate

#### A. Georgia Official Ballot Form Statute: O.C.G.A. §§ 21-2-280 through 21-2-294

Georgia law implements the federal prescription for elections conducted by paper ballot through a mandatory and comprehensive statutory scheme. When the paper ballot Manner is used, the form, issuance, marking, handling, and deposit of the ballot are not discretionary; they define the existence of a lawful election instrument.

An official paper ballot printed and furnished by the election superintendent must include:

- The designation "Official Ballot" printed on its face;
- The name of the precinct for which the ballot is issued; (not the county)
- The date of the primary or election;
- Directions that explain how to cast a vote and how to obtain a new ballot after one is spoiled; (missing)
- The offices to be filled and the names of candidates lawfully nominated or qualified, arranged as prescribed by law; (missing)
- Blank spaces for write-in votes where permitted by law; (missing)
- A detachable ballot stub or number strip corresponding to the ballot issued; (missing)
- Instructions directing the elector to mark the ballot only with pen or pencil, using an "X" or check mark (per O.C.G.A. § 21-2-435) and warning that any marks made in violation of directions shall be disregarded in the counting of votes.

## B. Georgia's Implementing Statute: O.C.G.A. § 21-2-435

Georgia law mirrors the federal prescription when paper ballots are used. O.C.G.A. § 21-2-435 requires that:

- The poll officer detaches a paper ballot from its stub and gives it to the elector;
- The ballot is presented to them folded so the type is not visible;
- The elector may mark choices only with pen or pencil, using an "X" or check mark;
- The elector removes the numbered stub and deposits the folded ballot into the ballot box to execute Ga. Const. art. II, § I, para. I (guaranteeing "secret ballot").

The plastic computer screen provided to Georgia voters is **not an official paper ballot** and the paper output of the electronic device is **immaterial** to a lawful election because elections with use of electronics are not authorized at the polls by Art 1 and O.C.G.A. § 21-2-300(a). Because Georgia's paper-ballot statutes (§§ 21-2-284, 21-2-285) must implement the federal ballot mandate of 2 U.S.C. § 9, failure to comply with their requirements is also a federal violation:

- No elector hand-marking by X or ✓ → violates § 9's ballot requirement
- No issuance of an Australian style printed ballot → violates § 9
- No official form used → a paper receipt is not a lawful ballot under federal meaning
- Unauthorized codes and system-generated selections → ballot integrity is violated

7

The issuance of **lawful, official paper ballots to voters at the polls is not optional, nor are the poll procedures.** Fulton County voters were **not** provided official ballots on Nov. 3, 2020. This is catastrophic to any election attempt. As such, electronic peripheral output cannot be included in documents requisite to general election returns subject to your legal seal.

---

## V. Absent Required Registration Records, No Lawful Election Occurred

Georgia law mandates, at the precinct, the creation and preservation of physical registration and voting records that are prerequisites to a lawful paper-ballot election, including:

- Voter's certificates executed by each elector and examined and signed/initialed by poll officers (O.C.G.A. § 21-2-431);
- The voter's certificate binder, constituting the official list of electors voting (O.C.G.A. § 21-2-432);
- The electors list, checked off by poll officers (O.C.G.A. § 21-2-431);
- The numbered list of voters, recording electors in order of voting (O.C.G.A. § 21-2-431).

No Georgia statute authorizing electronic poll pads, e-signatures, or database entries to replace these records exists. Where these required records were not created and preserved at the polls, the statutory prerequisites for a lawful election were not met. In that circumstance, no federal election occurred for purposes of Article I, and no lawful federal election records exist. Consequently, **there are no lawful federal election records to inspect or compel,** and any demand predicated on their existence must be denied.

---

## VI. Absence of Requisite Records Under Georgia Law for Precincts Using Paper Ballots (O.C.G.A. §§ 21-2-430 to 21-2-440)

In *Rhoden v. Athens-Clarke County Board of Elections*, the Supreme Court of Georgia held that elections conducted in Georgia are **"subject to the statutory provisions governing the use of paper ballots,"** and that those provisions operate **as mandatory law, not discretionary guidance.** 310 Ga. 266, 272–73, 850 S.E.2d 146, 151–52 (2020). The Court's holding confirms that when the General Assembly has prescribed a comprehensive statutory scheme for paper-ballot elections, election officials and courts lack authority to deviate from or selectively apply those provisions. Much of this Part is effective, stabilizing old law enacted in GA Code 1863, § 1234. When interpreting or applying a statute, courts must read and comply with the Act or set of unified provisions as a whole, giving effect to all operative provisions, not selecting isolated sections while ignoring others. As such, **alternative electronic systems and data output cannot be substituted.**

8

Georgia's paper-ballot election statutes require the creation and custody of specific records and accounting documents, including but not limited to:

- Voter certificates executed and manually signed by voters (§ 21-2-431);
- Ballot stubs and numbered lists of voters (§§ 21-2-431, -433);
- Physical paper ballots, folded, deposited, and preserved (§§ 21-2-433 to -438);
- Manually generated Tally papers, general return sheets, and sworn certifications signed by poll officers (§§ 21-2-437, -440);
- Reconciliation of ballots issued, cast, spoiled, and voided (§ 21-2-436).

There are no documents meeting the standard of official paper ballots and none of the requisite election accounting records exist. Without these materials, **county certification under O.C.G.A. § 21-2-493 cannot lawfully occur**, because the superintendent's canvass depends entirely on the **precinct level accounting**. Therefore, your legal seal of records per **O.C.G.A. § 21-2-500 cannot occur.**

To the extent such records do not exist, the DOJ demand necessarily seeks **electronic output**, not **the material of the election itself**.

---

### VII. Oath and Custodial Duties of the Clerk

As a constitutional officer, you are bound by oath to support the Constitutions of the United States and Georgia. **O.C.G.A. § 45-3-11; § 45-3-1(3), (6).** That oath **cannot be expanded or diminished by executive demand**. We therefore encourage your office to:

1. **Use the attached record-deficiency CHECKLIST IV** confirming lack of records.

2. **Decline to characterize derivative electronic data as "federal election records"** where the constitutional prerequisites were not met.

---

Under the governing federal preemption rule, substituted electronic artifacts cannot replace required election records. Pursuant to the Supremacy Clause, U.S. Const. art. VI, cl. 2, Congress's exercise of its exclusive authority under the Elections Clause preempts any inconsistent state constitutional or statutory provision. Congress fixed the manner of voting for Representatives, consistent with Art 1 Elections Clause, in **2 U.S.C. § 9 (1899)**, prescribing only paper ballots and mechanical lever voting machines as the lawful methods. Any departure from that prescription, including attempts at federally funded electronic replacements under the administrative and public assistive welfare laws of the HAVA Act, renders the resulting votes ineffective for maintaining the

Constitution's guaranteed republican form of government. Departures void the legal status of any purported election records.

     Accordingly, any Georgia law, regulation, or practice that replaces paper ballots or mechanical voting machines with electronic ballot marking, scanning, tabulation, or digital surrogates is preempted and void as applied to federal elections. Such practices cannot generate lawful federal-election records for your office to retain, preserve, or produce. You have been placed in this posture not by your own actions, but by state and federal executive officials who avoided Congress's election prescription and now seek judicial enforcement of that avoidance. The Constitution does not permit that result. As a voter who has personally observed the voting process, you are a firsthand witness to the facts described herein.

     This letter is submitted to assist you in faithfully discharging your oath and to ensure that the record accurately reflects the absence of Congressionally prescribed election materials—without which neither federal inspection statutes nor administrative demands may lawfully operate. Because 2 U.S.C. § 9 preempts O.C.G.A. § 21-2-300 and any electronic-ballot-marker regime, **no electronic artifact—whether scanner output, ballot image, tabulation report, database entry, or vendor-generated data in your possession—can constitute a lawful federal election record.** They cannot constitute the material of a constitutional election and cannot support a lawful certification or compelled production.

     No Election as specified by Article 1 of the U.S. Constitution occurred on November 3, 2020. As such, the DOJ-CRD may not employ federal election inspection statutes nor administrative demands to compel your action. Only Georgia's Open Records Act applies to the records in your possession, as they meet the definition of "public records" of an entity acting under corporate contracts [for unlawful activities] for or on behalf of the Georgia Secretary of State. The public records in your possession are evidence of crimes against the People of Georgia, including subversion and seditious conspiracy against rights under U.S. Title Code 18: Crimes and Criminal Procedure.

Very respectfully,

*Edward T. Metz*                                       *Sarah E. Thompson*

**Edward T. Metz**                                      **Sarah E. Thompson**

Attachments: Four Summary Comparison Charts Demonstrating Unconstitutionality

# ART. 1 ELECTIONS CLAUSE ALIGNMENT — 2 U.S.C. § 9

## I. Controlling Federal Law (Supremacy Baseline)

| Authority | Black-Letter Rule | Legal Effect |
|---|---|---|
| U.S. Const. art. I, § 4, cl. 1 (Elections Clause) | States prescribe the *Times, Places and Manner* of congressional elections, limited by Congressional law | When Congress legislates, state law must conform |
| 2 U.S.C. § 9 (1899) | Elections for Representatives shall be by written or printed ballot [paper], or by voting machine | Congress fixed the federal "Manner" |
| USPTO Patent for Voting Machine, J.H. Myers, No. 415,549, (Nov. 19, 1889) | When interpreting a statutory term, the court's job is to interpret the words consistent with their ordinary meaning at the time Congress enacted the statute. A fundamental canon of statutory construction is that words generally should be interpreted as taking their ordinary, contemporary, common meaning at the time Congress enacted the statute. *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). | Congress fixed the definition of "voting machine" consistent with USPTO; manufacture not specified; electronics not even invented |
| Federal meaning of "ballot" | A ballot is a secret method of voting ensuring integrity of the popular vote. (*Johnson v. Clark*, 25 F. Supp. 285, 286 (N.D. Tex. 1938) | Congress used the common-law meaning |

Key Federal Point:
Congress did not authorize electronic ballot-marking systems or electronic peripheral output as a substitute for the ballot itself. Absent such authorization, states must use a written or printed ballot in the common-law sense—i.e., one prepared for the voter to manually mark, and marked by the voter.

11

## II. Georgia Law as Subordinate Implementation (Not Modification)

| <u>Georgia Provision</u> | <u>Correct Construction (Consistent with § 9)</u> | <u>Federal Constraint</u> |
|---|---|---|
| O.C.G.A. § 21-2-300(a) | Federal, state, and county elections shall be conducted with the use of scanning ballots marked by electronic ballot markers *unless otherwise authorized by law* | State statute cannot redefine the federal "ballot" that is otherwise authorized |
| "Unless otherwise authorized by law" | The authorization refers to statutes governing use of paper ballots at precincts or if lever voting machines had been authorized and funded per state law (they aren't) | Federal paper-ballot mandate is the federal backstop |
| O.C.G.A. § 21-2-2(40). Definition. | "Voting machine" is a mechanical device on which an elector may cast a vote and which tabulates those votes by its own devices and is also known as a "lever machine." "Pulling a lever on a mechanical device" *McCall v. Automatic Voting Mach. Corp.,* 236 Ala. 10, 19, 180 So. 695, 703 (1938). | States cannot redefine the term outside state and federal election prescriptions |
| O.C.G.A. §§ 21-2-430–440 | Elections are subject to statutory provisions governing use of paper ballots | These statutes implement, not alter, § 9 |
| O.C.G.A. §§ 21-2-280–294 | Georgia separately preserves Voting by Paper Ballot. Any electronic reference falls to the ground. | Confirms compliance with § 9 |

| Rhoden v. Athens-Clarke Cnty. Bd. of Elections, 310 Ga. 266, 141, 146–47 (2020) | Elections using electronics remain subject to paper-ballot statutes; electronics are assistive/adjunct only - prohibited in the effective acts of election per 21-2-300(a) | State court enforces § 9-consistent hierarchy |

Federal Framing:

Georgia may require the *use* of electronic equipment only insofar as that use does not negate the federally mandated paper ballot. Any construction of § 21-2-300 that elevates electronic peripheral output above the ballot conflicts with 2 U.S.C. § 9 and is preempted.

---

## III. Federal Ballot Requirements vs. Electronic Peripheral Output

| **Federal Requirement (2 U.S.C. § 9)** | **What § 9 Requires** | **Unlawful Electronic Peripheral Output Shows** | **Conflict** |
|---|---|---|---|
| Written [by hand] or printed [as Australian style] paper ballot | Paper ballot must exist at polls before voting as the instrument to be marked by pen or pencil | Printed output generated after interaction with electronic system | Not the paper ballot Congress prescribed |
| Ballot marked by voter | Voter records choice directly on the ballot | Voter touches plastic screen; data output and barcode printed by electronic system | Voter act displaced |
| Secrecy of the paper ballot | Ballot preserves secrecy of voter's choices | Encoded selections (e.g., QR codes) readable only by system on data output papers | Secrecy/integrity eliminated |
| Integrity of the vote | Ballot itself is the authoritative record | Peripheral output treated as authoritative | No official ballot record |

13

| No unapproved devices in Art 1 election processes | Only Congress may constitutional Manner of election for federal representatives | No congressional authorization for electronic ballot-marking systems | State substitution barred |

---

## IV. CHECKLIST to Confirm Absence of Statutory Election Records and Unconstitutional Electronic Substitution (Georgia Law in Conflict)

| **Required Constitutional / Statutory Record** | **Purpose Under Law** | **Authorizing Law** | **Common Substituted Artifact (If Any)** | **Legal Status of Substitution** |
| --- | --- | --- | --- | --- |
| ▫ Official paper ballots issued by the poll officers and returned from the precinct | Material instrument of voting; voter intent | 2 U.S.C. § 9; O.C.G.A. §§ 21-2-280–294; 21-2-430 | Electronic ballot marker output; scanned images | PROHIBITED — electronic devices preempted by federal and state law |
| ▫ Ballots cast (folded, hand-marked in pen or pencil) | Lawful vote casting | O.C.G.A. § 21-2-435; Ga. Const. art. II, § I, para. I | System-printed summaries | VOID — not official ballots; cannot be cast as such |
| ▫ Some ballots declared void | Required accounting | O.C.G.A. §§ 21-2-437, 21-2-438 | Electronic flags | Digitally invalid; all electronic output papers are void |
| ▫ Spoiled and canceled ballots | Reconciliation | O.C.G.A. §§ 21-2-433, 21-2-436 | Software logs | Digitally invalid; electronic output papers are void |

| | | | | |
|---|---|---|---|---|
| ▢ Unused ballots | Chain-of-custody proof | O.C.G.A. §§ 21-2-433, 21-2-436 | Inventory totals | No official printed ballots are available for electors to vote and cast |
| ▢ Ballot stubs and number strips | Secrecy + verification | O.C.G.A. §§ 21-2-431, 21-2-435(d) | None | Non-substitutable |
| ▢ Voter's certificates | Proof of elector participation, manually signed | O.C.G.A. § 21-2-431 | Electronic voter history | Not equivalent |
| ▢ Voter's certificate binder | Official elector list | O.C.G.A. § 21-2-432 | EMS database | Not a substitute |
| ▢ Electors list (poll-officer check-off) | Eligibility verification | O.C.G.A. § 21-2-431 | Electronic poll pads requiring e-signature permission | Prohibited |
| ▢ Numbered list of voters | Voting-order audit | O.C.G.A. § 21-2-431 | Time stamps on electronic data reports | Prohibited |
| ▢ Poll-officer oaths | Lawful authority | O.C.G.A. §§ 21-2-99, 21-2-440 | Training acknowledgments | Void; Duties Prohibited |
| ▢ Tally papers (ink) | Public count of votes, with ballot handling and visual exam | O.C.G.A. § 21-2-437(a) | Tabulator reports | PROHIBITED |

| | | | | |
|---|---|---|---|---|
| ▢ General return sheets (ink) | Official precinct return | O.C.G.A. § 21-2-437(b) | Electronic results tapes | Void |
| ▢ General return duly certified by all poll officers | Official precinct return, certified | O.C.G.A. § 21-2-437(b) | Electronic results tapes signed by a few under "The Local Authority Election Act" [Canadian Law] | Void w/ transnational crime indicators |
| ▢ Sealed ballot boxes | Preservation | O.C.G.A. §§ 21-2-436, 21-2-440 | Electronic equipment storage | Not a substitute for used official ballot records |
| ▢ Sealed envelopes (returns, oaths, tallies) | Chain-of-custody | O.C.G.A. § 21-2-440(b) | Digital folders; false documents | Invalid w/ criminality |
| ▢ Precinct accounting statement | Advises superintendent | O.C.G.A. § 21-2-420(a) | EMS summary | Insufficient |
| ▢ Posted precinct return | Immediate transparency | O.C.G.A. §§ 21-2-420, 21-2-440 | Poll exterior | Not equivalent; false documents posted |
| ▢ Certified county return | Final result | O.C.G.A. § 21-2-493(k) | False certificates | VOID w/ criminality; lacking lawful precinct records |

# FULTON COUNTY

## OFFICIAL BALLOT

### GENERAL AND SPECIAL ELECTION
### OF THE STATE OF GEORGIA
### NOVEMBER 3, 2020

*"I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(a)]*

832-04I



**For President of the United States** (Vote for One) (NP)
Vote for Joseph R. Biden (Dem)

**For United States Senate (Perdue)** (Vote for One) (NP)
Vote for Jon Ossoff (Dem)

**For United States Senate (Loeffler) - Special** (Vote for One) (NP)
Vote for Raphael Warnock (Dem)

**For Public Service Commissioner** (Vote for One) (NP)
Vote for Robert G. Bryant (Dem)

**For Public Service Commissioner** (Vote for One) (NP)
Vote for Daniel Blackman (Dem)

**For U.S. Representative in 117th Congress From the 5th Congressional District of Georgia** (Vote for One) (NP)
Vote for Nikema Williams (Dem)

**For State Senator From 38th District** (Vote for One) (NP)
Vote for Nan Orrock (I) (Dem)

**For State Representative in the General Assembly From 57th District** (Vote for One) (NP)
Vote for Stacey Evans (Dem)

**For District Attorney of the Atlanta Judicial Circuit** (Vote for One) (NP)
Vote for Fani Willis (Dem)

**For Clerk of Superior Court** (Vote for One) (NP)
Vote for Cathelene "Tina" Robinson (I) (Dem)

**For Sheriff** (Vote for One) (NP)
Vote for Patrick "Pat" Labat (Dem)

**For Tax Commissioner** (Vote for One) (NP)
Vote for Arthur E. Ferdinand (I) (Dem)

**For Surveyor** (Vote for One) (NP)
BLANK CONTEST

**For Solicitor-General of State Court of Fulton County** (Vote for One) (NP)
Vote for Keith E. Gammage (I) (Dem)

**For Fulton County Commissioner From District No. 4** (Vote for One) (NP)
Vote for Natalie Hall (I) (Dem)

**For Fulton County Soil and Water Conservation District Supervisor** (Vote for One) (NP)
BLANK CONTEST

**Constitutional Amendment #1** (NP)
BLANK CONTEST

**Constitutional Amendment #2** (NP)
BLANK CONTEST

**Statewide Referendum A** (NP)
BLANK CONTEST

**Atlanta Homestead Exemption - Special** (Vote for One) (NP)
BLANK CONTEST

1/1

*The Dominion ImageCast X BMD prints a summary ballot, printing voter selections in text and encoding them in a QR code. (Source: Mark Lindeman)*

17

Exhibit C 1 of 2

# TOTALLY MISSING REQUISITE ACCOUNTING RECORDS FOR ELECTIONS BY PROVISIONS OF GEORGIA LAW GOVERNING THE USE OF PAPER BALLOTS

- Official paper ballots issued by the superintendent and returned from the precinct, including: O.C.G.A. §§§§ 21-2-284 to 21-286, 21-2-433, 21-2-435
    - Official ballots cast, folded and marked with pen or pencil only
    - Official ballots declared void
    - Spoiled and canceled official ballots
    - Unused official ballots
    - Official ballot stubs and number strips corresponding to each official ballot issued and cast.
- Voter's certificates, manually signed and executed by each elector, then handed to poll officers who then signed/initial them. O.C.G.A. § 21-2-431(a)
- Voter's certificate binder, constituting the official list of electors voting. O.C.G.A. §§ 21-2-431, 21-2-432
- Electors list, checked off by poll officers as each elector votes O.C.G.A. §§ 21-2-431, 21-2-432
- Numbered list of voters, recording electors in order of voting O.C.G.A. § 21-2-432
- Poll-officer oaths, executed and preserved with election materials O.C.G.A. §§§ 21-2-94, 21-2-431, 21-2-435
- Tally papers, completed in ink during the public count O.C.G.A. §§ 21-2-436, 21-2-435
- General return sheets, prepared in ink and showing, at minimum: O.C.G.A. §§ 21-2-436, 21-2-493
    - Total ballots received from the superintendent
    - Total ballots issued
    - Total ballots cast
    - Total ballots void
    - Total ballots spoiled and canceled
    - Votes cast for each candidate and question

18

Exhibit C 2 of 2

- Signed certifications of returns by poll officers, including written reasons for any refusal to sign
  O.C.G.A. §§ 21-2-436, 21-2-493(b)
- Sealed ballot boxes, containing ballots and required materials after the count
  O.C.G.A. §§ 21-2-435, 21-2-436
- Sealed envelopes containing:
  O.C.G.A. §§ 21-2-435, 21-2-436
    - One general return sheet
    - Tally papers
    - Voter affidavits and poll-officer oaths
- Precinct accounting statement advising the superintendent of:
  O.C.G.A. §§ 21-2-435, 21-2-436
    - Total number of ballots cast
    - Total number of provisional ballots cast
- Posted precinct return, publicly displayed at the polling place
  O.C.G.A. § 21-2-436
- Delivery receipt / custody transfer evidencing immediate delivery of all required materials to the election superintendent
  O.C.G.A. §§ 21-2-435, 21-2-436
- County comparison and reconciliation records showing:
  O.C.G.A. §§ 21-2-493, 21-2-495
    - Comparison of ballots cast vs. voter certificates
    - Comparison of ballots cast vs. electors list
    - Resolution of discrepancies, if any
- Certified consolidated county return, signed and attested by the superintendent, based on the above precinct records
  O.C.G.A. § 21-2-493

ceasful termination of the negotiations with each of these tribes can be completed within the time fixed by existing law, the 1st of April next. It is deemed important that this commission should be continued until these negotiations can be brought to a termination. The length of time required for this purpose, in the opinion of this office, is one year from the 1st of April next.
Very respectfully,

W. A. JONES, *Commissioner.*

Hon. J. A. HEMENWAY,
*House of Representatives.*

Mr. PRITCHARD. I renew my motion, Mr. President.
Mr. PETTIGREW. In view of what has occurred, I think I am entitled to make a very brief explanation.
The PRESIDING OFFICER. Does the Senator from North Carolina withdraw his motion?
Mr. PRITCHARD. I will withhold the motion, Mr. President, but I hope the Senator from South Dakota will be brief.
Mr. PETTIGREW. Mr. President, I am still of the opinion that what I said in regard to the commissioner from Indiana is correct, except as to the statement of spending the winter in Washington. I was informed, however, on credible authority, that he was here, and that he had solicited indorsements for a continuance of this commission.
I was also informed, on good authority, that he was intoxicated in Montana, and I know of my own knowledge that this commission has performed no valuable service to the Government.
While I dislike very much to assail the character of any man, yet, when a public servant is employed to do a public duty and fails to do that duty, but, on the contrary, disgraces the position which he occupies, he has a right to expect to be assailed and to have his course criticised, especially if he undertakes to continue in the service and to draw money from the Treasury of the United States.
I do not believe that I have done this man any injustice; and until I am thoroughly convinced that I have I shall allow my statement to stand. When I am convinced that I have done an injustice I shall be very glad to make amends, to withdraw what I have said, and to apologize, for that matter. I would not do him any injustice intentionally or purposely; but I do believe that this commission, or two members of the commission at least, have pursued a course which has withdrawn from them the right to expect the respect of the Senate of the United States or anybody connected with it.
Mr. FAIRBANKS. I think it would be only fair for the Senator from South Dakota to give the names of his informants for the information of the Senate.

EXECUTIVE SESSION.

Mr. PRITCHARD. I now renew my motion that the Senate proceed to the consideration of executive business.
The motion was agreed to; and the Senate proceeded to the consideration of executive business. After one hour and forty-two minutes spent in executive session the doors were reopened, and (at 5 o'clock and 50 minutes p. m.) the Senate adjourned until to-morrow, Thursday, February 9, 1899, at 12 o'clock meridian.

NOMINATIONS.

*Executive nominations received by the Senate February 8, 1899.*

GENERAL APPRAISER.

William B. Howell, of New Jersey, to be general appraiser of merchandise, to succeed George H. Sharpe, resigned.

SURVEYOR.

Fenton W. Gibson, of Louisiana, to be surveyor for the port of New Orleans, in the State of Louisiana, to succeed S. D. Ellis, whose term of office has expired by limitation.

APPRAISER.

Frank N. Wicker, of Louisiana, to be appraiser of merchandise in the district of New Orleans, in the State of Louisiana, to succeed Charles F. Alba, removed.

ASSISTANT APPRAISER.

James H. Ducote, of Louisiana, to be assistant appraiser of merchandise in the district of New Orleans, in the State of Louisiana, to succeed E. P. Prudhomme, removed.

SPECIAL EXAMINER OF DRUGS, ETC.

George W. McDuff, of Louisiana, to be special examiner of drugs, medicines, and chemicals in the district of New Orleans, in the State of Louisiana, to succeed Alexander G. Maylie, removed.

ASSISTANT TREASURER.

Charles J. Bell, of Louisiana, to be assistant treasurer of the United States at New Orleans, La., to succeed D. M. Kilpatrick, whose term of office has expired by limitation.

MELTER AND REFINER.

H. Dudley Coleman, of Louisiana, to be melter and refiner of the mint of the United States at New Orleans, La., to succeed Lewis Guion, removed.

APPOINTMENT IN THE ARMY.

*To be brigadier-general.*

Col. William Sinclair, Seventh Artillery, vice Patterson, retired from active service.

APPOINTMENTS IN THE VOLUNTEER ARMY.

*Second Regiment Volunteer Engineers.*

Second Lieut. Frank S. Clark, to be first lieutenant, vice Klapp, appointed regimental quartermaster.
Sergt. George J. Harman, Company F, Second United States Volunteer Engineers, to be second lieutenant, vice Clark, promoted.

PROMOTIONS IN THE NAVY.

Asst. Surg. Reginald K. Smith, to be a passed assistant surgeon in the Navy, from the 3d day of April, 1898, to fill a vacancy existing in that grade.
Asst. Surg. Jacob C. Rosenbleuth, to be a passed assistant surgeon in the Navy, from the 14th day of October, 1898, to fill a vacancy existing in that grade.

CONFIRMATIONS.

*Executive nominations confirmed by the Senate February 8, 1899.*

ASSISTANT TREASURER.

George A. Marden, of Massachusetts, to be assistant treasurer of the United States at Boston, Mass.

COLLECTOR OF INTERNAL REVENUE.

Joseph E. Lee, of Florida, to be collector of internal revenue for the district of Florida.

MARSHAL.

Charles K. Darling, of Massachusetts, to be marshal of the United States for the district of Massachusetts.

## HOUSE OF REPRESENTATIVES.

### WEDNESDAY, *February 8, 1899.*

The House met at 12 o'clock m. Prayer by the Chaplain, Rev. HENRY N. COUDEN.
The Journal of yesterday's proceedings was read and approved.

L. O. MADDUX.

On motion of Mr. EVANS, by unanimous consent, the Committee on Ways and Means was discharged from further consideration of the bill (H. R. 11195) for the relief of L. O. Maddux, doing business as Maddux, Hobart & Co.; and the same was referred to the Committee on Claims.

REPRINT OF REPORT, ETC.

Mr. PAYNE. Mr. Speaker, I ask unanimous consent that the report of the Committee on Merchant Marine and Fisheries on the shipping bill, together with the views of the minority of the committee, be reprinted, the entire supply having been exhausted.
The SPEAKER. In the absence of objection, that order will be made.
There was no objection.

UNITED STATES COURTS IN TEXAS.

Mr. SLAYDEN. I ask unanimous consent for the present consideration of House bill 11495.
The bill was read, as follows:

A bill (H. R. 11495) entitled "An act to amend section 5 of an act entitled 'An act to change the time and place for the district and circuit courts of the northern district of Texas,'" approved June 11, 1898.

*Be it enacted, etc.,* That all actions or proceedings now pending in the courts of the northern or western district of Texas against parties residing in either of the counties from which process is made returnable to the courts to be held at Fort Worth, San Angelo, and Abilene, respectively, may, on the application of either party to such actions or proceedings, be transferred to the court at which said proceedings would be returnable as provided in this act; and in case of such transfer all papers and files therein, with copies of all journal entries, shall be transferred to the office of the deputy clerk of the said court, and the same shall proceed in all respects as if originally commenced in said court.

The amendments reported by the committee were read, as follows:

After the word "assembled," in line 2, insert these words: "That section 5 of the act entitled 'An act to change the time and places for the district and circuit courts of the northern district of Texas' be so amended as to read as follows:"
Amend the title so as to read: "A bill to amend section 5 of an act entitled 'An act to change the time and place for the district and circuit courts of the northern district of Texas,' approved June 11, 1898."

There being no objection, the House proceeded to the consideration of the bill.

The amendments reported by the committee were agreed to.
The bill as amended was ordered to be engrossed and read a third time; and it was accordingly read the third time, and passed.

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

On motion of Mr. SLAYDEN, a motion to reconsider the last vote was laid on the table.

### RIGHT OF WAY THROUGH INDIAN TERRITORY, ETC.

Mr. FISCHER. I ask unanimous consent for the present consideration of House bill 9946.

The bill was read, as follows:

A bill (H. R. 9946) to amend an act entitled "An act to authorize the Muskogee, Oklahoma and Western Railroad Company to construct and operate a line of railway through Oklahoma and the Indian Territory, and for other purposes."

*Be it enacted, etc.,* That said railroad company shall cause maps, upon a scale of 1 inch per mile, showing the route of its located main line and branches through said allotted lands, and through the lands of the several Indian nations in the Indian Territory through which its main line and two branches are authorized to pass, to be filed in the office of the Secretary of the Interior and also in the office of the principal chief of such Indian nation; and when any map or maps are so filed showing the route of said railroad or either of its two branches, as herein provided, it shall be lawful for said railroad company to begin the construction of its railroad or either of its two branches through the lands of any Indian nation in the said Indian Territory where its map or maps are so filed, and where it is authorized to construct its railroad or its two branches: *Provided,* That the chief engineer of said railroad company shall certify, under oath, to the Secretary of the Interior the date of completion of said railroad or either of its two branches through the lands of any Indian nation through which it is authorized to construct its railroad; and said railroad company shall begin the work of constructing its railway in any Indian nation through which it is authorized to pass within six months from the time of filing its plat through that Indian nation with the Secretary of the Interior and with the principal chief of said nation, or such location shall be null and void: *And provided further,* That the said railroad and its two branches shall be constructed within the time limited by the act to which this is amendatory.

The amendment reported by the committee was read, as follows:

Add as a new section the following:
"SEC. 2. That section 1 of the act of which this act is amendatory is hereby amended by striking out the following words: 'The eastern boundary of the Oklahoma Territory, south of the Canadian River,' and insert in lieu thereof the words 'On the Red River near the confluence of said Red River and the Wichita River.'"

Mr. SULZER. I wish to ask the gentleman from New York [Mr. FISCHER] whether this bill has been favorably reported from a committee of this House?

Mr. FISCHER. It has been unanimously reported, and I am instructed to call it up.

Mr. SULZER. Is this the merely formal kind of a bill usually passed with regard to eminent domain through Indian reservations?

Mr. FISCHER. It complies with all the usual requirements. The amendment has been attached to the bill by the committee, so as to make it conform to all other bills of similar character.

The SPEAKER. It is a public bill.

Mr. FISCHER. Yes, sir. It simply amends a bill heretofore passed and permits this railroad company to file its map in sections rather than to file a map of the entire system, a requirement which would make it impossible under present conditions to build the road. The Indian Bureau favors the bill.

Mr. COWHERD. The gentleman will allow me to state that the bill definitely locates one end of the road.

Mr. SULZER. Will the bill in any way take away, without consent of the Indians, any of the Indian lands in the reservation? I am opposed to any infringement on the property rights of the Indians. They have no one to speak for them here, and we should be just and fair.

Mr. FISCHER. On the contrary, it requires a deposit of $50 a mile before condemnation proceedings may be entered upon.

There being no objection, the House proceeded to the consideration of the bill.

The amendment reported by the committee was agreed to.

The bill as amended was ordered to be engrossed for a third reading; and it was accordingly read the third time, and passed.

On motion of Mr. FISCHER, a motion to reconsider the last vote was laid on the table.

### REPORT OF SUPERINTENDENT OF INDIAN SCHOOLS FOR 1898.

Mr. PERKINS. Mr. Speaker, I ask unanimous consent for the present consideration of the concurrent resolution 1 send to the desk.

The SPEAKER. The resolution will be read, subject to objection.

The Clerk read as follows:

*Resolved by the House of Representatives (the Senate concurring),* That there be printed 1,000 additional copies of the Report of the Superintendent of Indian schools for 1898, the same to be delivered to the Commissioner of Indian Affairs for the use of his office.

Mr. PERKINS. There is a letter from the Secretary of the Interior accompanying this resolution, which I will ask to have read, but will ask consent to have printed in the RECORD, as explanatory of the resolution.

The SPEAKER. Without objection, the letter will be printed, to accompany the resolution.

There was no objection.

The letter referred to is as follows:

DEPARTMENT OF THE INTERIOR,
*Washington, January 20, 1899.*

SIR: I have the honor, at the request of the Commissioner of Indian Affairs, to inclose herewith, for consideration by the Committee on Printing, the draft of a concurrent resolution providing for the printing of additional copies of the report of the superintendent of Indian schools for 1898. In making this request the Commissioner says that "The entire edition of this report already published has been exhausted, while there are already on hand a large number of unfilled applications for it, and they keep coming in each day. The edition is hardly large enough to provide the copies needed for Indian school employees and for libraries which are on the regular mailing list."

Under existing laws only 1,000 copies of this report can be printed for the use of this Department, except upon the special order of Congress. I am work has already been stereotyped, so that the expense of printing another edition will be small.

In view of these facts, I concur with the Commissioner of Indian Affairs in recommending that an additional edition of a thousand copies be printed for the use of his office, and will be glad to have the resolution introduced in the House in order that it may be properly referred.

Very respectfully,
C. N. BLISS,
*Secretary.*

Hon. GEORGE D. PERKINS,
*Chairman of the Committee on Printing, House of Representatives.*

Mr. PERKINS. This resolution, I will state, Mr. Speaker, involves an expenditure of only $182.

There being no objection, the resolution was considered, and agreed to.

On motion of Mr. PERKINS, a motion to reconsider the last vote was laid on the table.

### ELECTION OF REPRESENTATIVES.

Mr. CORLISS. Mr. Speaker, I am requested by the Committee on the Election of President and Vice-President and Members of Congress to call up from the Speaker's table the bill (S. 5088) to amend section 27 of the Revised Statutes, relative to the apportionment and election of Representatives, a similar bill having been reported favorably by the committee, and ask its present consideration.

The SPEAKER. The Clerk will report the bill called up by the gentleman from Michigan.

The bill was read, as follows:

*Be it enacted, etc.,* That section 27 of the Revised Statutes of the United States of 1878 be amended so as to read as follows:
"All votes for Representatives in Congress must be by written or printed ballot, or voting machine the use of which has been duly authorized by the State law; and all votes received or recorded contrary to this section shall be of no effect."

Mr. McRAE. Mr. Speaker, I would like, before consent is given to consider this matter, for the gentleman to explain in what particular this changes the law as it now exists?

Mr. GROSVENOR. The right to object should be reserved.

Mr. CORLISS. I yield to the gentleman from Minnesota [Mr. STEVENS] who introduced the bill to explain it.

The SPEAKER. The Chair understands the right of objection is reserved.

Mr. STEVENS of Minnesota. Mr. Speaker, this bill was introduced by myself and at the request of a number of gentlemen interested in the introduction of voting machines in the various States. The only change in the present law is as follows:

The statute as it now stands reads as follows:

All votes for Representatives in Congress must be by written or printed ballots, and all votes received or recorded contrary to this section shall be of no effect.

This proposed amendment provides this addition to the statute, after the word "ballots:"

Or by voting machine the use of which has been duly authorized by the State law.

Now, the reason is, that the statute as it now exists makes it doubtful whether or not voting machines can be used at Congressional elections. Quite a number of the States have a provision allowing the use of such machines, but they are not used to any large extent, because it has been considered doubtful whether or not they can be used, as I have said, in Congressional elections.

The question has been raised in one of the contests pending before this House, and was considered by the Committee on Elections No. 2 in the contested-election case of Ryan *vs.* Brewster, in which case the committee considered the use of such machines as doubtful.

Mr. KLEBERG. Is the use left optional to the State?
Mr. STEVENS of Minnesota. Yes; to States and municipalities.

Mr. GAINES. Did I understand the gentleman to say that this question had been determined by Elections Committee No. 2 in the case he refers to?

Mr. STEVENS of Minnesota. That is my recollection.
Mr. GAINES. The gentleman is mistaken as to the committee, at all events. That case was before Elections Committee No. 3, of which I happen to be a member.

Mr. STEVENS of Minnesota. I thought it was the other committee, No. 2.

Mr. GAINES. And besides that, we did not pass on the question to which the gentleman has referred at all, but settled the

case on another point. Since that case has been determined by the House the supreme court of the State of New York held the law allowing the use of these machines to be unconstitutional.

Mr. SULZER.  That is right.

Mr. GAINES.  Now, Mr. Speaker, I do not want to appear at all obnoxious or disagreeable in a matter of this kind. But I do not think that we have time to-day to give consideration to a question so important as this is. I say candidly and frankly to the gentleman that this question is one that will and should require considerable time for discussion in the House, in my judgment.

Mr. SHAFROTH.  As the matter is left optional with the States, I do not see what possible objection there can be to the request. What harm can possibly result from it? There is nothing contained in the bill that imposes the obligation of the use of these machines upon the States.

Mr. GAINES (continuing).  And further, Mr. Speaker, as far as I have investigated the matter, I do not believe that any State, outside of New York has adopted the use of these machines, and there it has been declared unconstitutional. The committee did not pass on the question of the propriety of the use of these machines under the statute, but found in favor of the contestee on other grounds.

Mr. SULZER.  And let me state, in addition, that the State of New York has not adopted a voting machine.

Mr. GAINES.  I regret exceedingly that I will have to object to the consideration of the bill.

Mr. CORLISS.  Then, Mr. Speaker, I demand the regular order.

The SPEAKER.  The regular order, unless the special order is called for, will be the further consideration of this bill, which has just been read by the Clerk.

Mr. CORLISS.  I want members to understand that the only change made by this bill is this: The present law provides that in the election of members of Congress the ballot must be either written or printed. The proposed amendment simply adds the words 'or machine lawfully adopted by a State.' In Massachusetts the use of voting machines has been authorized, and in the last election in the city of Boston machines were about to be used, having been authorized by the State and city, but in consequence of this Federal statute the project was discontinued. In several States in this country, particularly in New York, the machine has been successfully used. It has been used in one precinct in my city. This law recognizes no particular machine, but simply permits the use of a machine instead of a printed or written ballot, if the State authorizes its use.

Mr. GAINES.  Mr. Speaker, a parliamentary inquiry.

The SPEAKER.  The gentleman from Michigan has the floor, unless the parliamentary inquiry relates to his speaking.

Mr. CORLISS.  The present Federal statute interfered with the use of machines in the election in the city of Boston, and compelled that city to dispense with the use of a machine that had been adopted. I can see no harm and much good to result from the adoption of this measure. The committee having it under consideration were unanimous in recommending the adoption of this bill. It has passed the Senate. It will jeopardize no interests, and will preserve the rights of the State in controlling the use of the machine. It is optional with the State, and can not be used until the State adopts that method. This does not attempt to say what kind of a machine shall be used. There are five or six States, Massachusetts, New York, Minnesota, Michigan, and, I think, California, as well as other States, which have authorized the use of machines, and in municipal, county, and State elections they have been used, but this statute forbids their use in the election of members of Congress. I trust the bill will be passed.

Mr. BARLOW.  Mr. Speaker——

Mr. CORLISS.  I yield to the gentleman from California [Mr. BARLOW] five minutes.

Mr. BARLOW.  I hope there will be no objection to this bill. It simply authorizes the States to use voting machines if they wish to do so. In the State of California we have appointed a commission, and they have investigated the machines and reported to the legislature, and their report is now under consideration. They are anxious that this bill shall be passed, so that the question can not be raised as to the legality of a Congressional election where machines are used.

Mr. McRAE.  Why should we authorize the States? Can not the States control their own elections and say how the ballots shall be cast?

Mr. BARLOW.  That question was considered in the committee, and they thought the passage of this bill could do no harm.

Mr. GAINES.  Did the committee have the opinion of the supreme court of New York upon this question?

The SPEAKER.  To whom does the gentleman from California yield?

Mr. BARLOW.  One at a time; any of them. I yield to the gentleman from Tennessee.

Mr. GAINES.  Did the committee have the opinion of the supreme court of New York on this question before them?

Mr. BARLOW.  I do not believe that question was raised in the committee.

Mr. GAINES.  You ignored the opinion of the supreme court of New York entirely, did you?

Mr. BARLOW.  I believe it was raised by one of the members of the committee from New York.

Mr. GAINES.  You are not familiar with the opinion, are you?

Mr. BARLOW.  No, sir.

Mr. GAINES.  Well, that machine and the manner in which it worked was held by the court to be unconstitutional.

Mr. BARLOW.  I do not see how there can be any objection to letting the States adopt the system that they want, and in order to do this we must pass this bill.

Mr. DOCKERY.  If this bill becomes a law, it becomes somewhat important to control the machines, does it not?

Mr. BARLOW.  This bill does not touch that question at all.

Mr. CORLISS.  I yield to the gentleman from Colorado [Mr. SHAFROTH].

Mr. SHAFROTH.  I hope there will be no objection on this side of the House to the passage of this measure. As the law stands at the present time, I understand that votes cast for a Representative in Congress can not be counted unless they are by printed or written ballots. This bill simply provides that the States may be permitted to use machines, or any machine that they desire, for casting votes in Congressional elections.

Mr. GAINES.  Have not the States already the right to prepare the ballots?

Mr. SHAFROTH.  There is a statute of the United States that does not authorize this mode.

Mr. GAINES.  Have not the States the right and power to prepare their ballots?

Mr. SHAFROTH.  Certainly.

Mr. GAINES.  Then what right have Congress to say that a machine shall be used, if the State has the sovereign control over the question?

Mr. SHAFROTH.  What harm can it do to pass this bill?

Mr. GAINES.  The State already has the power.

Mr. SHAFROTH.  I am not sure, as a matter of fact, that it has the power.

Mr. GAINES.  Is it your judgment the State has not the power?

Mr. SHAFROTH.  I do not care whether my opinion is one way or the other. There is respectable authority that holds that a State has not that power as against the statute of the United States which provides that votes for Representatives must be only by printed or written ballots, and all doubt in the matter ought to be removed. We ought not to have members of Congress voted for by a system under which they may not be entitled to a seat here. This bill simply authorizes the States to adopt a machine of this kind. If the State wants to adopt that system of election, and wants to go to that expense, it ought to have that privilege.

Mr. GAINES.  You want to impose a burden on the State for these machines.

Mr. SHAFROTH.  I never heard of this bill until it was called up. I do not care anything about the machines. I do not know the name of any of the machines or who owns them. It seems to me that this law, which only authorizes the State to adopt a system of balloting it may desire, is an absolutely safe measure.

Mr. GAINES.  Have not the States already that power?

Mr. SHAFROTH.  Under the statutes of the United States the votes for Representatives can not be counted when recorded by a machine.

Mr. GAINES.  If you are not undertaking to compel the States to pay for these machines, why do you want to give them a right that they already have?

Mr. SHAFROTH.  It is a question as to whether they have the right.

Mr. GAINES.  The State—

The SPEAKER.  The gentleman from Tennessee is out of order.

Mr. LACEY.  I wish to ask the gentleman from Colorado a question.

The SPEAKER.  Does the gentleman from Colorado yield to the gentleman from Iowa?

Mr. SHAFROTH.  I do.

Mr. LACEY.  Have you any machines in Colorado?

Mr. SHAFROTH.  No.

Mr. CORLISS.  I yield three minutes to the gentleman from Ohio.

Mr. GROSVENOR.  Mr. Speaker, this is a very important matter, sprung suddenly upon the House. I had a promise from a member that an objection should have been made, or I certainly should have objected, because I know no more about the bill than I can learn here.

Mr. SULZER.  Objection was made.

The SPEAKER.  The gentleman from New York is not in order.

Mr. GROSVENOR. I am not complaining. Now, it is stated a State may provide by law for using these machines in certain localities. It would certainly occur, I think, on every hand that to force by law voting by a machine in the rural districts of the country would be absurd; yet, under a provision of the constitution of Ohio, the law can not be put into one precinct unless it is put into every voting precinct in the State. The provision of the constitution is that the laws shall be uniform in their operation throughout the State. That is the great fundamental law of Ohio and of many other States in the Union. So you are limited by the very terms of the constitutional provision to either exclude the balloting machine from the State or else give it to every voting place in the State.

Mr. SIMPSON. Will this law compel the State of Ohio to adopt that machine?

Mr. GROSVENOR. I do not so understand it.

Mr. SIMPSON. It leaves every State free to adopt this system if they want to.

Mr. GROSVENOR. I believe there is machine politics enough in this country now without any more of it.

Mr. CORLISS. Mr. Speaker, in answer to the gentleman from Ohio, I want to state that in the Fifty-fourth Congress a contest was made in consequence of the use of a machine in the State of New York, but fortunately the written and printed ballots cast gave the member a majority as well as the ballots that were cast by the machine, and that question did not affect his right to a seat in this House. Now, the gentleman from Tennessee says that the States ought to control the law of Congress. The law of our nation provides how members of this House shall be elected——

Mr. GAINES. Mr. Speaker, I can not hear what the gentleman says.

The SPEAKER. The gentleman from Tennessee makes the point of order that the House is not in order. Gentlemen will cease conversation.

Mr. CORLISS. Mr. Speaker, I desire to emphasize the difference between the present statute and this amendment. The present statute provides how members of this House shall be elected. That controls the State so far as an election for Congress is concerned. The States desire to elect their officers in a different way, and I and the committee, recognizing the right of a State to dictate in an election of their Representatives here, have recommended this law, in order that a State may elect members to this House by the same method as they elect their governor or any other officer of the State——

Mr. SMITH of Kentucky. I desire to ask the gentleman a question.

Mr. CORLISS (continuing). The State to adopt this at its option.

The SPEAKER. Does the gentleman from Michigan yield to the gentleman from Kentucky?

Mr. CORLISS. I do.

Mr. SMITH of Kentucky. If the section of the Revised Statutes is repealed, will not the States have authority to regulate their own elections?

Mr. CORLISS. I for one am not prepared to repeal national legislation in reference to the election of Congressmen; and that question is not here. The question is whether we will permit States to elect members of Congress as they elect their officers in the States.

Mr. GAINES. Will the gentleman allow me to ask him a question?

Mr. CORLISS. No; I can not yield to the gentleman from Tennessee. He has occupied——

The SPEAKER. The gentleman from Michigan declines to yield.

Mr. CORLISS. He has occupied more time in the consideration of this measure than I have, or any other member of this House, and I think the House has got tired of the gentleman from Tennessee.

Mr. GAINES. I do not doubt the gentleman is tired of hearing the truth.

Mr. CORLISS. Now, Mr. Speaker, I move the previous question.

The SPEAKER. The gentleman from Michigan demands the previous question.

The question was taken on ordering the previous question.

The SPEAKER. The Chair is in doubt.

The House divided; and there were—ayes 117, noes 33.

So the previous question was ordered.

The SPEAKER. The question is on ordering the bill to a third reading.

The question was taken; and the Speaker announced that the ayes seemed to have it.

Mr. SULZER. Division.

The House divided; and there were—ayes 97, noes 44.

So the bill was ordered to a third reading; and it was accordingly read the third time.

The SPEAKER. The question is on the passage of the bill.

The question was taken; and the Speaker announced that the ayes seemed to have it.

Mr. GAINES. The yeas and nays, Mr. Speaker.

The question was taken on ordering the yeas and nays.

The SPEAKER. Twenty-four gentlemen have arisen—not a sufficient number; the yeas and nays are refused, and the bill is passed.

On motion of Mr. CORLISS, a motion to reconsider the vote by which the bill was passed was laid on the table.

Mr. CORLISS. Mr. Speaker, I move that the House bill lie on the table.

The SPEAKER. Without objection, the House bill will lie on the table.

## WAR REVENUE ACT.

Mr. HOPKINS. Mr. Speaker, I ask for the present consideration of H. Res. 353, which I send to the Clerk's desk.

The resolution was read, as follows:

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That an act passed June 13, 1898, entitled "An act to provide ways and means to meet war expenditures, and for other purposes," be amended by adding to the end of Schedule A, section 25, the following: "Whenever any bond or note shall be secured by a mortgage, but one stamp shall be required to be placed upon such papers: *Provided,* That the stamp duty placed thereon shall be the highest rate required for said instruments, or either of them."

The SPEAKER. This requires unanimous consent.

Mr. HOPKINS. Then I ask unanimous consent for its consideration.

Mr. SWANSON. I object to that and call for the regular order.

Mr. HOPKINS. This will take but a moment.

Mr. SWANSON. I must object, and I call for the special order.

Mr. HOPKINS. Very well, Mr. Speaker, I will withdraw the resolution.

Mr. MERCER. Mr. Speaker, I call up the special order.

The SPEAKER. The Chair understands that the revenue bills were not excepted out of the regular order; only appropriation bills.

Mr. MERCER. Mr. Speaker, by the action of the House on yesterday in Committee of the Whole certain bills with amendments were reported to the House with a favorable recommendation. I am informed by the clerks at the desk that these bills have been arranged with reference to a certain classification, and in order to save the clerks any inconvenience, I desire to take the bills up in the order in which they appear in the RECORD, page 1588, and I ask that House bill 10399, with the amendment recommended by the Committee of the Whole, be now placed upon its passage, and I ask for the previous question upon the bill and amendment.

Mr. DOCKERY. Mr. Speaker, I desire to ask the gentleman a question.

Mr. RICHARDSON. I reserve the point of order.

Mr. DOCKERY. I desire to ask the gentleman whether it is proposed to first consider the bills reported from the Committee of the Whole?

Mr. MERCER. Yes.

Mr. DOCKERY. It is not the gentleman's purpose to offer a motion that the House resolve itself into Committee of the Whole to consider the other bills for public buildings on the Calendar?

Mr. MERCER. It is; just as soon as we finish the consideration and the passage of these bills reported to the House by the Committee of the Whole yesterday.

Mr. DOCKERY. All of them?

Mr. MERCER. Yes.

Mr. RICHARDSON. That will take the remainder of the day.

Mr. MERCER. It will not take the remainder of the day unless the gentleman from Missouri and the gentleman from Tennessee take up too much time talking.

The SPEAKER. The gentleman from Nebraska moves for the previous question on the bill and amendments.

Mr. RICHARDSON. A point of order, Mr. Speaker.

The SPEAKER. The gentleman will state it.

Mr. RICHARDSON. The point of order I make is that under the special order reported these two days should be devoted to the consideration of these bills, and I take it for granted that a regular motion would be to go into Committee of the Whole to consider the bills.

The SPEAKER. The Chair will hear any argument upon that.

Mr. RICHARDSON. I have no argument to make. I am addressing myself to the general consideration for the special order.

Mr. SWANSON. Mr. Speaker, I would like to ask the gentleman from Nebraska, the chairman of the committee, a question. The special order provides that we shall consider such bills as are indicated by the Committee on Public Buildings and Grounds, and I would like to ask the gentleman whether that committee has indicated to him that it desires the passage of these bills at this time. I understand it is controlled by the wishes of the majority of the Committee on Public Buildings and Grounds, and consequently the procedure had under the special order should be according to the wishes of a majority of that committee.



**From:** **Michele Nichols** Nicholsm@audits.ga.gov 🔗
**Subject:** Re: Open Records Request
**Date:** January 30, 2026 at 11:55 AM
**To:** freedomwinsusa freedomwinsusa@protonmail.com

Good morning.

I received information back after doing a little digging on your question. Our office does not have any public records outlining federal preemptions.

Thanks,
Michele Nichols

  **Michele Nichols, CPA, CGMA**

**Director**

**Phone: (404) 463-2672**



---

**From:** freedomwinsusa <freedomwinsusa@protonmail.com>
**Sent:** Thursday, January 29, 2026 3:47 PM
**To:** Michele Nichols <Nicholsm@audits.ga.gov>
**Subject:** Re: Open Records Request

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Thank you, Ms. Nichols. You have important work to do as you have taken an important oath of loyalty to the U.S. Constitution. We are counting on you! Very respectfully, Sarah Thompson

Sent with Proton Mail secure email.

On Thursday, January 29th, 2026 at 3:44 PM, Michele Nichols <Nicholsm@audits.ga.gov> wrote:

Sarah,

Thank you for the expanded question. We are going to reach out to another office to get some clarification on the different components of your request. This may take a few days, but I will get back to you soon.

Thanks,
Michele Nichols

Michele Nichols



**Michele Nichols, CPA, CGMA**
**Director**
**Phone: (404) 463-2672**

---

**From:** freedomwinsusa <freedomwinsusa@protonmail.com>
**Sent:** Thursday, January 29, 2026 1:31 PM
**To:** Michele Nichols <Nicholsm@audits.ga.gov>
**Subject:** Re: Open Records Request

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Ms. Nichols,

Your job is auditing compliance with higher Laws (Ga / U.S.) and Constitutions (Ga / U.S.).

As part of your auditing process, I ask that you, as auditor, provide public documents outlining the federal (congressional) preemptions that your office has in document form and uses to check Georgia's compliance with long-standing federal election laws under U.S. Const. Article 1, specifically U.S. Const. Art 1, Sec 4, cl 1. Congress has made prescriptions.

Flowcharts and written public records of any type are fine. These preemptions embedded in existing documents are fine.

Thank you,

Sarah Thompson

Sent with Proton Mail secure email.

On Thursday, January 29th, 2026 at 9:23 AM, Michele Nichols <Nicholsm@audits.ga.gov> wrote:

> Good morning, Sarah.
>
> I would like to get clarification on the question you are asking. I am not sure if it is regarding requirements or compliance. Can you restate the question?
>
> Thank you,
> Michele Nichols

**From:** tlock@armyofbees.com <tlock@armyofbees.com>
**Sent:** Tuesday, January 27, 2026 3:26 PM
**To:** Michele Nichols <Nicholsm@audits.ga.gov>
**Subject:** [DOAA Website] Media / Records Request

CAUTION: This email originated from outside of the organization. Do not
click links or open attachments unless you recognize the sender and know the
content is safe.

Submitted information:

**What do you need help with?**

Media / open records request

**First name**

Sarah

**Last name**

Thompson

**Organization**

self

**Phone number**

(856) 866-6881

**Email address**

freedomwinsusa@protonmail.com

**Formal request**

In March 2022, your office produced a report entitled Special
Examination Report No. 21-11 Performance Audit Division (Greg S.
Griffin, State Auditor; Leslie McGuire, Director)
Secretary of State Grant Administration
Requested Information on Help America
Vote Act Funds and Compliance
It states (intro):
What we found:
The Office of the Secretary of State (SOS) spent Help America
Vote Act (HAVA) funds on goods and services that were
allowed, with few exceptions in the sample we reviewed.

You stated (pg 7): Compliance

SOS is responsible for ensuring HAVA (Title I, II, V) funds are used in compliance with applicable federal and state requirements.

You also stated (pg 7): If SOS does not comply with the HAVA grant requirements, it may result in a questioned cost by an auditor.

The Department of Audits and Accounts shall audit all state institutions. Ga Const. Art III requires that all appropriations and contracts be for purposed either mandated or authorized by the constitution. As these receipts and expenditures all involve federal dollars and federal elections, I ask that you, as auditor, provide public documents outlining the federal preemptions that your office uses to check compliance with long-standing federal election laws under U.S. Const. Article 1 (Sections 2 and 4, both clause 1), and not merely 2002 congressional enactments for spending under 42 U.S.C. Public Health and Welfare Law.

If you have any questions, you may contact me personally.

Form used:
https://www.audits2.ga.gov/contact-us/



**Michele Nichols, CPA, CGMA**
**Director**
**Phone: (404) 463-2672**

NOTICE: This e-mail (including attachments) may contain information that is confidential and legally privileged. If you are not the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this in error, please notify us immediately and delete the message.

NOTICE: This e-mail (including attachments) may contain information that is confidential and legally privileged. If you are not the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this in error, please notify us immediately and delete the message.

NOTICE: This e-mail (including attachments) may contain information that is confidential and legally privileged. If you are not the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this in error, please notify us immediately and delete the message.

# IN THE COURTS OF THE UNITED STATES

AFFIDAVIT AND STATE JURAT OF EDWARD T. METZ
IN SUPPORT OF MOTIONS AND MEMORANDA OF LAW

I, Edward T. Metz, being of lawful age and competent to testify, hereby declare and state under oath as follows:

1. I am a Movant and interested party in the following matters in The United States District Court Northern District of Georgia, Atlanta Division, Case No. 1:25-cv-07084-TWT, *U.S.A. v. Che Alexander* and No. 1:26-MC-0177, *In re Search Warrant,* (N.D. Ga. Jan. 28, 2026).

2. I have personal knowledge of the facts stated herein and of the facts and evidence contained in the documents attached to, referenced in, or incorporated into motions and memoranda of law filed by me and my co-movant, Sarah E. Thompson, in these matters.

3. Pursuant to Federal Rules of Civil Procedure Rule 7(C)(2) and Local Rule 7.1(A)(1) of the United States District Court for the Northern District of Georgia, I submit this affidavit in support of factual allegations relied upon in motions and memoranda of law.

4. I hereby attest, verify, and affirm that:

   a. The facts stated in my motions, memoranda of law, and supporting exhibits in the above-captioned matters are true and correct;

   b. The documents attached thereto are true and correct copies of the originals or are accurate representations of what they purport to be; and

   c. All factual statements made therein are true, correct, and complete to the best of my knowledge, information, and belief.

5. I make this affidavit based upon my personal knowledge, review of records, and firsthand experience, and I understand that it is submitted for use in federal judicial proceedings.

6. I declare under penalty of perjury under the laws of the United States and the State of Georgia that the foregoing is true and correct.

---

STATE JURAT

State of Georgia County of ___Cobb___

Subscribed and sworn to (or affirmed) before me, by Edward T. Metz, this 2nd day of ___Feb___, 2026.

Affiant, being personally known to me or having provided satisfactory evidence of identity, did execute the foregoing affidavit and swore (or affirmed) before me that the facts and documents of public record attached thereto, and all statements made therein, are true, correct, and complete to the best of her knowledge, information, and belief, pursuant to O.C.G.A. §§ 9-10-113 and 9-11-56(e), under penalty of perjury.

FURTHER AFFIANT SAYETH NAUGHT.

---

Notary Public

Printed Name: ___Stephen M George Jr___
My Commission Expires NOTARY PUBLIC
Cobb County, GEORGIA
My Commission Expires 03/31/2027

EDWARD T·METZ

Printed

Date: ___2-2-2026___

Signed

# IN THE COURTS OF THE UNITED STATES

---

## AFFIDAVIT AND STATE CIVIL JURAT OF SARAH E. THOMPSON
## IN SUPPORT OF MOTIONS AND MEMORANDA OF LAW

I, Sarah E. Thompson, being of lawful age and competent to testify, hereby declare and state under oath as follows:

1. I am a Movant and interested party in the following matters in The United States District Court Northern District of Georgia, Atlanta Division, Case No. 1:25-cv-07084-TWT, *U.S.A. v. Che Alexander* and No. 1:26-MC-0177, *In re Search Warrant*, (N.D. Ga. Jan. 28, 2026).

2. I have personal knowledge of the facts stated herein and of the facts and evidence contained in the documents attached to, referenced in, or incorporated into motions and memoranda of law filed by me and my co-movant, Edward T. Metz, in these matters.

3. Pursuant to Federal Rules of Civil Procedure Rule 7(C)(2) and Local Rule 7.1(A)(1) of the United States District Court for the Northern District of Georgia, I submit this affidavit in support of factual allegations relied upon in motions and memoranda of law.

4. I hereby attest, verify, and affirm that:

   a. The facts stated in my motions, memoranda of law, and supporting exhibits in the above-captioned matters are true and correct;

   b. The documents attached thereto are true and correct copies of the originals or are accurate representations of what they purport to be; and

   c. All factual statements made therein are true, correct, and complete to the best of my knowledge, information, and belief.

5. I make this affidavit based upon my personal knowledge, review of records, and firsthand experience, and I understand that it is submitted for use in federal judicial proceedings.

6. I declare under penalty of perjury under the laws of the United States and the State of Georgia that the foregoing is true and correct.

**STATE JURAT**

State of Georgia County of _Bulloch_

Subscribed and sworn to (or affirmed) before me, by Sarah E. Thompson, this _2_ day of _Feb_, 2026.

Affiant, being personally known to me or having provided satisfactory evidence of identity, did execute the foregoing affidavit and swore (or affirmed) before me that the facts and documents of public record attached thereto, and all statements made therein, are true, correct, and complete to the best of her knowledge, information, and belief, pursuant to O.C.G.A. §§ 9-10-113 and 9-11-56(e), under penalty of perjury.

**FURTHER AFFIANT SAYETH NAUGHT.**

Notary Public _[signature]_

Printed Name: _Quinten Texidor_

My Commission Expires: _05/23/2028_

_[Notary seal: QUINTEN TEXIDOR — NOTARY PUBLIC — BULLOCH COUNTY, GEORGIA — COMMISSION EXPIRES MAY 23, 2028]_

SARAH E. THOMPSON

Printed

Date: _Feb 2, 2026_

_[signature: Sarah E. Thompson]_

Signed